IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| NATIONAL HORSEMEN'S BENEVOLENT and PROTECTIVE ASSOCIATION et al., *Plaintiff* | § § § § § | |
| and | § § | |
| THE STATE OF TEXAS and THE TEXAS RACING COMMISSION, *Proposed Intervenor-Plaintiffs,* | § § § § § | CIVIL ACTION NO.  5:21-cv-00071-H |
| v. | § § | |
| JERRY BLACK et al., *Defendants.* | § § § | |

## THE STATE OF TEXAS AND THE TEXAS RACING COMMISSION'S COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF

Intervenor-Plaintiffs the State of Texas and the Texas Racing Commission (collectively "Texas"), by way of this Complaint in Intervention for Declaratory and Injunctive Relief states and alleges as follows:

## INTRODUCTION

1.      The State of Texas and the Texas Racing Commission file this complaint in intervention in the above captioned case. Texas has a justiciable interest in the outcome of the case that is not adequately represented by the current parties in this case. Fed. R. Civ. P. 24(a)(2).[1]

2.      Texas seeks to intervene in this action to challenge the recently enacted federal Horseracing Integrity and Safety Act ("HISA"), which, among other things, unconstitutionally

---

[1] Texas understands that this case is set for a hearing on cross-motions for summary judgment and dismissal on February 16, 2022 and does not wish to delay resolution of the case. Should this Court grant Texas's Motion to Intervene, argument at the summary judgment hearing will be confined to the issues before the Court in the parties' motions and will not include additional grounds for relief sought in this Complaint. Texas reserves the right to continue with its additional claims in this case should Plaintiffs' claims fail.

delegates to a private entity the legislative authority to regulate Plaintiffs and commandeers the legislative and executive branches of state government.

3.      "Federal lawmakers cannot delegate regulatory authority to a private entity." *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013) (vacated and remanded on other grounds by *Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225 (2015)). Under the private nondelegation doctrine, granting regulatory authority to a private entity violates Article I, Section 1 of the United States Constitution, which states that, "All legislative Powers herein granted shall be vested in a Congress of the United States . . . ."

4.      "The Constitution confers on Congress not plenary legislative power but only certain enumerated powers," as "the Tenth Amendment confirms." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018). "[T]he anticommandeering principle prevents Congress from shifting the costs of regulation to the States." *Murphy*, 138 S. Ct. at 1477.

5.      This Court should declare HISA unconstitutional and preliminarily and permanently enjoin Defendants from implementing and enforcing the law.

6.      This Complaint in Intervention incorporates the First Amended Complaint of Plaintiffs herein in its entirety to the extent the allegations there are relevant to Plaintiff Texas and adopts such allegations as its own.

## PARTIES

7.      Plaintiff-Intervenor, the State of Texas, is a sovereign state and has the authority and responsibility to protect its sovereignty, the wellbeing of its public fisc, and the health, safety, and welfare of its citizens.

8.      Plaintiff-Intervenor, the Texas Racing Commission ("TRC"), is a state agency of the state of Texas and is responsible for regulating horse racing integrity and safety in the state of Texas. Its county of residence is Travis County, Texas.

2

9.     Plaintiff National Horsemen's Benevolent and Protective Association ("National HBPA") is a not-for-profit corporation with its principal place of business in Lexington, Kentucky. Since 1940 it has represented the interests of Thoroughbred racehorse owners and trainers in the United States and Canada. The National HBPA has close to 30,000 members in 30 affiliate organizations throughout the United States and Canada. It is the largest representation group of Thoroughbred owners and trainers in the United States. Membership is open without restriction to all owners and trainers licensed by state racing authorities.

10.     Plaintiff National HBPA's purpose, as set forth in its by-laws, includes co-operating with governmental authorities charged with regulating horse racing; making recommendations in the best interest of racing and its participants, including medication and safety rules; and representing owners and trainers before state and federal governmental entities, national industry organizations, and trade associations. Its principal goals are providing a representative voice for all Thoroughbred horsemen on matters integral to the advancement of Thoroughbred racing in the United States and Canada and encouraging the highest standards of horsemanship to continuously improve the care, health, and safety of the horse.

11.     Plaintiff Arizona Horsemen's Benevolent and Protective Association ("Arizona HBPA") is a not-for-profit corporation with its principal place of business in Phoenix, Arizona. It is an affiliate of the National HBPA. The Arizona HBPA Thoroughbred owner and trainer members are licensed by the Arizona Racing Commission, the state agency with regulatory authority over all aspects of racing in Arizona, including promulgating and enforcing equine medication and safety rules.

12.     Plaintiff Arizona HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Arizona Racing Commission, including those governing equine medication and safety.

3

13.     Plaintiff Arkansas Horsemen's Benevolent and Protective Association ("Arkansas HBPA") is a not-for-profit corporation with its principal place of business in Hot Springs, Arkansas. It is an affiliate of the National HBPA. The Arkansas HBPA Thoroughbred owner and trainer members are licensed by the Arkansas Racing Commission, the state agency with regulatory authority over all aspects of racing in Arkansas, including promulgating and enforcing equine medication and safety rules.

14.     Plaintiff Arkansas HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Arkansas Racing Commission, including those governing equine medication and safety.

15.     Plaintiff Indiana Horsemen's Benevolent and Protective Association ("Indiana HBPA") is a not-for-profit corporation with its principal place of business in Shelbyville, Indiana. It is an affiliate of the National HBPA. The Indiana HBPA Thoroughbred owner and trainer members are licensed by the Indiana Racing Commission, the state agency with regulatory authority over all aspects of racing in Indiana, including promulgating and enforcing equine medication and safety rules.

16.     Plaintiff Indiana HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Indiana Racing Commission, including those governing equine medication and safety.

17.     Plaintiff Illinois Horsemen's Benevolent and Protective Association ("Illinois HBPA") is a not-for-profit corporation with its principal place of business in Caseyville, Illinois. It is an affiliate of the National HBPA. The Illinois HBPA Thoroughbred owner and trainer members are licensed by the Illinois Racing Commission, the state agency with regulatory authority over all aspects of racing in Illinois, including promulgating and enforcing equine medication and safety rules.

4

18.     Plaintiff Illinois HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Illinois Racing Commission, including those governing equine medication and safety.

19.     Plaintiff Kentucky Horsemen's Benevolent and Protective Association ("Kentucky HBPA") is a not-for-profit corporation with its principal place of business in Louisville, Kentucky. It is an affiliate of the National HBPA. The Kentucky HBPA Thoroughbred owner and trainer members are licensed by the Kentucky Horse Racing Commission, the state agency with regulatory authority over all aspects of racing in Kentucky, including promulgating and enforcing equine medication and safety rules.

20.     Plaintiff Kentucky HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Kentucky Horse Racing Commission, including those governing equine medication and safety.

21.     Plaintiff Louisiana Horsemen's Benevolent and Protective Association ("Louisiana HBPA") is a not-for-profit corporation with its principal place of business in New Orleans, Louisiana. It is an affiliate of the National HBPA. The Louisiana HBPA Thoroughbred owner and trainer members are licensed by the Louisiana Racing Commission, the state agency with regulatory authority over all aspects of racing in Louisiana, including promulgating and enforcing equine medication and safety rules.

22.     Plaintiff Louisiana HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Louisiana Racing Commission, including those governing equine medication and safety.

23.     Plaintiff Mountaineer Park Horsemen's Benevolent and Protective Association ("Mountaineer Park HBPA") is a not-for-profit corporation with its principal place of business in Newell, West Virginia. It is an affiliate of the National HBPA. The Mountaineer Park HBPA Thoroughbred owner and trainer members are licensed by the West Virginia Racing Commission, the state agency with regulatory authority over all aspects of racing in West Virginia, including promulgating and enforcing equine medication and safety rules.

24.     Plaintiff Mountaineer Park HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the West Virginia Racing Commission, including those governing equine medication and safety.

25.     Plaintiff Nebraska Horsemen's Benevolent and Protective Association ("Nebraska HBPA") is a not-for-profit corporation with its principal place of business in Lincoln, Nebraska. It is an affiliate of the National HBPA. The Nebraska HBPA Thoroughbred owner and trainer members are licensed by the Nebraska Racing Commission, the state agency with regulatory authority over all aspects of racing in Nebraska, including promulgating and enforcing equine medication and safety rules.

26.     Plaintiff Nebraska HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Nebraska Racing Commission, including those governing equine medication and safety.

27.     Plaintiff Oklahoma Horsemen's Benevolent and Protective Association ("Oklahoma HBPA") also does business as the Thoroughbred Racing Association of Oklahoma and is a not-for-profit corporation with its principal place of business in Oklahoma City, Oklahoma. It is an affiliate of the National HBPA. The Oklahoma HBPA Thoroughbred owner and trainer members are licensed

by the Oklahoma Racing Commission, the state agency with regulatory authority over all aspects of racing in Oklahoma, including promulgating and enforcing equine medication and safety rules.

28. Plaintiff Oklahoma HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Oklahoma Racing Commission, including those governing equine medication and safety.

29. Plaintiff Oregon Horsemen's Benevolent and Protective Association ("Oregon HBPA") is a not-for-profit corporation with its principal place of business in Portland, Oregon. It is an affiliate of the National HBPA. The Oregon HBPA Thoroughbred owner and trainer members are licensed by the Oregon Racing Commission, the state agency with regulatory authority over all aspects of racing in Oregon, including promulgating and enforcing equine medication and safety rules.

30. Plaintiff Oregon HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Oregon Racing Commission, including those governing equine medication and safety.

31. Plaintiff Pennsylvania Horsemen's Benevolent and Protective Association ("Pennsylvania HBPA") is a not-for-profit corporation with its principal place of business in Grantville, Pennsylvania. It is an affiliate of the National HBPA. The Pennsylvania HBPA Thoroughbred owner and trainer members are licensed by the Pennsylvania Racing Commission, the state agency with regulatory authority over all aspects of racing in Pennsylvania, including promulgating and enforcing equine medication and safety rules.

32. Plaintiff Pennsylvania HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Pennsylvania Racing Commission, including those

governing equine medication and safety.

33.     Plaintiff Tampa Bay Horsemen's Benevolent and Protective Association ("Tampa Bay HBPA") is a not-for-profit corporation with its principal place of business in Oldsmar, Florida. It is an affiliate of the National HBPA. The Tampa Bay HBPA Thoroughbred owner and trainer members are licensed by the Florida Department of Business and Professional Regulation, the state agency with regulatory authority over all aspects of racing in Florida, including promulgating and enforcing equine medication and safety rules.

34.     Plaintiff Tampa Bay HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Florida Department of Business and Professional Regulation, including those governing equine medication and safety.

35.     Plaintiff Washington Horsemen's Benevolent and Protective Association ("Washington HBPA") is a not-for-profit corporation with its principal place of business in Auburn, Washington. It is an affiliate of the National HBPA. The Washington HBPA Thoroughbred owner and trainer members are licensed by the Washington Racing Commission, the state agency with regulatory authority over all aspects of racing in Washington, including promulgating and enforcing equine medication and safety rules.

36.     Plaintiff Washington HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Washington Racing Commission, including those governing equine medication and safety.

37.     Defendant Jerry Black is a member of the Nominating Committee for the Horseracing Integrity and Safety Authority, Inc. and a Visiting Professor at the Texas Tech University School of Veterinary Medicine. On information and belief, he resides in Lubbock, Texas, in the Northern

District of Texas.

38.     Defendant Katrina Adams is a member of the Nominating Committee for the Horseracing Integrity and Safety Authority, Inc. and a past President of the United States Tennis Association. On information and belief, she resides in White Plains, New York.

39.     Defendant Leonard Coleman, Jr. is a co-chair of the Nominating Committee for the Horseracing Integrity and Safety Authority, Inc. and a former President of the National League of Major League Baseball. On information and belief, he resides in Atlantic Highlands, New Jersey.

40.     Defendant Nancy Cox is a co-chair of the Nominating Committee for the Horseracing Integrity and Safety Authority, Inc. and Vice President for Land Grant Engagement and the Dean of the College of Agriculture, Food, and Environment at the University of Kentucky. On information and belief, she resides in Lexington, Kentucky.

41.     Defendant Joseph Dunford is a member of the Nominating Committee for the Horseracing Integrity and Safety Authority, Inc. and a former Chairman of the Joint Chiefs of Staff. On information and belief, he resides in Marshfield, Massachusetts.

42.     Defendant Frank Keating is a member of the Nominating Committee for the Horseracing Integrity and Safety Authority, Inc. and a former Governor of the State of Oklahoma. On information and belief, he resides in McLean, Virginia.

43.     Defendant Kenneth Schanzer is a member of the Nominating Committee for the Horseracing Integrity and Safety Authority, Inc. and a former President of NBC Sports. On information and belief, he resides in Avon, Colorado.

44.     Defendant Horseracing Integrity and Safety Authority, Inc. (the "Authority") is a nonprofit Delaware corporation. HISA gives it the authority to draft rules to develop and implement a horseracing anti-doping and medication control program and a racetrack safety program.

45.     Defendant Federal Trade Commission is the federal agency given limited authority by

HISA to approve or disapprove rules promulgated by the Authority. Its headquarters are in Washington, D.C.

46. Defendant Rebecca Kelly Slaughter is sued in her official capacity as Acting Chair of the Federal Trade Commission.

47. Defendant Rohit Chopra is sued in his official capacity as Commissioner of the Federal Trade Commission.

48. Defendant Noah Joshua Phillips is sued in his official capacity as Commissioner of the Federal Trade Commission.

49. Defendant Christine S. Wilson is sued in her official capacity as Commissioner of the Federal Trade Commission.

## JURISDICTION AND VENUE

50. This case presents claims arising under the United States Constitution. Therefore, the Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and may grant injunctive relief pursuant to Fed. R. Civ. P. 65. The Court also has jurisdiction pursuant to 28 U.S.C. § 1337 because HISA purports to regulate commerce. The Court has jurisdiction pursuant to 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 to grant a declaratory judgment because an actual controversy exists among the parties. Jurisdiction is proper over Defendants Slaughter, Chopra, Phillips, and Wilson under *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682 (1949).

51. Venue is appropriate under 28 U.S.C. § 1391(b)(3) because Defendant Black resides in the Northern District of Texas and is subject to this Court's personal jurisdiction. Venue is also appropriate under 28 U.S.C. § 1391(e) because Defendant Federal Trade Commission is an agency of the United States, and Defendants Slaughter, Chopra, Phillips, and Wilson are officers of the Federal Trade Commission.

## FACTUAL ALLEGATIONS

**Plaintiffs**

52.     Plaintiffs Arizona HBPA, Arkansas HBPA, Indiana HBPA, Illinois HBPA, Kentucky HBPA, Louisiana HBPA, Mountaineer Park HBPA, Nebraska HBPA, Oklahoma HBPA, Oregon HBPA, Pennsylvania HBPA, Tampa Bay HBPA, and Washington HBPA are all affiliates of Plaintiff National HBPA (collectively, "Plaintiffs" or "Horsemen"). They have as their members thousands of men and women who own, train, and race Thoroughbred horses in the United States.

53.     HBPAs grew out of the time-honored tradition of passing the hat to provide for burial services, medical attention, feeding, and housing for the many needy families in the industry.

54.     For over 125 years, Thoroughbred racing has been regulated by the States. State laws establish a statutory framework, which is then administered and enforced by State Racing Commissions, whose members are appointed by the governor of each state. All owners and trainers must be licensed by their State Racing Commissions and are subject to rules and regulations promulgated by those Commissions, including rules and regulations regarding equine medication and racetrack safety.

55.     Plaintiffs work to advance and protect the interests of their members by participating in State Racing Commission rulemaking and enforcement procedures. They also negotiate on behalf of their members, horsemen's contracts with racetrack management covering terms and conditions of racing consistent with state law, rules, and regulations.

56.     Plaintiff National HBPA advises and assists its state affiliates in carrying out their responsibilities. On the national level, it participates in model rulemaking by the Association of Racing Commissioners International, a trade association of state regulators, and assists with the work of the Racing Medication & Testing Consortium, an organization of scientists, veterinarians, and racing industry stakeholders, in establishing equine medication and testing standards. In its advocacy, Plaintiff

National HBPA makes recommendations in the best interest of racing and its participants, including proposed medication and safety rules, to foster safe and honest horse racing and to provide for the well-being of racehorses and those who care for them.

57.     Plaintiff, the State of Texas, is a sovereign state and has the authority and responsibility to protect its sovereignty, the wellbeing of its public fisc, and the health, safety, and welfare of its citizens.

58.     In 1987, voters passed a referendum that legalized pari-mutuel betting and established the Texas Racing Commission. The purpose of the Texas Racing Act is to provide for the strict regulation of horse racing and greyhound racing and the control of pari-mutuel wagering in connection with that racing. Tex. Occ. Code § 2021.002.  The Texas Racing Commission consists of: (1) seven members appointed by the governor with the advice and consent of the senate; and (2) two ex officio members who have the right to vote. The ex officio members are: (1) the chair of the Public Safety Commission, or a member of the Public Safety Commission designated by the chair; and (2) the commissioner of agriculture or the commissioner's designee. Of the appointed commission members, five members must be representatives of the general public and have general knowledge of business or agribusiness. One additional member must have special knowledge or experience related to horse racing, and one additional member must have special knowledge or experience related to greyhound racing. At least one of the members appointed may be a veterinarian, who also satisfies the requirement that the person have general knowledge of business or agribusiness. Tex. Occ. Code § 2022.001(a)-(d). The Texas Racing Act establishes the statutory framework, which is then administered and enforced by State Racing Commissions, whose members are appointed by the governor of each state. The Texas Racing Commission promulgates the Texas Rules of Racing. 16 Tex. Admin. Code Chs. 301-323. All owners, trainers, veterinarians, other horsemen personnel and racing officials must be licensed by the Texas State Racing Commission and are subject to rules and regulations promulgated

by the Commission, including rules and regulations regarding racetrack safety and equine medication including, but not limited to, prohibited substances and therapeutic medications.

**Legislative History**

59.     On September 8, 2020 the Horseracing Integrity and Safety Authority Inc. ("the Authority), filed a Certificate of Incorporation in Delaware.

60.     The Certificate of Incorporation, at ¶ Seventh, directs that a sole private individual shall appoint temporary Directors to the Authority, who shall then appoint a Nominating Committee, who shall then appoint the Board of Directors of the Authority.

61.     On September 29, 2020, the Horseracing Integrity and Safety Act of 2020, H.R. 1754, passed the U.S. House of Representatives on a voice vote with no debate. It was never discussed either in committee or on the floor of the U.S. Senate. It would have unconstitutionally delegated regulatory authority over the horseracing industry to the newly incorporated Authority.

62.     On October 6, 2020, the Horseracing Integrity and Safety Authority, Inc. selected and publicized the members of the Nominating Committee to select the members of the Board of the Horseracing Integrity and Safety Authority.

63.     Defendants Black, Adams, Coleman, Cox, Dunford, Keating, and Schanzer (collectively, the "Nominating Committee") were appointed to the Nominating Committee; therefore, they have the authority to select the members of the Board of the Horseracing Integrity and Safety Authority.

64.     On December 21, 2020, Congress enacted House Resolution 133, the 2,000-page Consolidated Appropriations Act, 2021, which was signed into law on December 27, 2020 as Public Law No. 116-260. Title XII of Division FF of the Consolidated Appropriations Act, 2021, constitutes the Horseracing Integrity and Safety Act of 2020 ("HISA" or the "Act"). Public Law No. 116-260, §§ 1201-1212, 134 Stat. 1182, 3252-53.

**HISA**

65.     HISA unconstitutionally grants to the Authority, a non-governmental private, independent, self-regulatory, non-profit corporation, power to develop and enforce a horseracing medication control and racetrack safety program that preempts existing state regulation. The Authority has regulatory control over owners and trainers, among others, who compete in races having a substantial relation to interstate commerce, or virtually all Thoroughbred horse racing in the United States and in the State of Texas. The Authority is charged with developing programs and promulgating rules covering all facets of equine medication and horseracing safety. Further, the Authority is given investigatory powers of the sort possessed by the Texas Racing Commissions and the right to enforce alleged rule violations with fines, suspensions, and civil lawsuits brought in its own name.

66.     According to HISA, the Authority is governed by a nine-member Board of Directors appointed by a non-governmental Nominating Committee of seven private citizen members. Those seven individuals are identified and named in their official capacity as Defendants in this action.

67.     The Nominating Committee consists of private citizens who are "independent members selected from business, sports, and academia." § 1203(d), 134 Stat. at 3255.

68.     The Nominating Committee is a private entity and not a governmental body.

69.     HISA did not give any governmental entity the authority to approve, disapprove, or modify the decision of the private individual appointing temporary Directors to the Authority or the decision of the temporary Directors of the Authority appointing the Nominating Committee.

70.     HISA delegates legislative authority to the Nominating Committee to "select the initial members of the Board" of the Authority. § 1203(d), 134 Stat. at 3255.

71.     HISA does not give any governmental entity the authority to approve, disapprove, or modify the selection of the initial Board members of the Authority by the Nominating Committee.

72.     The Authority is a "private, independent, self-regulatory, nonprofit corporation." §
1203(a), 134 Stat. at 3253.

73.     HISA delegates legislative authority to regulate the horseracing industry to the
Authority, including the power to "develop[ ] and implement[ ] a horseracing anti-doping and
medication control program and a racetrack safety program." § 1203(a), 134 Stat. at 3253.

74.     HISA delegates legislative authority to the Authority to collect revenue from those it
regulates. § 1203(f), 134 Stat. at 3255-57.

75.     HISA directs the Authority to obtain its initial funding through the program's effective
date by securing loans. HISA § 1203(f)(1)(A), 134 Stat. at 3255. Thereafter, no later than 90 days
before the effective date and no later than "November 1 each year thereafter," HISA instructs the
Authority to "determine and provide to each State racing commission the estimated amount required
from the State" for "the State's proportionate share of the horseracing anti-doping and medication
control program and the racetrack safety program for the next calendar year" and "to liquidate the
State's proportionate share of any loan or funding shortfall in the current calendar year and any
previous calendar year." § 1203(f)(1)(C)(i), 134 Stat. at 3255–56.

76.     Each state's proportional share is based on the Authority's annual budget for the
following year and "the projected amount of covered racing starts for the year in each State." HISA §
1203(f)(1)(C)(ii)(I), 134 Stat. at 3256.

77.     Under HISA, states are forced to adopt one of two options for funding the Authority.
First, a state racing commission may "elect[] to remit fees" and, if they do so, "the election shall remain
in effect and the State racing commission shall be required to remit fees . . . according to a schedule
established in rule developed by the Authority and approved by" the Federal Trade Commission.
HISA § 1203(f)(2), 134 Stat. at 3256–57. The state racing commission must give the Authority at least
one year's notice before it withdraws that election. *Id.* § 1203(f)(2)(C), 134 Stat. at 3256.

78.     Second, if a state refuses to pay the fees demanded by the private corporation, the Authority shall, at least monthly, "calculate the applicable fee per racing start multiplied by the number of racing starts in the State during the preceding month." HISA § 1203(f)(3)(A), 134 Stat. at 3257. The Authority will then "allocate equitably the amount calculated . . . among covered persons involved with covered horseraces pursuant to such rules as the Authority may promulgate," and the Authority will directly collect fees from the covered persons, who "shall be required to remit such fees to the Authority." *Id.* § 1203(f)(3)(B)–(C), 134 Stat. at 3257. If a state chooses this second route, however, a punishment follows: HISA prohibits that state racing commission from "impos[ing] or collect[ing] from any person a fee or tax relating to anti-doping and medication control or racetrack safety matters for covered horseraces." *Id.* § 1203(f)(3)(D), 134 Stat. at 3257.

79.     That the States are forced to fund this private regulatory corporation empowered by Congress, instead of Congress itself, is made explicit: "Nothing in this Act shall be construed to require . . . the appropriation of any amount to the Authority; or . . . the Federal Government to guarantee the debts of the Authority."  HISA § 1203(f)(5), 134 Stat. at 3257.

80.     HISA delegates to the Authority federal regulatory authority over horseracing activities throughout the country. § 1205, 134 Stat. at 3262.

81.     HISA delegates legislative authority to the Authority to implement a horseracing anti-doping and medication control program and a racetrack safety program. § 1205(a)(1), 134 Stat. at 3262.

82.     HISA delegates legislative authority to the Authority to "exercise independent and exclusive national authority over . . . all horseracing safety, performance, and anti-doping and medication control matters for covered horses, covered persons, [and] covered horseraces." § 1205(a)(2), 134 Stat. at 3262.

83.     HISA states that "[t]he rules of the Authority promulgated in accordance with [HISA] shall preempt any provision of State law or regulation with respect to matters within the jurisdiction

16

of the Authority under [HISA]."  HISA § 1205(b), 134 Stat. at 3259.

84.    HISA further states "[t]o avoid duplication of functions, facilities, and personnel, and to attain closer coordination and greater effectiveness and economy in administration of Federal and State law," in any case involving a violation of both the Authority's rules and state law, HISA requires "State law enforcement authorities" to "cooperate and share information" with the Authority. HISA § 1211(b), 134 Stat. at 3275.

85.    HISA defines "covered" horses, persons, and horseraces initially to include only Thoroughbreds—the breed of horses that Plaintiffs' members own, train, and race. § 1202, 134 Stat. at 3253.

86.    HISA delegates legislative authority to state and private organizations to expand the Authority's regulatory jurisdiction to other breeds: "A State racing commission or a breed governing organization for a breed of horses other than Thoroughbred horses may elect to have such breed be covered by this Act." § 1205(l)(1), 134 Stat. at 3262.

87.    HISA delegates to the Authority federal subpoena and investigatory authority to pursue civil violations within its jurisdiction. § 1205(h), 134 Stat. at 3262.

88.    HISA does not give any governmental entity the authority to approve, disapprove, or modify decisions of the Authority regarding issuing subpoenas and exercising its investigatory authority.

89.    HISA delegates legislative authority to the Authority to establish its own civil penalties for violations of the rules it promulgates. § 1205(i), 134 Stat. at 3262.

90.    HISA delegates legislative authority to the Authority to bring civil enforcement actions, asserting the power of the federal government to enforce its rules. § 1205(j), 134 Stat. at 3262.

91.    HISA delegates legislative authority to the Authority to draft its own governmental rules. § 1204(a), 134 Stat. at 3257-58.

92.     The rules drafted by the Authority are published in the Federal Register for public comment, as if they had been drafted by a governmental agency. §§ 1204(b)(1), (c)(1), and (d)(2), 134 Stat. at 3258.

93.     HISA attempts to justify this unconstitutional delegation of legislative authority to a private entity by providing that the rules promulgated by the Authority must be submitted for oversight to Defendants the Federal Trade Commission and Commissioners Slaughter, Chopra, Phillips, and Wilson (collectively, the "FTC"). § 1204, 134 Stat. at 3257-58.

94.     But the FTC role in this process is purely ministerial. It does not develop or implement federal regulatory authority but, instead, publishes the Authority's regulations for notice and comment rulemaking. § 1204, 134 Stat. at 3257-58.

95.     Under HISA, the FTC may not draft rules to regulate horse racing, nor may it modify rules drafted by the Authority. §1204(c)(1), 134 Stat. at 3258.

96.     The FTC may only "approve or disapprove" rules that have already been drafted by the Authority. §1204(c)(1), 134 Stat. at 3258.

97.     If the FTC wants to modify a rule, it must make recommendations to the Authority to do so. § 1204(c)(3), 134 Stat. at 3258.

98.     The only instruction given to the Authority for its rulemaking authority is to "develop[ ] and implement[ ] a horseracing anti-doping and medication control program and a racetrack safety program . . . ." § 1203(a), 134 Stat. at 3253.

99.     HISA provides the Authority a list of topics for rulemaking, but the list is non-exhaustive, and the Authority may or may not choose to draft rules on those topics. § 1204(a), 134 Stat. at 3257-58.

100.    The only guidance given to the FTC on whether to approve a rule that has been drafted by the Authority is that it "shall approve a proposed rule . . . if [it] finds that the proposed rule . . . is

consistent with—(A) this Act; and (B) applicable rules approved by the [FTC]." § 1204(c), 134 Stat. at 3258.

101.    In summary, HISA gives tremendous power to a private entity, the Authority, to regulate many facets of the Horsemen's business and relegates the FTC to a minor role in the process.

**HISA's Effects on Texas**

102.    HISA will harm the State of Texas and the TRC in numerous ways.

103.    The TRC is state agency governed by the Texas Racing Act, which provides for strict regulation of horse racing and greyhound racing and the control of pari-mutuel wagering in connection with that racing. Tex. Occ. Code Ann. § 2021.002. The TRC licenses and regulates all aspects of horse racing and greyhound racing in Texas, regardless of whether that racing involves pari-mutuel wagering. Tex. Occ. Code Ann. § 2023.001(a). In adopting rules and in the supervision and conduct of racing, the TRC considers the effect of a proposed commission action on the state's agricultural, horse breeding, horse training, greyhound breeding, and greyhound training industry. Tex. Occ. Code Ann. § 2023.001(b). The TRC is vested with the authority to enact regulations related to anti-doping, racetrack safety, disciplinary action, and enforcement. *See* 16 Tex. Admin. Code §§ 301.1 to 323.203.

104.    The TRC is self-funded by the entities it regulates and is appropriated only General Revenue–dedicated funds. The agency's revenue primarily comes from fees assessed to racetracks, occupational licensee's fees, and simulcast racing taxes. Without these funds, the TRC will not be able to operate, leaving the State of Texas without a horse racing regulatory agency.

105.    HISA requires Texas and the TRC to cooperate and share information with the Authority; forces them to remit taxes and fees to fund the Authority or lose the ability to collect taxes and fees for their own anti-doping, medication-control, and racetrack-safety programs; and preempts some of Texas's laws and regulations.

106.    HISA forces the state through the TRC to assess, collect, and remit to the Authority

19

fees that the Authority determines to be Texas's proportional share of the Authority's annual budget for the next calendar year. HISA § 1203(f)(2), 134 Stat. at 3256–57. The Board of Directors of the Authority, subject only to public comment, determines the annual budget of the Authority. There is no appeal or allowable challenges of what the Authority ultimately approves as its budget. If the State of Texas refuses to assess, collect, and remit fees to the Authority, HISA strips from Texas its right to "impose or collect from any person a fee or tax relating to anti-doping and medication control or racetrack safety matters for covered horseraces." *Id.* § 1203(f)(3), 134 Stat. at 3257. So, for example, if Texas were to decide that it desired that its anti-doping regulations be stricter than the Authority's regulations, HISA would bar Texas from raising the funds necessary to enforce its own regulations unless it also agreed to collect the Authority's fees. That ban on state legislation or regulation that imposes taxes and fees applies only to states that refuse to fund the Authority—not to states that give money to the Authority. Furthermore, a portion of the amount of the statutorily designated taxes that the TRC collects are used for these purposes, but it may not be feasible to separately calculate or remove those amounts from the existing taxes.

107.    HISA requires Texas "law enforcement authorities" to "cooperate and share information" with the Authority whenever a person's conduct may violate both a rule of the Authority and Texas law. HISA § 1211(b), 134 Stat. at 3275. HISA thus forces the State of Texas to spend time and resources to help the Authority carry out a federal regulatory program.

108.    Finally, even though Texas has successfully regulated horseracing for decades through the TRC, HISA preempts state laws and regulations on which Texans and the regulated industry have long relied to ensure the safety and integrity of horseracing. *See* HISA § 1205(b), 134 Stat. at 3259. HISA purports to impose this preemption on Texas via the regulations of a private corporation, which has a governing board that is neither appointed nor removable by a federal officer, and which can impose rules compliant with the Act and federal regulations without any meaningful oversight by

politically accountable actors.

## CLAIM I

**HISA violates Article I, Section 1 of the United States Constitution because it delegates legislative authority to a private entity.**

109.    The allegations in all preceding paragraphs are incorporated herein by reference.

110.    "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

111.    The doctrine dates back to the founding generation, with Chief Justice Marshall pointing out that "[i]t will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825).

112.    The basic principle is so well acknowledged that some years later the Court described it as self-evident: "That Congress cannot delegate legislative power . . . is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892).

113.    Even more objectionable is delegating authority to a private entity, which represents "legislative delegation in its most obnoxious form." *Carter v. Carter Coal Co.*, 56 S. Ct. 855, 873 (1936); *see also Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 118-19, 49 S. Ct. 50 (1928); *Eubank v. City of Richmond*, 226 U.S. 137, 140-41, 33 S. Ct. 76 (1912).

114.    Put simply, "Federal lawmakers cannot delegate regulatory authority to a private entity." *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013).

115.    With HISA, Congress has delegated regulatory authority over the horseracing industry to the Authority, a private, nongovernmental entity.

116.    This unlawful delegation of authority includes, among other things, the right to draft governmental rules on equine medication and safety, to assess millions of dollars in fees on horse

owners and trainers to finance the operations of the Authority, to assess civil penalties, civil sanctions, and rule violations, including levying fines and ordering suspensions of owners and trainers for alleged violations of Authority rules, to issue subpoenas and otherwise investigate purported violations, and to commence civil actions in federal court to enforce Authority rules.

117.    HISA also permits the Authority to "access . . . offices, racetrack facilities, other places of business, books, records, and personal property of covered persons"; to issue and enforce "subpoenas and subpoenas duces tecum"; and to exercise "other investigatory powers of the nature and scope exercised by State racing commissions." HISA § 1205(c)(1)(A), 134 Stat. at 3259. The Authority's decision to exercise its investigative powers against a particular regulated party is subject to *no* governmental oversight *at all*. Congress has empowered a private entity to use the full enforcement power of the government with absolutely no governmental supervision (unless the Authority decides to impose sanctions, at which point the government's review is limited to that decision to impose sanctions). Such a delegation of governmental authority to a private entity is an unconstitutional delegation of legislative power.

118.    HISA additionally empowers the Authority to "determine and provide to each State racing commission the estimated amount required from the State" for "the State's   proportionate share of the horseracing anti-doping and medication control program and the racetrack safety program for the next calendar year" and "to liquidate the State's proportionate share of any loan or funding shortfall in the current calendar year and any previous calendar year." HISA § 1203(f)(1)(C)(i), 134 Stat. at 3255–56. This private delegation of authority not only to collect fees, but also to set the amounts due, impermissibly exceeds what the Constitution permits and the limited arrangements that some courts have approved in the past. *See Pittston*, 368 F.3d at 395 (addressing scheme where private entity collects premiums but "has no power to determine the premium payments owed by each coal operator" as separately determined by the government); *Frame*, 885 F.2d at 1123–24 (scheme allowing

private "collection of assessments" that the government separately determined); *cf. Adkins*, 310 U.S. at 399 (distinguishing a scheme in which the government, "not the [private entity], determines the prices" in the market at issue and thus "lawmaking is not entrusted to the industry").

119.    Congress has subjugated Plaintiffs to this entire regulatory scheme, which is unlawfully run by a private entity.

120.    The delegation of legislative authority to a private entity in HISA constitutes a violation of the private nondelegation doctrine found in Article I, Section I of the Constitution.

121.    The limited oversight given to the FTC over the Authority is not sufficient to cure the constitutional violation. Because the FTC may not draft rules on its own initiative, may only recommend modifications to Authority rules, and has virtually no say in enforcement proceedings, HISA places it in a subservient role to the Authority, and thus, violates the private nondelegation doctrine.

122.    In addition, HISA unlawfully delegates to the Nominating Committee the unconstitutional authority to select this federal regulatory body, and there is no FTC oversight whatsoever over the decision.

123.    Texas is harmed by the unconstitutional delegations because it is subject to a regulatory process that it is forced to finance with fees imposed by the Authority. Also, Texas is harmed because it is subject to new and onerous Authority rules on equine medication and safety that change and supersede the Texas Racing Commission rules on which the Plaintiffs' training and racing businesses have long relied.

## CLAIM II

**HISA violates Article I, Section I of the United States Constitution
because it delegates legislative authority to a public entity without an intelligible principle**.

124.    The allegations in all preceding paragraphs are incorporated herein by reference.

125.    When Congress delegates legislative authority to a public agency without giving it an

"intelligible principle" to guide its discretion, it violates the public nondelegation doctrine found in Article I, Section 1 of the United States Constitution. *Gundy v. U.S.*, 139 S. Ct. 2116, 2123 (2019).

126.    In the alternative, HISA's delegation of oversight powers to the FTC violates the public nondelegation doctrine because Congress failed to give it an "intelligible principle" to guide its discretion.

127.    HISA gives the FTC no standards upon which to base its decision to approve or disapprove rules proposed by the Authority. § 1204(c)(2), 134 Stat. at 3258. Its guidance is completely circular and unintelligible: it is told to look to rules proposed by the Authority and approved by the FTC to determine whether to approve rules proposed by the Authority. It is also told to look at the Act, itself, but that guidance is also unintelligible. It does not point to a specific section of the Act. In Section 1204(a), HISA gives a list of topics on which the Authority may draft rules, but it provides no direction about what principles the FTC should follow in deciding whether to approve the proposed rules.

128.    This unlawful delegation of legislative authority to the FTC subjects the Horsemen to onerous fees and regulations without any Congressional or meaningful governmental oversight. It, thus, violates the public nondelegation doctrine and harms the Horsemen.

129.    In addition, if the Authority were considered a public, governmental entity, HISA's delegation of authority to it still would be unconstitutional because Congress also failed to give it an "intelligible principle" to guide its discretion.

130.    HISA contains no "statement of purpose" and no "findings" provision. In Section 1204(a), HISA gives a list of topics on which the Authority may draft rules, but it provides no direction about what principles the Authority should follow in doing so. The only instruction given to the Authority for its rulemaking authority is to "develop[ ] and implement[ ] a horseracing anti-doping and medication control program and a racetrack safety program . . . ." § 1203(a), 134 Stat. at 3253. But

the Authority is given no "intelligible principle" to guide its discretion in creating the two programs.

131.    Therefore, HISA violates the public nondelegation doctrine, subjects the Horsemen to onerous fees and regulations, and harms the Horsemen.

### CLAIM III

**HISA violates the Appointments Clause found in Article II, Section 2, Clause 2 of the United States Constitution because the Authority is appointed by a private Nominating Commission.**

132.    The allegations in all preceding paragraphs are incorporated herein by reference.

133.    In the alternative, if a court were to conclude that the grant of power to the Authority was sufficient to render it a public entity, it would still be unconstitutional because appointment of its Board of Directors violates the Appointments Clause of the United States Constitution.

134.    Under the Appointments Clause, only the president, a head of a department, or a court of law may appoint an officer of the United States. U.S. Const. Art. II, Sec. 2, Cl. 2.

135.    If it were deemed public, the members of the Board of the Authority would be "Officers of the United States" because they "occupy a continuing position established by law" and "exercise[] significant authority pursuant to the laws of the United States". *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (internal quotation marks omitted).

136.    But the Authority Board members are not appointed by the president, a head of a department, or a court of law. Instead, they are appointed by a private Nominating Committee, which was also selected privately, with no governmental oversight, even before HISA was passed into law.

137.    Therefore, in the alternative, the appointment of the Authority violates the Appointments Clause.

138.    Plaintiffs are harmed by the unconstitutional appointment of the Authority because they are subject to a regulatory process that they are forced to finance with fees imposed on them by the Authority. Also, Plaintiffs are harmed because they are subject to new and onerous Authority rules

on equine medication and safety that change and supersede the Texas Racing Commission rules on which Plaintiffs' training and racing businesses have long relied.

## CLAIM IV

**HISA violates the Due Process Clause of the Fifth Amendment because interested participants in the horseracing industry are given regulatory power over their competitors in the industry.**

139.    The allegations in all preceding paragraphs are incorporated herein by reference.

140.    When Congress gives an "economically self-interested actor [the power] to regulate its competitors," it violates the Due Process Clause found in the Fifth Amendment. *Ass'n of Am. R.Rs. v. Dep't of Transp.*, 821 F.3d 19, 23 (D.C. Cir. 2016).

141.    HISA designates four of the members of the Board of the Authority to be economically self-interested actors, and they are given authority to regulate their competitors. § 1203(b)(1)(B), 134 Stat. at 3253–54.

142.    More importantly, under HISA the entire Board of the Authority is selected by a private Nominating Committee. On information and belief, this private Nominating Committee was hand-picked by a small group of owners and trainers within the horseracing industry who supported passage of HISA, over the objections of thousands of owners and trainers represented by Plaintiffs, who will be regulated by HISA.

143.    On information and belief, the businesses of the small group of owners and trainers will thrive as a result of HISA. Meanwhile, HISA will harm thousands of horsemen and drive many of them out of the industry by artificially increasing the costs and fees of participation and by eliminating the use of therapeutic medication prescribed by veterinarians for the health and safety of horses.

144.    By granting these self-interested actors the authority to regulate their competitors, Congress violated the Due Process Clause and harmed Plaintiffs by creating a regulatory body that

26

will increase their fees, diminish the value of many of their horses, and otherwise subject them to onerous regulations.

## CLAIM V

### HISA violates the Tenth Amendment by commandeering state legislative and executive branches.

145.    The allegations in all preceding paragraphs are incorporated herein by reference.

146.    "The Constitution confers on Congress not plenary legislative power but only certain enumerated powers," as "the Tenth Amendment confirms." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018). Absent from Congress's list of powers "is the power to issue direct orders to the governments of the States," a constitutional limitation known as the "anticommandeering doctrine." *Id.* Congress may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).    The "States are not mere political subdivisions of the United States," and our Constitution requires Congress to "exercise its legislative authority directly over individuals rather than over States." *New York v. United States*, 505 U.S. 144, 165, 188 (1992).

147.    "[T]he anticommandeering principle prevents Congress from shifting the costs of regulation to the States." *Murphy*, 138 S. Ct. at 1477. HISA requires states (via their state racing commissions) to remit state monies to fund the Authority's operations and to pay off the Authority's private loans authorized by the Act. If a state refuses to do so, HISA further commandeers state legislative and executive authorities by prohibiting the state from imposing or collecting certain taxes or fees. In other words, Congress has either (1) unconstitutionally shifted the costs of a federal regulatory program to the states or (2) commanded state legislators and officers not to impose or collect specific taxes or fees.

148.    HISA also violates this constitutional principle by requiring "State law enforcement

authorities" to "cooperate and share information" with the Authority whenever a person's conduct may violate both state law and the rules of the Authority. HISA § 1211(b), 134 Stat. at 3275. By requiring state law enforcement to cooperate with the Authority, HISA unconstitutionally conscripts the state governments into helping the Authority carry out a federal regulatory program. If Congress wants to regulate, "it must appropriate the funds needed to administer the program," and it must enforce it. *Murphy*, 138 S. Ct. at 1477. Congress has no constitutional authority to command the law-enforcement agencies of the several states to help the Authority administer a federal regulatory program.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.  Declare that HISA's delegation of legislative authority to the Horseracing Integrity and Safety Authority is unconstitutional because it violates the private nondelegation doctrine;

b.  In the alternative, declare that HISA's delegation of legislative authority to the Horseracing Integrity and Safety Authority violates the public nondelegation doctrine;

c.  Declare that delegating legislative authority to the private Nominating Committee to select the Board members of the Authority violates the private nondelegation doctrine;

d.  In the alternative, declare that delegating authority to the private Nominating Committee to select the Board members of the Authority violates the Appointments Clause of the Constitution;

e.  In the alternative, declare that the delegation of legislative authority to the Federal Trade Commission and its Commissioners to oversee the Horseracing Integrity and Safety Authority violates the public nondelegation doctrine;

f.  Declare that HISA violates the Due Process Clause of the Constitution because it gives economically self-interested actors the power to regulate their competitors;

g.  Declare that HISA violates the Tenth Amendment of the Constitution by commandeering

Texas's legislative and executive branches;

h.   Enjoin Defendants, preliminarily and permanently, from taking any action to implement the Horseracing Integrity and Safety Act of 2020;

i.   Enjoin Defendants Black, Adams, Coleman, Cox, Dunford, Keating, and Schanzer, preliminarily and permanently, from appointing the Board of the Horseracing Integrity and Safety Authority;

j.   Award Plaintiffs nominal damages of $1 each for suffering a violation of their constitutional rights;

k.   Award Plaintiffs compensatory damages in the amount of any fees charged to them by Defendant the Horseracing Integrity and Safety Authority, Inc.; and

l.   Award any further relief to which Plaintiffs may be entitled, including attorneys' fees and costs.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Taylor Gifford*
TAYLOR GIFFORD
Texas Bar No. 24027262
Office of the Attorney General
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

(512) 463-2120 | FAX: (512) 320-0667
taylor.gifford@oag.texas.gov
ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that that on February 10, 2022, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Taylor Gifford*
TAYLOR GIFFORD
Assistant Attorney General