UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

NATIONAL HORSEMEN'S
BENEVOLENT AND PROTECTIVE
ASSOCIATION, et al.,

      Plaintiffs,

v.

                               No. 5:21-CV-071-H

JERRY BLACK, et al.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

After a rash of doping scandals and racetrack fatalities, Congress began considering how it could standardize thoroughbred-horseracing regulation. Proposals in 2013, 2015, and 2017 stalled. But after a particularly deadly 2019 season, the Horseracing Integrity and Safety Act of 2020 (HISA) became law. HISA creates a novel regulatory scheme that pairs the expertise of a private, self-regulatory nonprofit entity with the oversight of the Federal Trade Commission. Although modeled on the longstanding and long-upheld self-regulatory schemes found in the securities industry and elsewhere, the parties agree that HISA breaks new ground. And while the private plaintiffs favor nationwide regulation, they allege that HISA's unconventional structure facially violates the private-nondelegation doctrine under Article I and the Due Process Clause. Their concerns are legitimate. But precedent requires only that the private entity function subordinately to the FTC, guided by Congressional standards. And it does: Only the FTC can give proposed rules the force of law and, even then, the FTC can only do so when both it and the private entity adhere to Congress's instructions. Given the current state of the law and the private entity's subordination to the FTC, the plaintiffs' challenge must fail.

Thus, for the reasons stated below, the Court denies the plaintiffs' motion for summary judgment (Dkt. No. 37).  The Court grants the defendants' motions to dismiss the plaintiffs' Article I private nondelegation and due process claims (Dkt. Nos. 34; 36).  The Court also dismisses the plaintiffs' Appointments Clause and public nondelegation claims, which the plaintiffs abandoned.

## 1.    Factual and Procedural Background

### A.    Factual Background[1]

On September 8, 2020, the Horseracing Integrity and Safety Authority, Inc. (the Authority) incorporated as a nonprofit to "establish safety and performance standards" and "develop and implement a horseracing anti-doping and medication control program and a racetrack safety program."  Dkt. 34-1 at 28.  A few weeks later, the Authority issued its corporate bylaws, defining its terms in accordance with the "contemplated Horseracing Integrity and Safety Act of 2020 or a substantially similar act."  *Id.* at 53.  And on December 27, 2020, HISA was signed into law, nationalizing thoroughbred horseracing regulation and "recogniz[ing]" the Authority for purposes of developing and implementing the same programs listed in its certificate of incorporation and bylaws.  *See* Horseracing Integrity and Safety Act of 2020 § 1202, 15 U.S.C. § 3052.  Although the private plaintiffs support nationalizing regulation, they take issue with the Authority's powers under HISA.  Transcript of Oral Argument at 117–18 (hereinafter "Tr.").

Had the Authority been created by Congress, it may have been subject to certain Article II requirements.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477,

---

[1] The parties were given the opportunity to offer any further evidence not attached to their briefing on the plaintiffs' summary-judgment motion.  Both parties declined to offer anything further and agreed to the viability and admissibility of the attached declarations and appendices.  Tr. at 6–7.

483–85 (2010) (recognizing that, unlike private self-regulatory organizations, entities that are "Government-created [and] Government-appointed" must comply with Article II).  But because Congress "recognized" it and left the appointment of its board to a private group selected by industry constituents—the Nominating Committee—the Authority avoids some of the strictures of governmental entities, just as other private, self-regulatory organizations that operate nationwide do.  *See* 15 U.S.C. § 78o-3 (recognizing private associations such as the Financial Industry Regulatory Authority (FINRA)).

HISA enables the Authority to propose draft rules covering anti-doping and medication control (Section 3055), racetrack safety (Section 3056), and disciplinary proceedings (Section 3057).  The Authority lacks the power, however, to promulgate rules themselves.  *See* § 3053(b).  Only the FTC can give a rule the force of law.  *Id.*  To do so, the FTC must determine that the rule is consistent with the statute and applicable rules, and it must independently approve it following notice and public comment.  § 3053(b)–(d).  If the FTC disapproves a proposed rule, it must recommend modifications so that the Authority may "incorporate[] the modifications" prior to resubmission.  § 3053(c)(3).  Without a proposed rule, the FTC may, for good cause under the Administrative Procedure Act, "adopt an interim final rule" if it finds it "necessary to protect (1) the health and safety of covered horses; or (2) the integrity of covered horseraces and wagering on those horseraces."  § 3053(e); 5 U.S.C. § 553(b)(B) (good cause provision).

HISA also empowers the Authority to investigate rule violations and to assess penalties when it determines that an enacted rule has been violated.  15 §§ 3054(i), 3057(d).  But the Authority may only investigate rule violations according to "uniform procedures" reviewed and approved by the FTC.  § 3054(c).  Moreover, HISA lists the required elements

of the disciplinary process and mandates that all proceedings provide due process, including "impartial hearing officers or tribunals commensurate with the seriousness" of the alleged violation.  § 3057(c)(3).

The FTC retains the ability to review sanctions imposed by the Authority.  All civil sanctions are subject to de novo review by an Administrative Law Judge appointed by the FTC, and the FTC can review de novo any final decision of the ALJ.  § 3058(b)–(c).  Finally, any determination by an ALJ or the FTC is a "Final decision," triggering judicial review under the Administrative Procedure Act.  *See* § 3058(b)(3)(B), (c)(2)(B); *see also* Administrative Procedure Act § 10, 5 U.S.C. § 704 (outlining judicial review of administrative agency decisions).

To fund its operations, the Authority must initially obtain loans.  § 3052(f)(1).  After this initial funding stage, it appears that the Authority will primarily fund its programs by collecting fees from covered persons or state racing commissions.  § 3052(f)(1)–(4).  Before the Authority can collect any fees, however, the FTC must approve the "formula or methodology" for determining fee assessments.  § 3053(a)(11).

HISA also creates parameters for the composition of the Authority's Board and committees in an attempt to ensure fair governance and representation within the horseracing industry.  A nominating committee of "seven independent members selected from business, sports, and academia" chose the Authority's board members and standing committee members.[2]  § 3052(d).  HISA attempts to insulate the Authority from conflicts of

---

[2] The Nominating Committee members are outlined in the Authority's bylaws: Leonard S. Coleman, Jr. (Co-Chair), Dr. Nancy M. Cox (Co-Chair), Katrina Adams, Dr. Jerry B. Black, Gen. Joseph F. Dunford, Jr. (Ret.), Francis Anthony Keating II, and Ken Schanzer.  Dkt. No. 39-1 at 47–48.

interest with other industry members.  For example, a majority of the Board and standing committee members must be "independent members selected from outside the equine industry."  § 3052(b)–(c).  And no board member or independent member of the committees may (1) have a "financial interest in, or provide[] goods or services to, covered horses"; (2) be "[a]n official or officer of an equine industry representative" or serve in a "governance or policymaking capacity for an equine industry representative"; or (3) be "[a]n employee of, or an individual who has a business or commercial relationship with" people who have financial interests in covered horses or equine industry officers.  § 3052(e)(1)–(3).  The immediate family members of individuals in the first two categories are also barred from board and independent-committee membership.  § 3052(e)(4).  And, to assure diverse industry representation, a minority of the board and standing committee members must be industry members representing the "various equine constituencies, and shall include not more than one industry member from any one equine constituency."[3]  *See* § 3052(b)–(c).

There are no disputes of material fact, as the nature of the plaintiffs' facial challenge turns primarily on the language of the statute.[4]  Dkt. No. 38 at 7.

## B.    Procedural History

The National Horsemen's Benevolent and Protective Association and twelve of its affiliate organizations sued the FTC, its commissioners, the Authority, and its Nominating Committee members, bringing a facial challenge to HISA's constitutionality.  Dkt. No. 1.

---

[3] HISA defines "equine constituencies" as "owners, breeders, trainers, racetracks, veterinarians, State racing commissions, and jockeys who are engaged in the care, training, or racing of covered horses."  § 3051(7).

[4] Because there are no disputes of material fact, the Court would grant the defendants' motions (Dkt. Nos. 34; 36) on the merits even if it converted them to motions for summary judgment under Federal Rule of Civil Procedure 12(d).

The Horsemen then amended their complaint, which is the operative pleading. *See* Dkt. No. 23. They brought claims under the private-nondelegation doctrine, public-nondelegation doctrine, Appointments Clause, and the Due Process Clause, seeking to permanently enjoin the defendants from implementing HISA and to enjoin the Nominating Committee members from appointing the Authority's board of directors.[5] *Id.* at 27–29. They also seek declaratory relief, nominal damages for violations of their constitutional rights, compensatory damages for any fees the Authority charges them, and attorneys' fees and costs. *Id.* at 26–29.

The FTC and the Authority defendants separately moved to dismiss the amended complaint. Dkt. Nos. 34; 36. The same day, the Horsemen moved for summary judgment on their private-nondelegation and due-process claims only. Dkt. No. 37; *see* Dkt. No. 23. The parties responded and replied in due course, and the Court heard oral argument.[6] *See* Dkt. Nos. 67; 85. The state of Texas and the Texas Racing Commission intervened after briefing was completed and joined the plaintiffs' motion. *See* Dkt. Nos. 73; 91. Thus, the dispositive motions are ripe for review.

Limited by the parties' motions and assertions at oral argument, the Court examines the two claims in which the plaintiffs persist: Article I private nondelegation and Due Process. The plaintiffs abandoned their Appointments Clause claim by not opposing the defendants' motions to dismiss that claim, by failing to pursue it in their motion for

---

[5] The Nominating Committee appointed the Authority's Board just after litigation commenced. *See* Dkt. No. 54 at 28 (recognizing the "appointments were announced on May 5, 2021").

[6] The North American Association of Racetrack Veterinarians (NAARV) and the American Quarter Horse Association (AQHA) filed amicus briefs in support of the Horsemen. Dkt. Nos. 49; 51. Senator Mitch McConnell and Representatives Paul Tonko and Andy Barr filed an amicus brief in support of the defendants. Dkt. No. 53.

summary judgment, and by conceding at oral argument that they were no longer asserting it.  Tr. at 10; *see Black v. North Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006); *see also In re Dall. Roadster, Ltd.*, 846 F.3d 112, 126 (5th Cir. 2017) (holding that plaintiff abandoned a claim by not opposing the motion to dismiss it).  They initially pled their Appointments Clause claim in the alternative, alleging a violation only if the "court were to conclude that the grant of power to the Authority was sufficient to render it a public entity."  Dkt. No. 23 at 25.  But all parties briefed the dispositive motions assuming, as HISA indicates, that the Authority is a "private, independent, self-regulatory, nonprofit corporation."  § 3052(a). The Court therefore—respecting the contours of the claims before it and the adversarial process—assumes without deciding that the Authority is a private entity.[7]

The plaintiffs also abandoned their "public nondelegation claim" that HISA violates Article I, Section I of the Constitution because it delegates legislative authority to a public entity without an intelligible principle.  Dkt. No. 23 at 23.  At the hearing, the plaintiffs affirmed that they abandoned their public-nondelegation claim.  *See* Tr. at 10.

---

[7] Although the Authority appears to be private under Supreme Court precedent, the Court pauses to note its unique genesis.  The last time the Supreme Court encountered a similar private-nondelegation challenge, it held that the private entity—Amtrak—was part of the government for constitutional purposes.  *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 51–55 (2015) (*Amtrak II*).  Like Amtrak, the Authority's private label is "not dispositive" of its status.  *Id.* at 51.  And despite the defendants' assurances that the Authority is like other self-regulatory organizations, *e.g.*, Dkt. No. 34 at 24, it also bears an uncomfortable resemblance to the Public Company Accounting Oversight Board (PCAOB)—recognized as both governmental and unconstitutional by the Supreme Court in 2010.  *See Free Enter. Fund*, 561 U.S. at 484–85.  Unlike other "private" self-regulatory organizations in the securities industry, the PCAOB was a "Government-created, Government-appointed entity, with expansive power to govern an entire industry."  *Id.* at 485.  By contrast, the government here did not create the Authority nor appoint its directors.  But the Authority formed just over three months prior to HISA's passage (Dkt. No. 39-1 at 95), its bylaws mirror large portions of HISA (*Id.* at 40–59), and HISA supplies many key terms in its bylaws (*Id.* at 57–58).

2.      **Jurisdiction**[8]

Before addressing the merits, the Court must first confirm that it has jurisdiction to resolve the case.  Without a live case or controversy, the Court cannot assess the merits of any claim.

A complaint must be dismissed under Rule 12(b)(1) if the Court lacks subject matter jurisdiction.  *See Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).  "A case is properly dismissed for lack of subject matter jurisdiction when the Court lacks the statutory or constitutional power to adjudicate the case."  *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (citation omitted).  The jurisdiction of federal courts is limited to "cases" and "controversies."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992) (citing U.S. Const. art. III, § 2).  And plaintiffs "bears the burden of proof that jurisdiction does in fact exist."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  When addressing a 12(b)(1) motion, the Court can base its decision upon "the complaint alone" or "the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts."  *Montez v. Dept. of Navy,* 392 F.3d 147, 149 (5th Cir. 2004).

A.      **Standing**

The Constitution speaks directly to the limits of the federal judiciary's authority. Article III, Section 2, makes clear that federal jurisdiction is limited to "cases" and "controversies."  *See Lujan*, 504 U.S. at 559.  *Lujan* explained the importance of this limitation: "[T]he Constitution's central mechanism of separation of powers depends largely

---

[8] At the hearing, the Horsemen conceded that the Court does not have personal jurisdiction over individual nominating committee members Leonard Coleman, Dr. Nancy Cox, Katrina Adams, Gen. Joseph Dunford, Frank Keating, and Ken Schanzer.  Tr. at 10.  Therefore, they are dismissed from this case.  *See* Fed. R. Civ. P. 12(b)(2).

upon the common understanding of what activities are appropriate to legislatures, to executives, and to courts." *Id.* at 559–60; *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (noting that "separation-of-powers principles underl[ie] th[e] [case-and-controversy] limitation").

Thus, to invoke the judicial power and the jurisdiction of the federal courts, "a plaintiff must satisfy the . . . 'irreducible constitutional minimum' for standing," which is composed of three elements. *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 689 (5th Cir. 2021) (quoting *Lujan*, 504 U.S. at 560). A plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (internal quotations omitted). To be "fairly traceable to the challenged action of the defendant," the injury must "not [be] the result of the independent action of some third party not before the court." *Id.* (internal quotations omitted). The redressability element will not be satisfied if it is "merely 'speculative[]' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561. And because "standing is not dispensed in gross," plaintiffs "must demonstrate standing for each claim [they] seek[] to press and for each form of relief that is sought." *Town of Chester v. Laroe Est., Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).

Though injuries must be concrete and particularized, "an allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)

(quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). But a plaintiff who challenges a "statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

The Horsemen allege many abstract constitutional harms but present only two possible concrete injuries—financial injury arising from the payment of fees and an increased regulatory burden. Dkt. No. 54 at 33–34. First, the Horsemen fail to show a concrete injury arising from the payment of fees. They allege that they will suffer either a direct injury by paying the Authority's fees themselves or, in the case of a state commission remitting fees to the Authority, indirect injury resulting from "state racing commission fees that inevitably must increase if the state commissions pay Authority fees." *Id.* at 34. Whether the Authority will collect fees from the Horsemen depends on the states' decisions to remit fees. *See* § 3052(f)(2)–(3). And "[w]here a causal relation between injury and challenged action depends upon the decision of an independent third party," standing is "ordinarily substantially more difficult to establish." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (quoting *Lujan*, 504 U.S. at 562). Specifically, "the plaintiff must show at the least 'that third parties will likely react in predictable ways.'" *Id.* at 2117 (quoting *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019)). At this stage, the Horsemen have not shown how the state commissions will react to HISA, so the alleged direct injury—the Authority charging the Horsemen fees—is not certainly impending.

Likewise, the Horsemen fail to show an indirect financial injury arising from state racing commissions passing on increased fees to the Horsemen. If the state racing commissions choose to remit fees to the Authority, they will continue to collect fees from

the Horsemen but then pass the fees along to the Authority.  *See* § 3052(f)(2)(D).  So irrespective of the state commissions' choices, the Horsemen will be subject to fees under HISA whether they are payable to the state commissions or to the Authority.  But the Horsemen offer no evidence that HISA will cause existing state fees to increase.  And because, under HISA, state racing commissions no longer dictate medication control and racetrack safety regulation, they would have no need to finance those regulatory responsibilities.  Accordingly, state racing commission fees may decrease.  Adding Authority fees to a decreased rate may not raise the Horsemen's total financial burden beyond what they currently pay.  As of now, there is no evidence detailing the amount of fees the Authority will charge.

In sum, it remains unclear whether the Horsemen will be required to pay fees to the Authority.  Even if they are not, it is uncertain whether state racing commissions will increase the fees the Horsemen owe.  Thus, any financial injury is "speculative" at this stage.  *Clapper*, 568 U.S. at 401.

The Horsemen, however, primarily challenge the rulemaking mechanism in HISA, and they have shown a concrete injury arising from certainly impending regulation.  *See* Dkt. No. 54 at 33.  Requiring regulations to take effect when they allege that any regulation would violate Article I and Due Process "would make little sense."  *Cf. State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 54 (D.C. Cir. 2015) ("[I]t would make little sense to force a regulated entity to violate a law (and thereby trigger an enforcement action against it) simply so that the regulated entity can challenge the constitutionality of the regulating agency.") (citing *Free Enter. Fund*, 561 U.S. at 490).  The statute requires the regulations to take effect on July 1, 2022, and no one disputes that the Horsemen will be the "objects" of

– 11 –

regulations adopted under HISA.  §§ 3051(14), 3055(a); *see Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) ("If a plaintiff is an object of a regulation 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'") (quoting *Lujan*, 504 U.S. at 561–62).  The Horsemen "participate in the type of events"—thoroughbred horse training and racing—"that the [programs] seek[] to regulate." *Contender Farms*, 779 F.3d at 266.  In fact, HISA directly targets the Horsemen's members as owners of thoroughbred horses that will participate in covered horseraces.  *See* § 3051(4) ("The term 'covered horse' means any Thoroughbred horse . . . that participates in covered horseraces or at a training facility."); § 3051(5) ("[C]overed horseraces are those involving covered horses that [have] a substantial relation to interstate commerce.").[9]  As a result, to remain involved in the thoroughbred horseracing industry, the Horsemen must register with the Authority and comply with its rules.  § 3054(d).

In any event, the language of HISA makes clear that the Authority and the FTC will exercise regulatory control over the Horsemen starting on July 1, 2022—the program effective date.  §§ 3051(14), 3054(a); *see Buckley v. Valeo*, 424 U.S. 1, 114 (1976).  HISA states that the FTC "shall" approve rules proposed by the Authority if it finds that they are

---

[9] The National Horsemen's Benevolent and Protective Association (NHBPA) represents thoroughbred racehorse owners and trainers throughout the United States and Canada.  Dkt. No. 23 at 2–3.  The NHBPA proposes medication and safety rules to a trade association of state regulators.  The NHBPA has 28 affiliate organizations—12 of which joined the lawsuit here.  Dkt. No. 39-1 at 1.  The affiliate associations negotiate contracts with racetrack owners that must comply with each state's medication and safety regulations.  And these state regulations would be replaced by rules promulgated under HISA.  § 3054(a)(2)(A) (the FTC, Authority, and the anti-doping and medication control and enforcement agency shall "exercise independent and exclusive national authority over . . . the safety, welfare, and integrity" of covered entities); *see* § 3054(b) (noting the preemption of state regulations).

"consistent" with the statute itself and with applicable rules.  § 3053(c).  And the Authority

"shall" propose rules to develop the programs on the topics outlined in the statute while

taking into consideration the guidance outlined in the statute.  §§ 3055(a)–(d), 3056(a)–(c).

The rules will preempt existing state law and explicitly cover thoroughbred horses and their

owners—*i.e.*, members of the Horsemen.  §§ 3052(a), 3054(b).  As the Supreme Court has

long recognized, "[w]here the inevitability of the operation of a statute against certain

individuals is patent, it is irrelevant to the existence of a justiciable controversy that there

will be a time delay before the disputed provisions will come into effect."  *Blanchette v. Conn.*

*Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974) (citing *Carter v. Carter Coal Co.*, 298 U.S. 238, 287

(1936)).

The only universe in which members of the Horsemen will not be subject to the

FTC–Authority regulatory regime—governing the medication of their horses and racetrack

safety at the venues where their horses race—is one in which the Authority proposes no

rules consistent with the Act, and the FTC adopts no final interim rules in response.  That

unlikely series of events contravenes the plain language of the statute and is inconsistent

with the presumption that the FTC "will act properly and according to law."  *FCC v.*

*Schreiber*, 381 U.S. 279, 296 (1965).  Accordingly, the "risk" is "substantial" that the

Horsemen will be subject to FTC–Authority regulatory control.  *Susan B. Anthony List*, 573

U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5).

The presence of impending regulation does not, however, end the analysis.  The

Horsemen must show an "imminent," concrete injury to challenge the statutory scheme

under which they will be regulated.  *Lujan*, 504 U.S. at 560.  Attempting to avoid this

requirement, the Horsemen rely on two cases concerning the President's power to remove

executive officers for the proposition that separation-of-powers violations can create "here-and-now" injuries.  Dkt. No. 54 at 37–38 (citing *Free Enter. Fund*, 561 U.S. at 477; *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020)).  Indeed, they can.  But neither of the Horsemen's examples involved allegations of future injuries, nor do they dispense with the concrete injury requirement of standing.  In both cases, the regulating entities took some concrete action against plaintiffs that enabled them to challenge the constitutionality of the entity's structure.  *See Free Enter. Fund*, 561 U.S. at 487 (the challenged entity "inspected [plaintiff], released a [critical] report . . . and began a formal investigation"); *Seila Law*, 140 S. Ct. at 2196 (explicitly holding that the petitioner established a "concrete injury" because it was compelled to comply with a "civil investigative demand").

And while the Supreme Court in *Seila Law* made clear that its precedents "have long permitted private parties . . . to challenge [an] official's authority to wield [executive] power," the party must still be "aggrieved" by that "official's exercise of executive power." 140 S. Ct. at 2196; *see also Bond v. United States*, 564 U.S. 211, 223 (2011) ("If the constitutional structure of our Government that protects individual liberty is compromised, individuals who *suffer otherwise justiciable injury may object*." (emphasis added)).[10]  The same is true with the other separation-of-powers cases the Horsemen cite.  Dkt. No. 54 at 38; *see e.g.*, *Freytag v. Comm'r*, 501 U.S. 868, 872, 892 (1991) (rejecting plaintiffs' Appointment Clause

---

[10] The same goes for the Horsemen's argument that "Appointments Clause cases are 'structural' and therefore" do not require a showing of injury.  Dkt. No. 54 at 38 n.5. (quoting *Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000)).  But the question in *Landry* was whether a "party claiming constitutional error in the vesting of authority must show a direct causal link between the error and the *authority's adverse decision*."  *Landry*, 204 F.3d at 1131 (emphasis added).  The D.C. Circuit held that no causal link was required.  It did not hold, however, that a plaintiff could bring an appointments clause challenge against an official before receiving a "decision" from the official.  Indeed, the plaintiff in *Landry* challenged the constitutionality of an ALJ's appointment only after the ALJ decided against him in the administrative proceeding.

challenge to a special trial judge who had decided against them); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239–40 (1995) (upholding a district court's decision against plaintiffs because the statute the plaintiffs invoked violated the separation of powers); *see also Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (finding standing when plaintiff would be injured "by not receiving a scheduled increase in benefits"). So far, the defendants in this case have done nothing to "aggrieve" the Horsemen because the Horsemen are not yet subject to any Authority rules. And the proposition that "[a]n *increased* regulatory burden typically satisfies the injury in fact requirement" does not necessarily apply to HISA because the Horsemen allege few facts about their current regulatory burdens. *Cf. Contender Farms*, 779 F.3d at 266 (emphasis added) (highlighting that the "harsher, mandatory penalties" and "additional measures" conferred standing under the new regulation).

　　Although this case law does not permit the Horsemen to avoid the certainly impending injury requirement, the undisputed facts satisfy it. HISA requires that certain regulations be passed, showing that a concrete injury is "certainly impending," which will "aggrieve" the Horsemen. *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5); *Seila Law*, 140 S. Ct. at 2196. The Horsemen specifically allege, for example, that they will be injured by the mandatory requirement that their horses may not race under the influence of any "therapeutic medication." Dkt. Nos. 23 at 27; 54 at 33 (citing 15 U.S.C. § 3055(b)(1) & (d)). Section 3055(b)(1) specifies that "[c]overed horses should compete only when they are free from the influence of medications . . . that affect their performance." Further crystallizing this requirement, the Authority's rules "shall prohibit the administration of any prohibited or otherwise permitted substance to a covered horse within 48 hours of its next racing start." § 3055(d). Because the statute requires the

Authority to submit rules including these prohibitions and mandates that the FTC "shall approve" proposed rules "consistent" with HISA, a substantial risk exists that the Horsemen will be subject to these requirements.  § 3053(c).  And, in their view, the requirements harm their horses that "need therapeutic drugs to race safely."  Dkt. Nos. 54 at 35; 23 at 27.[11]

To be sure, the 48-hour prohibition in Section 3055(d) provides for limited exceptions in Subsections (e) and (f), but neither defeats the Horsemen's certainly impending injury.  First, a possible exemption under Subsection (e) cannot take effect until at least three years after the initial regulations are implemented.  *See* § 3055(e)(3)(A).  And second, an exemption under Subsection (f) is only available for one substance—furosemide.  § 3055(f)(1).  Even then, an exemption covers only a limited subset of horses.  No exceptions are available for "two-year-old covered horses" or any covered horse that competes "in stakes races."  § 3055(f)(2).[12]

The Horsemen's certainly impending regulatory injury is also "fairly traceable" to the challenged conduct of the defendants.  *Lujan*, 504 U.S. at 560.  Here, the Horsemen challenge HISA's allegedly unconstitutional rulemaking scheme—subjecting them to a

---

[11] Per the Horsemen's supplemental filing (Dkt. No. 89), the Court also notes that the FTC has already approved of the Authority's proposed racetrack-safety rule.  *See* HISA Racetrack Safety, 87 Fed. Reg. 435-59 (Jan. 5, 2022); FTC Approves Horseracing Racetrack Safety Rule, Federal Trade Commission, https://www.ftc.gov/news-events/press-releases/2022/03/ftc-approves-horseracing-racetrack-safety-rule (March. 4, 2022).  These rules, which include inspections of the Horsemen's horses, will take effect July 1, 2022.  Dkt. No. 89-1 at 21; § 3051(14).

[12] HISA also outlines the minimum contents of the baseline rules by incorporating currently available lists of prohibited substances, laboratory standards, testing standards, and violation rules.  *See* § 3055(g)(1), (2).  Of course, the Authority is empowered to modify these rules, subject to certain limitations in section 3055(g)(3), but possible modifications cannot overcome the substantial risk that the Horsemen will be subject to a new regulatory burden imposed from the baseline rules.  *See also* Tr. at 55 (the FTC recognizing that the baseline rules are "certainly impending" and "likely to impact plaintiffs").  The Horsemen fail to allege, however, whether these baseline rules will *increase* their existing regulatory burden.  *Cf. Contender Farms*, 779 F.3d at 266.

private entity's regulatory control in violation of Article I and the Due Process Clause. Dkt. No. 38 at 14–15. And, outside of interim final rules, all rules flow through the Authority-proposal-FTC-approval scheme. *See* § 3053; Dkt. No. 56 at 16 n.3 (recognizing that no rulemaking provision is self-executing). Therefore, the Horsemen's increased regulatory burden is directly traceable to the scheme that they allege allows a purportedly self-interested private party to regulate without sufficient governmental oversight. *See* § 3053(c). Irrespective of HISA's specificity, the Authority must "develop[]" and "implement[]" the rules. § 3052(a). Traceability is satisfied.

The defendants' attempts to undermine the traceability and redressability of the Horsemen's injury fall short. The FTC argues that the Horsemen "assert non-delegation and due process claims based on their view that HISA delegates *too much* power and discretion to a private entity," and severing the substance-prohibition provisions "would do nothing to *reduce*" the Authority's discretion generally. Dkt. No. 61 at 9–10 (citing Dkt. No. 23 at 19–27). In the FTC's view, "this incompatibility creates a remedy problem." *Id.* at 9. Fundamentally, however, the Horsemen challenge HISA's primary rulemaking *mechanism*, through which their certainly impending injury will arise. *See* Dkt. No. 54 (challenging "being directly regulated by an unconstitutionally constituted body").

That they bring a structural challenge distinguishes *California v. Texas*, the case on which the FTC relies. Dkt. No. 61 at 10. In *California v. Texas*, the state plaintiffs only challenged the constitutionality of the minimum-essential-coverage provision of the Affordable Care Act, but they alleged injury arising from other provisions.[13] *California*, 141

---

[13] The Supreme Court rejected the state plaintiffs' other alleged injuries as well. *California*, 141 S. Ct. at 2116–19.

S. Ct. at 2120.  Therefore, the Court held the alleged injuries were not "fairly traceable" to the provision they claimed was unlawful.  *Id.*  The Court reasoned that "show[ing] that the minimum essential coverage requirement is unconstitutional would not show that enforcement of any of these other provisions violates the Constitution."  *Id.* at 2119.  They "operate[d] independently" of each other.  *Id.* at 2119–20.

Unlike the plaintiffs in *California v. Texas*, the Horsemen facially challenge the constitutionality of an entire statute.  Moreover, the substance prohibition does not "operate independently" of the Authority's statutory mandate to develop and implement the regulations—it operates within it.  As described above, the Authority is principally tasked with proposing rules to "establish" the "anti-doping and medication control program." § 3055(a).  The degree to which HISA delegates power and discretion to the Authority affects the merits of the delegation challenge more than its redressability if the Horsemen's facial attack succeeds.  *Cf. Duarte ex rel. Duarte v. City of Lewisville*, 759 F.3d 514, 520 (5th Cir. 2014) (highlighting the danger of conflating the standing inquiry with the merits of a claim). Were the Court to find that the rulemaking mechanism of sections 3055(b)(1), (d), and (g) violated the private-nondelegation doctrine or Due Process Clause, it would necessarily show that rulemaking according to less specific provisions would likewise be unconstitutional.

In sum, a favorable Court decision would redress the Horsemen's certainly impending injury.  Were the Court to find that HISA unconstitutionally delegates legislative power to a self-interested private entity, the Horsemen's injury would "likely" be redressed. *Spokeo*, 578 U.S. at 338.  They would no longer be subject to certainly impending regulatory control under the HISA and would be able to continue administering the race-day

medications to their horses that the Authority's rules would inevitably prohibit.  The Horsemen thus have standing to pursue their private-nondelegation and due-process claims.

### B.      Ripeness

Like standing, "ripeness is a constitutional prerequisite to the exercise of jurisdiction."  *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002).  "Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review."  *United States v. Carmichael*, 343 F.3d 756, 761 (5th Cir. 2003) (internal quotation marks and citation omitted).  A claim is not ripe for review if it is contingent [on] future events that may not occur as anticipated, or indeed may not occur at all."  *Lopez v. City of Houston*, 617 F.3d 336, 342 (5th Cir. 2010) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).

"The ripeness doctrine's 'basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'"  *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 148 (1967)).  In evaluating whether a case is ripe for adjudication, courts must balance "(1) the fitness of the issues for judicial resolution, and (2) the potential hardship to the parties caused by declining court consideration."  *Lopez*, 617 F.3d at 342 (citation omitted).  Regarding fitness for adjudication, "[a] case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required."  *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987) (citing *Thomas*, 473 U.S. at 581).  In other words, "[a] case becomes ripe when it would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now."  *DM Arbor Ct.,*

– 19 –

*Ltd. v. City of Houston*, 988 F.3d 215, 218 (5th Cir. 2021) (citing *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010)).  And regarding hardship, the Fifth Circuit has held that the kinds of hardships considered in a ripeness analysis include: "the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being 'force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences.'"  *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998)).

Here, the Horsemen challenge the constitutionality of HISA's regulatory structure, which presents a legal question fit for judicial resolution.  Their private-nondelegation claim hinges on the language of the statute.  The two primary Supreme Court cases dealing with the private-nondelegation doctrine assessed the plaintiffs' claims by looking to the language of the statute to see if Congress unconstitutionally delegated power.  *See Carter Coal Co.*, 298 U.S. at 311 (holding that the statute itself "conferred" regulatory power to "private persons"); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940) ("Since law-making is not entrusted to the industry, this statutory scheme is unquestionably valid."). The inquiry is one of structural subordination and the agency's statutory surveillance and authority.  *See Adkins*, 310 U.S. at 399.  Tasked with a similar private-nondelegation question arising from a statute imbuing Amtrak with regulatory power, the D.C. Circuit found that the pre-enforcement challenge was ripe.  *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 721 F.3d 666, 672 n.6 (D.C. Cir. 2013) (*Amtrak I*), *vacated on other grounds by Amtrak II*, 575 U.S. at 56.  The D.C. Circuit concluded that the statute's constitutionality was a "purely legal question . . . appropriate for immediate judicial resolution."  *Id.* at 672 n.6.

The Horsemen's separate due-process argument—that HISA allows an economically self-interested actor to regulate its competitors (Dkt. 38 at 7)—also presents a purely legal question.  Whether the Authority possesses regulatory power mirrors the private-nondelegation analysis, and, in this context, self-interest also presents a legal question based on the statute's language.  *See Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 821 F.3d 19, 32 (D.C. Cir. 2016) (*Amtrak III*) (finding self-interest based on the statutory language governing its incentives); *see also N. Carolina State Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 510 (2015) (assessing self-interest in terms of a "*structural* risk of market participants' confusing their own interests with the State's policy goals") (emphasis added).  Therefore, the Court "would be in no better position to adjudicate the issues in the future than it is now." *DM Arbor*, 988 F.3d at 218 (citing *Pearson*, 624 F.3d at 684).

With respect to hardship, "the harmful creation of legal rights or obligations" is certainly impending as discussed above.  *Texas*, 497 F.3d at 499.  Declining to consider these hardships at this stage would likely preclude judicial review before the plaintiffs will be subject to new federal regulatory burdens—burdens that will become effective in three months.  Therefore, "[f]ailure to resolve this case now could be harmful to" the plaintiffs. *Pearson*, 624 F.3d at 685 (finding that the plaintiff satisfied the hardship requirement because he "could suffer harm if his claims are not adjudicated as soon as practicable").

Because the language of the statute is fixed, resolving the Horsemen's facial challenge now does not "entangle" the Court in an "abstract disagreement[]'" about administrative policy.  *Greenstein*, 691 F.3d at 715 (quoting *Abbott Labs.*, 387 U.S. at 148). Rather, it requires the Court to resolve a dispute over Congress's choice to create a hybrid rulemaking scheme and the words it used to do so.  *See Carter Coal*, 298 U.S. at 287 (finding

that the suit was "not prematurely brought" because "mandatory" provisions in the statute required that regulations be "formulated and promulgated").

### 3.    Dismissal and Summary Judgment Standards

Beyond meeting basic jurisdictional thresholds, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Therefore, a complaint must allege sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendants can challenge the sufficiency of a complaint through a motion to dismiss under Rule 12(b)(6).  In evaluating whether a complaint states a claim for relief, the Court must accept all well-pleaded facts as true, but it need not accept a plaintiff's legal conclusions.  *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  The Court "must limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  But "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).  And the Court may take judicial notice of "matters of public record." *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Movants must cite to particular parts of the record to show the

absence of a genuine dispute or explain why the cited materials do not create a genuine

dispute.  Fed. R. Civ. P. 56(c)(1).  The Court must consider materials cited by the parties but

may also consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).  "[T]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The substantive law identifies the material facts.  *Id.* at 248.

### 4.     Under current precedent, HISA is not an unconstitutional private delegation in violation of Article I or the Due Process Clause.

Limited by the parties' motions, the Court examines the two claims in which the

Horsemen persist.  The Horsemen facially challenge HISA, arguing that it violates the

Article I private-nondelegation doctrine.  *See* Dkt No. 38 at 7.  They also argue that they will

be regulated by a self-interested industry competitor in violation of the Due Process Clause.

*Id.*  The Horsemen are correct that HISA creates a novel structure that nationalizes

regulation of the horseracing industry.  But they cannot escape the reality that HISA

satisfies the current, low thresholds created by Supreme Court and Fifth Circuit precedent.

Although the Horsemen make compelling arguments that HISA goes too far, only appellate

courts may expand or constrict their precedent.  This Court cannot.  And under current

frameworks, HISA stays within constitutional boundaries.

### A.     HISA stays within current constitutional boundaries because it provides standards that confine the FTC's and Authority's discretion and places the Authority subordinate to the FTC.

The Constitution vests "[a]ll legislative Powers herein granted" in the United States

Congress—not in another branch of government nor in a private entity.  U.S. Const. art 1,

§ 1.  "Accompanying that assignment of power to Congress is a bar on its further

delegation."  *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality).

Eighty years ago, the Supreme Court—in *Carter v. Carter Coal Company*—invalidated

the part of the Bituminous Coal Conservation Act of 1935 that delegated regulatory power

to private parties.  298 U.S. at 310–11.  The Act allowed two-thirds of coal producers to set

the wage-and-hour rates for the rest of the producers and miners in the industry.  *Id.*  In

other words, it gave the majority of coal producers "the power to regulate the affairs of an

unwilling minority."  *Id.*  at 311.  This was "legislative delegation in its most obnoxious

form" because Congress delegated power "to private persons whose interests may be and

often are adverse to the interests of others in the same business."  *Id.*  Though debated by

some, the Supreme Court likely held that this scheme violated due process, not Article I.

*See id.* (finding that the delegation was "so clearly arbitrary, and so clearly a denial of . . .

due process."); *see Boerschig v. Trans-Pecos Pipeline*, *LLC*, 872 F.3d 701, 707–09 (5th Cir. 2017)

(characterizing *Carter Coal* as a due process case); *Synar v. United States*, 626 F. Supp. 1374,

1383 n.8 (D.D.C. 1986) (recognizing that *Carter Coal* appeared to rest on due process

grounds).[14]  *Carter Coal* forms the heart of the Horsemen's private-nondelegation claim.  *See*

Dkt. No. 38 at 17 ("This Court should rely on *Carter Coal* to enjoin HISA for delegating

regulatory authority of an industry to a private entity.").

A due process view of private nondelegation seems to comport with modern public-

nondelegation jurisprudence.  Supreme Court precedent provides that if an act of Congress

lays down an intelligible principle, then an agency does not wield any "legislative power"

---

[14] *See* Alexander Volokh, *The New Private-Regulation Skepticism: Due Process, Non-Delegation, and
Antitrust Challenges*, 37 Harv. J.L. & Pub. Pol'y 931, 979 (2014) ("On balance, *Carter Coal* is
properly considered a due process case and not a non-delegation case.").

when enacting binding rules according to that principle.  *See City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (explaining that agencies do not exercise "legislative power" when making rules); *INS v. Chadha,* 462 U.S. 919, 953 n.16 (1983) (explaining that rulemaking "may resemble 'lawmaking,'" but it is not).  As Justice Scalia and many others have explained, agency rulemaking and adjudicating may take "'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must* be exercises of—the 'executive power.'"  *City of Arlington*, 569 U.S. at 304 n.4.[15]  So, if Congress lays down an intelligible principle in a statute and also properly gives a private party power to help an agency administer that statute, no Article I delegation problem could arise.  Legislative power remains with Congress.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213–14 (1976) ("The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law.  Rather, it is 'the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.'") (quoting *Dixon v. United States*, 381 U.S. 68, 74 (1965)).[16]

---

[15] Still, as articulated by Chief Justice Roberts, "the citizen confronting thousands of pages of regulations—promulgated by an agency directed by Congress to regulate, say, 'in the public interest'—can perhaps be excused for thinking that it is the agency really doing the legislating." *City of Arlington*, 569 U.S. at 315 (Roberts, C.J., dissenting).

[16] Good reason exists, however, to not apply the forgiving intelligible-principle test indiscriminately between public and private entities alike.  The Constitution commits no executive power to private entities.  They have no vested powers of their own "that resemble lawmaking." *See Amtrak II*, 575 U.S. at 61 (Alito, J., concurring) ("[T]he formal reason why the Court does not enforce the [intelligible-principle inquiry] with more vigilance is that the other branches of Government have vested powers of their own that can be used in ways that resemble lawmaking.").  Indeed, the "whole theory of *lawful* congressional 'delegation' is not that Congress is sometimes too busy or too divided and can therefore assign its responsibility of making law to someone else; but rather that a certain degree of discretion, and thus of lawmaking, *inheres* in most executive or judicial action." *Mistretta*, 488 U.S. at 417 (Scalia, J., dissenting).  But neither party suggests what a stricter standard would look like, nor has the Supreme Court articulated one.

An intelligible principle, however, "cannot rescue a statute empowering private parties to wield regulatory authority." *Amtrak I*, 721 F.3d at 671. *Carter Coal* was clear: "regulating" is "necessarily a governmental function." 298 U.S. at 310–11. Private parties may play a role in the regulatory process only if they "function subordinately" to an agency. *Adkins*, 310 U.S. at 399.

Following the Supreme Court's reprimand in *Carter Coal*, Congress passed the Bituminous Coal Act of 1937. The 1937 Act eliminated the unconstitutional provisions of the 1935 version and "made other substantive and structural changes." *Adkins*, 310 U.S. at 387. The changes included removing the private parties' regulatory power over their competitors. *Id.* Instead, the statute allowed the private parties to "propose minimum prices" and other related standards to a government agency that could "approve[], disapprove[], or modif[y]" those rules. *Id.* at 388. They "operate[d] as an aid" to the agency. *Id.* The Supreme Court blessed this scheme as "unquestionably valid." *Id.* at 399. Specifically, the Court held that Congress does not impermissibly delegate "its legislative authority" to a private entity, when the entity "function[s] subordinately" to a governmental agency. *Id.* When the agency retains the ability to "determine the prices" and exercises "authority and surveillance over" the private entity, "law-making is not entrusted to the industry." *Id.*

Lawmaking is also not entrusted to the industry when Congress conditions an agency's regulatory power on private party approval. In *Currin v. Wallace*, for example, the Supreme Court upheld a scheme where a regulation could not take effect in a particular market without the approval of two-thirds of the regulated industry members in that market. 306 U.S. 1, 6, 15 (1939). There, the government possessed lawmaking power. *Id.* at 15

("[T]he required referendum does not involve any delegation of legislative authority.").  The Court found that "it is Congress that exercises its legislative authority in making the regulation and in prescribing the conditions of its application" on industry approval.  *Id.* at 16; *see also United States v. Rock Royal Co-operative, Inc.*, 307 U.S. 533, 577–78 (1939) (upholding a similar scheme).  Other circuit courts have upheld similar schemes where the effect of government regulations was contingent upon approval by a portion of the regulated industry members.[17]

Courts have consistently relied on *Currin* and *Adkins* in assessing private-nondelegation challenges.  Just last year—in the subdelegation[18] context—the Fifth Circuit relied on *Adkins* for the proposition that subdelegations from agencies to private entities are lawful "so long as the entities 'function subordinately to' the federal agency and the federal agency 'has authority and surveillance over [their] activities.'"  *Texas v. Rettig*, 987 F.3d 518, 532 (5th Cir. 2021) (quoting *Adkins*, 310 U.S. at 399).

The Fifth Circuit has also addressed the private nondelegation doctrine more generally and even identified the constitutional infirmities of *Carter Coal* and the other cases where the Supreme Court held statutes unconstitutional under the doctrine.  *Boerschig*, 872 F.3d at 707–09.  In *Boerschig*, the Fifth Circuit distinguished the "so-called 'private

---

[17] *See, e.g.*, *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 759 (9th Cir. 1992) (upholding a scheme that required 75% of orange growers to approve a regulation in order for it to take effect); *see also Ky. Div., Horsemen's Benevolent and Protective Ass'n v. Turfway Park Racing Ass'n*, 20 F.3d 1406, 1416 (6th Cir. 1994) (holding that the Horsemen did not have the power to "make the law and force it upon others" when it only had the power to waive a restriction imposed by Congress); *see also Cook v. Ochsner Found. Hosp.*, 559 F.2d 968, 975 (5th Cir. 1977) (finding that the "approval of the Federal Hospital Council is merely a condition precedent to the operative effect of the Secretary's regulations").

[18] Subdelegation occurs when an agency delegates a task to a private entity without Congressional authorization.  *See Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1143–44 (D.C. Cir. 1984).  Here, Congress explicitly involved the Authority in HISA's regulatory scheme.

nondelegation' doctrine,"—arising from the Due Process Clause—from the nondelegation doctrine rooted in "separation-of-powers" concerns, which arises from Article I. *Id.* at 707; *but see Amtrak II*, 575 U.S. at 87–88 (Thomas, J., concurring) (suggesting that the "so-called 'private nondelegation doctrine' flows logically from the three Vesting Clauses"). "Like the doctrine that prevents Congress from delegating too much power to agencies, this doctrine preventing governments from delegating too much power to private persons and entities is of old vintage, not having been used by the Supreme Court to strike down a statute since the early decades of the last century." *Boerschig*, 872 F.3d at 707. In the Fifth Circuit's view, the problem with the statute in *Carter Coal*, and other statutes violating the private nondelegation doctrine,[19] was that private parties were "uncontrolled by any standard," and their determinations were "unreviewable." *See id.* at 708–09 (quoting *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 118–19 (1928) and citing *Carter Coal*, 298 U.S. at 310–11). In other words, a statute does not violate the private nondelegation doctrine—or "suffer from" the "twin ills" of *Carter Coal*—when (1) the statute "imposes a standard to guide" the private party and (2) provides "review of that determination that prevents the [private party] from having the final say." *Id.* at 708. Applied to a delegation of federal

---

[19] The Supreme Court held unconstitutional two other statutes for delegating power to private entities because the private parties were "uncontrolled by any standard," and there was "no provision for review." *See Roberge*, 278 U.S. at 118–19; *Eubank v. City of Richmond*, 226 U.S. 137, 140–41 (1912). *Eubank* and *Roberge* both predate *Carter Coal* and dealt with city ordinances. In *Eubank*, the Supreme Court struck down an ordinance that allowed two-thirds of property owners on any given block to prevent other property owners on the block from building in front of a block-long "setback line," even if the other owners were building on their own property. *Eubank*, 266 U.S. at 140–42, 144. In *Roberge*, the Supreme Court struck down an ordinance requiring a property owner to obtain consent from two-thirds of surrounding property owners in order to build a home for the poor. *Roberge*, 278 U.S. at 118–19, 122. As with *Carter Coal*, the problem with both laws was that the private parties had unrestrained and unreviewable power to restrict the property rights of others. *Id.* at 122 (citing *Eubank*, 226 U.S. at 143).

regulatory authority, this articulation appears to set out a test requiring both an intelligible principle and subordination.

But *Boerschig* does not provide a perfect fit for federal delegations.  Though it discussed *Carter Coal*, the case itself involved a delegation of state eminent domain power to private companies.  *Id.* at 706.  The company could only take another's land if "necessary for 'public use'" (the standard), and the "review" to which it referred was judicial review, not agency rulemaking review.  *Id.* at 708.  Accordingly, it omitted any discussion of *Adkins*—the Supreme Court's last word on private party involvement in federal regulation and, as recognized by the defendants, the most analogous case.  *See Adkins*, 310 U.S. at 399; Tr. at 92.  Still, *Boerschig*'s articulation of the "twin ills" of the private nondelegation doctrine provides a starting framework.  872 F.3d at 708.  And its holding does, of course, bind this Court.

Synthesizing the above case law, HISA must clear two primary hurdles to avoid a private-nondelegation violation.  First, HISA must contain an intelligible principle guiding the Authority and the FTC, ensuring that Congress has not given away its legislative power under Article I.  And second—related to government oversight and review—the Authority must function subordinately to the FTC, subject to its authority and surveillance, in accordance with *Adkins, Rettig*, and other case law assessing the limits of Congressional delegations in the regulatory context.  Thus, the Court begins its analysis with an intelligible-principle inquiry and then turns to the question of subordination.  The Court concludes its analysis by addressing the plaintiffs' best arguments against the statute.

i.      **HISA confines the FTC's and Authority's discretion.**

For nearly a century the Supreme Court has "held, time and again, that a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy,* 139 S. Ct. at 2123 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928))).  Indeed, its "jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372.

Those "standards . . . are not demanding." *Gundy*, 139 S. Ct. at 2129.  In fact, the Supreme Court "has found only two delegations to be unconstitutional.  Ever.  And none in more than eighty years."  *Big Time Vapes*, 963 F.3d at 446; *see A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935).  Those delegations were unconstitutional because "'Congress had failed to articulate *any* policy or standard' to confine discretion."  *Gundy*, 139 S. Ct. at 2129 (quoting *Mistretta*, 488 U.S. at 373 n.7).  On the other hand, the Supreme Court has "blessed delegations that authorize regulation in the 'public interest' or to 'protect the public health'" or to set "fair and equitable" prices.  *Big Time Vapes*, 963 F.3d at 442 n.18 (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001); *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26 (1943); and *Yakus v. United States*, 321 U.S. 414, 426–27 (1944)).  The Fifth Circuit has also "uniformly upheld Congress's delegations."  *Id.* at 442 n.17 (citing, for example, *United States v. Jones*, 132 F.3d 232, 239 (5th Cir. 1998) (upholding a delegation to DOJ to "define

non-statutory aggravating factors" to determine "death-eligible" offenders under the Federal Death Penalty Act)).

The Supreme Court and Fifth Circuit have both embraced a "non-blinkered brand of interpretation" when assessing whether Congress has given away its legislative powers. *Id.* at 443 (quoting *Gundy*, 139 S. Ct. at 2126). The Court is "meant also to consider 'the purpose of the [statute], its factual background, and the statutory context'" when "evaluating whether Congress laid down a sufficiently intelligible principle." *Id.* (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946)). In other words, Congress must "'(1) clearly delineate its general policy, (2) the public agency which is to apply it, and (3) the boundaries of the delegated authority.'" *Id.* at 443–44 (quoting *Mistretta*, 488 U.S. at 372–73) (cleaned up).

First, HISA's general policy is clear. It expressly defines the FTC's and Authority's purposes and jurisdictional boundaries. *See* § 3054. Congress sought to develop an "independent and exclusive national" scheme to protect "the safety, welfare, and integrity of covered horses, covered persons, and covered horseraces" through the "horseracing anti-doping and medication control program and the racetrack safety program." § 3054(a); *see also* Dkt. No. 36 at 26 (quoting H.R. Rep. No. 116-554, at 17 (2020)).[20] This policy communicates Congress's desire to protect the safety and integrity of horseracing through nationalizing and streamlining regulation under two specific programs, which are outlined in greater detail in sections 3055 and 3056. HISA, however, does not affect existing federal

---

[20] Indeed, the Act's title includes "Horseracing Integrity and Safety." *See INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text."); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 221 (2012) ("The title and headings are permissible indicators of meaning.").

and state regulation on any "matters unrelated to antidoping, medication control and racetrack and racing safety of covered horses and covered races." § 3054(k)(3).

Second, the "public agency" to apply the policy highlights HISA's hybrid nature. Congress both "recognized" the Authority as a "private, independent, self-regulatory, nonprofit corporation" for "purposes of developing and implementing" HISA's two programs and tasked the FTC with "oversight" so that only the FTC possessed the power to give draft rules the force of law. §§ 3052(a), 3053.

The third factor—the "boundaries" of the delegated authority—falls within the outer-limits of precedent under the Fifth Circuit's "non-blinkered" approach. *See Big Time Vapes*, 963 F.3d at 443.  Under HISA, the FTC shall approve proposed rules if they are "consistent with (A) this [statute] and (B) applicable rules approved by the [FTC]." § 3053(c)(2).  HISA limits the scope of rulemaking to medication control and racetrack safety.[21] *See* § 3052.  All other thoroughbred horseracing laws related to breeding, licensing, broadcasting, and the like remain "unaffected." § 3054(k)(3).  Next, it outlines several "considerations" the Authority must take into account in developing the horseracing and medication control program, the "activities" of the program, and its baseline rules. § 3055(b), (c), and (g).  For the racetrack safety program, HISA requires the Authority to "consider[]" existing safety standards, including those of three sources HISA lists; to incorporate twelve elements into the program; and to carry out specific "activities" under the program. § 3056 (a)–(c).

The Horsemen assert that this framework provides no boundaries to the FTC's authority and "no standards upon which to base its decisions" because the statute's

---

[21] To simplify and avoid redundancy, the Court refers to "anti-doping and medication control" as "medication control" when not directly quoting the statute.

"considerations" are given to the Authority.  Dkt. No. 54 at 14.  But the FTC can only

approve proposed rules if they are "consistent with" the statute—and the statute contains

those "considerations."  §§ 3053(c)(2); 3055(b).  In other words, the FTC may approve

proposed rules only if they are "consistent with" the many provisions delineating the

principles and elements the Authority must incorporate when developing proposed

standards.  Though not a paradigm of clarity, this suggests that the "elements" and

"considerations" apply equally to the FTC's review.[22]

        As in *Big Time Vapes*, Congress restricted the agency's—and the Authority's—

discretion by making some of the "key regulatory decisions itself."  *Big Time Vapes*, 963 F.3d

at 445.  HISA specifically creates the baseline list of permitted and prohibited substances by

incorporating the lists "in effect for the International Federation of Horseracing

Authorities."  § 3055(g)(2)[23]; *see Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,

896 F.3d 437, 441–42 (D.C. Cir. 2018) (recognizing that "federal law encourages"

incorporating "technical standards" by reference).  And it specifically prohibits the

administration of substances to covered horses within 48 hours of a race.  § 3055(d).  The

Authority only has the power to propose a modification to one substance included in this

_____

[22] The Horsemen also seem to suggest that using the word "considerations"—rather than
    "directives" or "principles" in the rulemaking guidance—is fatal.  Dkt. No. 54 at 15.  Precedent
    proves this distinction immaterial.  The Controlled Substances Act, the Horsemen's model of
    specific statutory guidance, directs the Attorney General to "consider . . . factors" in determining
    whether a substance is an "imminent hazard to the public safety."  21 U.S.C. § 811(h); *see* § 811(c);
    *Touby v. United States*, 500 U.S. 160, 165 (1991) (recognizing that "one cannot plausibly argue that
    §[811(h)]'s 'imminent hazard to the public safety' standard is not an intelligible principle").  In
    parallel fashion, HISA directs the Authority and the FTC to "consider . . . standards" and "take
    into consideration" enumerated factors and "elements" to ensure the "safety" and "integrity" of
    horseracing.  15 U.S.C. §§ 3055(b), 3056(a)(2).

[23] The Horsemen argue that "HISA . . . does not give direction as to what medications should be
    placed on the list."  Dkt. No. 54 at 15.  A plain reading of Section 3055(g)(2)(A)(i) refutes their
    assertion.

– 33 –

prohibition—furosemide—and may only do so if its board unanimously adopts four specific findings that the statute explicitly outlines: (1) the modification must be "warranted"; (2) the modification must be in the "best interests of horse racing"; (3) furosemide must have "no performance enhancing effect on individual horses"; and (4) "public confidence in the integrity and safety of racing [must] not be adversely affected." § 3055(e)(3)(B). And even if the Authority recommends such a change, that proposal must still run the gauntlet of FTC approval following notice and comment. *See* § 3053(b)(2) (providing that "a proposed modification to a rule . . . shall not take effect unless the proposed rule or modification has been approved by the Commission").

The Authority also has the power to propose modifications to the baseline rules. But before it can, it must consider, among other things, the following imperatives:

> (1) Covered horses should compete only when they are free from the influence of medications, other foreign substances, and methods that affect their performance.
>
> (2) Covered horses that are injured or unsound should not train or participate in covered races, and the use of medications, other foreign substances, and treatment methods that mask or deaden pain in order to allow injured or unsound horses to train or race should be prohibited.
>
> (3) The amount of therapeutic medication that a covered horse receives should be the minimum necessary to address the diagnosed health concerns identified during the examination and diagnostic process.

§ 3055(b).

For the racetrack-safety program, the Act's boundaries are more limited. HISA directs the Authority and the FTC to consider "existing safety standards," including those from "the National Thoroughbred Racing Association Safety and Integrity Alliance Code of Standards, the International Federation of Horseracing Authority's International Agreement

on Breeding, Racing, and Wagering, and the British Horseracing Authority's Equine Health and Welfare program." § 3056(b).  The "elements" of the program describe what it must contain.  They also specify that the training and racing safety standards must "tak[e] into account regional differences and the character of differing racing facilities" and be "consistent with the humane treatment of covered horses." § 3056(b)(1) & (2).

These considerations, topics, and elements confine the bounds of Congress's delegated authority to provide a sufficient intelligible principle.  HISA cabins Congress's delegation more than the many statutes the Supreme Court has upheld despite "very broad delegations." *Gundy*, 139 S. Ct. at 2129.  The standards it provides the Authority in proposing rules and the FTC in approving them as they seek to ensure the "safety, welfare, and integrity" of thoroughbred horseracing do not trespass the limits set by precedent.[24]  *See Big Time Vapes*, 963 F.3d at 442 n.18 (collecting cases).

An intelligible principle is necessary, but not sufficient, to save the Act, however.  The FTC must still exercise "authority and surveillance" over the Authority, which must function as a "subordinate[]" private entity.  *Adkins*, 310 U.S. at 399; *Boerschig*, 872 F.3d at 709 (holding that private entities cannot wield "unreviewable" power).  As explained next, HISA clears that hurdle as well.

---

[24] As the Fifth Circuit has recognized before, the Supreme Court "might well decide—perhaps soon—to reexamine or revive the [public] nondelegation doctrine.  But 'we are not supposed to . . . read tea leaves to predict where it might end up.'"  *Big Time Vapes*, 963 F.3d at 447 (quoting *United States v. Mecham*, 950 F.3d 257, 265 (5th Cir. 2020)).  And until that happens, given the specificity of the Act, its limited reach, the fact that it regulates a relatively small component of the national economy, and that many of the issues HISA addresses are already subject to state regulation, "it would be freakish to single out the [programs] at issue here for special treatment."  *Gundy*, 139 S. Ct. at 2131 (Alito, J., concurring).

ii.     **The Authority functions subordinately to the FTC because the FTC retains sole power to enact binding rules after independently reviewing the Authority's proposals.**

HISA suffers from neither of the "twin ills" the Fifth Circuit has identified as markers of private-nondelegation violations. *Boerschig*, 872 F.3d at 708. Unlike the private parties in *Carter Coal*, the Authority lacks unrestrained, unreviewable power to regulate the rest of the thoroughbred horseracing industry. *Id.* at 708–09 (discussing *Carter Coal*, 298 U.S. at 310–11). Rather, the Authority can propose rules to the FTC, which then submits them to the public for comment, independently reviews them, and afterward either approves or disapproves them with proposal for modification. *See* §§ 3052–53. In other words, the Authority has no independent power to enact binding rules and "function[s] subordinately" to the FTC. *Adkins*, 310 U.S. at 399. Without the FTC's independent review and approval, the Authority is left "to establish safety and performance standards for horseracing" in accordance with its bylaws (Dkt. No. 39-1 at 40)—but nothing it drafts will carry any legal effect for private parties. Lawmaking, then, is "not entrusted to the industry." *Adkins*, 310 U.S. at 399. The ability to "adopt generally applicable rules of conduct" remains with the FTC, according to the legislative policy Congress established in HISA. *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting) (explaining that the framers understood "legislative power . . . to mean the power to adopt generally applicable rules of conduct governing future actions by private persons"). Only the FTC can turn a draft rule into a "rule of prospective force." *Loving v. United States*, 517 U.S. 748, 758 (1996).

In this respect, HISA mimics other self-regulatory organizations (SROs) that have consistently withstood private nondelegation challenges. *See, e.g.*, *R. H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952) (citing *Adkins*, 310 U.S. 381). SROs are private

organizations that govern members of an industry under an agency's oversight.[25]  *See, e.g.*, 15 U.S.C. § 78*o*-3 (providing that "association[s] of brokers and dealers" may apply for registration with the SEC if they meet certain statutory terms and conditions).  Like the Authority, they possess "Congressionally-mandated power."  *Austin Mun. Sec., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 757 F.2d 676, 680 (5th Cir. 1985).  But "to prevent the misuse" of that power, Congress grants agencies "broad supervisory responsibilities" over these organizations.  *Id.*  Specifically, the Maloney Act gave birth to the SEC–FINRA model, which inspired the FTC–Authority relationship.  *See* Dkt. No. 53 at 15 (asserting that "HISA is modeled on the Maloney Act," which established the SEC–NASD (FINRA's predecessor) relationship).[26]

　　Circuit courts have uniformly rejected private nondelegation challenges to the Maloney Act, relying on the SEC's "power, according to reasonably fixed statutory standards, to approve or disapprove of [NASD] Rules."  *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982) (quoting *R. H. Johnson & Co.*, 198 F.2d at 695); *see also Todd & Co. v. SEC*, 557 F.2d 1008, 1012 (3d Cir. 1977).  Courts have likewise rejected challenges to NASD's ability to impose sanctions because the SEC has the power to "review [] any disciplinary action."  *Sorrell*, 679 F.2d at 1326 (quoting *R. H. Johnson & Co.*, 198 F.2d at 695).  Thus, every court to consider a nondelegation challenge to the Maloney Act has

---

[25] While agencies normally recognize SROs if they meet certain statutory terms and conditions, here, Congress "recognized" the Authority as a "self-regulatory" organization, setting statutory conditions for its structure and providing guidance for the development of its rules.  Congress, not the FTC, decided that an organization like the Authority was fit for a self-regulatory role under agency oversight.

[26] "FINRA is the successor organization to the National Association of Securities Dealers [NASD]." *See Scottsdale Cap. Advisors Corp. v. FINRA*, 844 F.3d 414, 417 n.1 (4th Cir. 2016).

concluded that there is "no merit in the contention that the Act unconstitutionally delegates power to" a private entity. *Id.*

Though the Fifth Circuit has not addressed a private nondelegation challenge to the Maloney Act, just last year it approvingly cited *R. H. Johnson & Co.*—the original case upholding the Maloney Act on nondelegation grounds. *See Rettig*, 987 F.3d at 532 n.12 (citing *R. H. Johnson & Co.*, 198 F.2d at 695). There, the Fifth Circuit rejected a private-legislative-nondelegation challenge to a Department of Health and Human Services (HHS) rule that granted power to a private entity. *Id.* at 531–32. The rule at issue required a private board to certify that the rates that states had to pay insurers in their Medicaid contracts were "actuarially sound." *Id.* at 526. But the board did so according to its own "practice standards," leading the district court to conclude that the rule unlawfully delegated legislative power to the private board "to set rules on actuarial soundness." *Id.* at 530–31. The Fifth Circuit first found that HHS did not subdelegate legislative authority to private entities because it only "reasonably conditioned" HHS's approval of state Medicaid contracts on the actuaries' standards and certification. *Id.* at 531. Next, assuming arguendo that "HHS subdelegated authority to private entities," the Fifth Circuit held that "such subdelegations were not unlawful." *Id.* at 532. The private board "function[ed] subordinately to" HHS because HHS maintained "final reviewing authority" over its activities. *Id.* (citing *Adkins*, 310 U.S. at 399). That is, HHS "independently perform[ed] its reviewing, analytical and judgmental functions." *Id.* (citing *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974)). Because HHS "reviewed and accepted" the board's standards, the rule did not "divest HHS of its final reviewing authority." *Id.* at 532–33 (citing *Louisiana Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 552 (5th Cir. 2014)).

HISA passes muster under *Rettig*'s rubric as well.  Structurally, the FTC possesses final reviewing authority over all of the Authority's proposed rules and standards. § 3053(b).  HISA even endows the FTC with greater oversight than HHS possessed.  Not only can the FTC approve the Authority's proposed rules, it can reject proposed rules and recommend modification after disapproval.  § 3053(c)(3).  HHS retained no such power without repealing wholesale the rule granting the board power in the first instance.  *Rettig*, 987 F.3d at 532 n.13; *see Texas v. Rettig*, 993 F.3d 408, 413 (5th Cir. 2021) (Ho, J.) (dissenting from denial of rehearing en banc) (explaining that HHS's "only recourse is to amend or repeal the rule delegating power to the Board in the first place").  In addition, all proposed rules are subject to notice and comment, which enables more scrutinizing agency review.  § 3053(c)(1).

To be sure, the subdelegated power in *Rettig* concerned only "a small part of the [contract] approval process" and that process was "closely 'superintended by HHS in every respect.'"  *Rettig*, 987 F.3d at 533 (citing *Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 708 n.5 (D.C. Cir. 1977)).  In HISA, by contrast, Congress instructs the Authority to draft myriad medication control and racetrack safety rules.  *See* §§ 3052, 3053.  But the private nondelegation analysis concerns the *scope* of agency review (*i.e.*, ultimate control over regulation) more than the *object* of its review (*i.e.*, the number of proposed rules).  *See Adkins*, 310 U.S. at 399.  Here, the object—development and implementation of medication and safety programs—appears sweeping.  But agency review is equally so.  No Authority rule can go into effect without notice and comment and independent FTC review and approval.  § 3053(b)–(c).

Another Fifth Circuit subdelegation case, *City of Dallas v. FCC*, similarly fails to help the Horsemen.  165 F.3d 341 (5th Cir. 1999).  There, the FCC promulgated a blanket rule banning cable operators from providing video programming coming from other service providers (OVS operators).  *Id.* at 357.  But under another FCC rule, OVS operators (private entities) could "selectively" lift this general ban for cable operators without any FCC oversight.  *Id.* at 358.  The Court held the FCC rule—permitting OVS operators to discriminate amongst cable operators—contradicted the plain language of the statute and impermissibly delegated regulatory authority to a private entity.  *Id.* at 357–58.  Critically, however, the FCC could not review the private entities' regulatory decisions.  *See In the Matter of Implementation of Section 302 of the Telecommunications Act of 1996 Open Video Sys.*, 11 F.C.C. Rcd. 20227, 20253 ¶ 52 (1996) ("We believe that it is not appropriate for the Commission to deny an open video system operator the *independent business discretion* to decide that a cable operator's presence on its system may be beneficial." (emphasis added)).  So while the Horsemen correctly assert that the FCC could not modify the private entities' decisions, the FCC also could not approve or disapprove their decisions.  Dkt. No. 38 at 27.  Here, the FTC can.  *See* § 3053(c).

But the subdelegation inquiry likely differs from Congress's choice to involve a private entity in the regulatory process.  In the subdelegation context, courts must ensure that an agency does not abdicate its *statutory duties* when reviewing particular private actions.  *Rettig*, 987 F.3d at 532; *Lynn*, 502 F.2d at 59 (noting that the statute does "not permit the responsible federal agency to abdicate its statutory duties by reflexively rubber stamping a statement prepared by others"; rather, "the agency must independently perform its reviewing, analytical and judgmental functions"); *see also Sierra Club v. Sigler*, 695 F.2d

957, 962 & n.3 (5th Cir. 1983). Here, by contrast, whether the FTC abdicates its statutory duties is irrelevant to the central question this facial challenge presents: whether the Authority's and FTC's assigned "statutory duties" were lawful in the first instance. That is why the subdelegation inquiry fits better with an as-applied challenge to a specific agency action—for example, failing to independently analyze and review a proposed rule—than with a facial challenge where the plaintiff must show that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). In any event, the Congressional authorization here likely puts HISA on firmer constitutional footing than subdelegations further removed from Congressional will. "[I]t is one thing to bless a Congressional decision to involve private parties in the rulemaking process. It is quite another to allow an agency—already acting pursuant to delegated power—to re-delegate that power out to a private entity." *Rettig*, 993 F.3d at 415 (Ho, J.) (dissenting from denial of rehearing en banc) (citing *Gundy*, 139 S. Ct. at 2123).

Still, the Horsemen argue that the statute itself renders the FTC a rubber stamp because the FTC has no pre-existing expertise in horseracing and only has 60 days to review proposed rules. Dkt. Nos. 38 at 23. Historically, valid private-public partnerships have involved agencies that possess independent expertise over the industry they are tasked with regulating. For example, the National Bituminous Coal Commission had expertise in the coal industry*,* and the SEC has expertise in securities regulation. *See Adkins*, 310 U.S. at 387–88; *Scottsdale Cap. Advisors Corp. v. FINRA*, 844 F.3d 414, 417–18 (4th Cir. 2016). This abnormality, however, is not fatal. While the Horsemen's concern is understandable—the parties agree that the FTC lacks pre-existing expertise in thoroughbred horseracing—neither contention presents an adequate legal basis on a facial challenge to hold that FTC review

will automatically prove meaningless.  Rather, the Court must presume that the FTC "will act properly and according to law."  *See FCC v. Schreiber*, 381 U.S. 279, 296 (1965); *see also United States v. Raines*, 362 U.S. 17, 22 (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases.").  And, at the hearing, the Horsemen stated that they were not concerned with the FTC wielding regulatory control over them.  Tr. at 117 (clarifying that they had no preference between being regulated by the Department of Agriculture or the FTC).  The Horsemen's concern lies with the Authority's power.  *Id.* at 117–18.

Moreover, some of HISA's goals fit neatly into the overall mission of the FTC— stopping unfair, deceptive, or fraudulent practices and promoting competition.  Dkt. No 38 at 12.  Congress passed HISA, in part, to stop cheating through the use of unauthorized substances and to otherwise increase the fairness of competition in horseracing and wagering.  *See, e.g.*, § 3059 ("Unfair or deceptive acts or practices").  By providing uniform rules and centralized enforcement, HISA promotes fair competition on a level playing field.

### iii.   HISA's unique features do not transform the Authority into an insubordinate entity, free from sufficient FTC oversight.

The Horsemen make several other compelling arguments, highlighting the unusual nature of the FTC–Authority relationship, but none establish a private nondelegation violation under current law.

### a.   The FTC's limited power to draft rules itself does not create a private nondelegation violation.

Though an uncommon feature in public-private partnerships, the FTC's limited ability to draft rules does not necessarily convert the Authority into an insubordinate entity in the rulemaking scheme.  Without Authority proposals, the FTC may adopt interim final

rules "if the Commission finds that such a rule is necessary to protect—(1) the health and safety of covered horses; or (2) the integrity of covered horseraces and wagering on those horseraces." § 3053(e).  But, as recognized in Section 3053(e), an agency may promulgate interim final rules only if it has "good cause" to find that notice and comment would be "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(3)(B).  Courts uniformly read "good cause" narrowly.  *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) (quoting *United States v. Garner*, 767 F.2d 104, 120 (5th Cir. 1985)).  So its "use 'should be limited to emergency situations.'"  *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (quoting *Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981)).  As a result, the FTC's ability to issue interim final rules is not much of an answer to the Horsemen's concern.

But Congress's decision to restrict the FTC's stand-alone rulemaking power parallels the private veto allowed in *Currin*.  306 U.S. at 16.  The Supreme Court has long allowed private parties to reject agency rules until their substance reflects the private parties' preferences.  *Id.*; *see Rock Royal*, 307 U.S. at 577–78; *see also Brackeen v. Haaland*, 994 F.3d 249, 352 n.63 (5th Cir. 2021) (recognizing that "the Supreme Court has historically upheld even delegations of authority to private entities" that "incorporate[] their decision-making into federal law") (citing *Currin* & *Rock Royal*).  Because part of the industry in *Currin* could veto government regulation, private parties ultimately determined whether any rule took effect and, therefore, what the substance of that rule would be.  In other words, the industry could hold the agency hostage.  Likewise, the Authority could theoretically do the same by refusing to propose a draft rule in an area the FTC wanted to regulate, but *Currin* and its progeny suggest that neither hypothetical would yield a constitutional harm.

– 43 –

Relying on the Amtrak litigation, the Horsemen argue that giving private parties both the power to draft rules and the power to veto the government's preferences violates the private nondelegation doctrine.  Dkt. No. 38 at 21–26.  Indeed, Congress can enter precarious territory when attempting to combine roles that private parties may play in the rulemaking process.  HISA, however, does not transgress these limits.

In *Amtrak I*, the D.C. Circuit struck down Section 207 of the Passenger Rail Investment and Improvement Act (PRIIA) because it unlawfully delegated "regulatory power to a private entity."  721 F.3d at 668; PRIIA, § 207, 49 U.S.C. § 24101. [27]  There, Congress authorized Amtrak—designated a private entity at the time—and the Federal Railroad Administration (FRA) to "jointly develop . . . metrics and standards" that would affect Amtrak's railway competitors.   PRIAA § 207(a).  Under this scheme, Amtrak enjoyed "equal footing" with the agency.  *Amtrak I*, 721 F.3d at 673.  Regulations required joint approval for passage.  And if the two entities disagreed as to the standards, either could petition the Surface Transportation Board to appoint an arbitrator to settle the disagreement.  PRIAA § 207(d).  Put another way, "[u]ltimate control over the regulatory standards did not rest with a neutral governmental agency; it could be exercised by Amtrak with an assist from the arbitrator."  *Ass'n of Am. Railroads v. United States Dep't of Transportation*, 896 F.3d 539, 546 (D.C. Cir. 2018) (*Amtrak IV*).

Referring to the valid arrangements in *Adkins* and *Currin*, the D.C. Circuit suggested that a private party's involvement may become unconstitutional when granted two separately permissible roles: (1) drafting and proposing regulations (*Adkins*) and

---

[27] The Supreme Court vacated the D.C. Circuit's opinion by holding that Amtrak was a governmental entity, so it did not evaluate PRIIA under the private nondelegation doctrine. *Amtrak II*, 575 U.S. at 43.

(2) effectively vetoing regulations developed by an agency (*Currin*).  *Amtrak I*, 721 F.3d at

671.  Even if the statute "merely synthesize[d] elements approved by *Currin* and *Adkins*, that

would be no proof of constitutionality."  *Id.* at 673.  "[N]ovelty," the court warned, "may,

in certain circumstances, signal unconstitutionality."  *Id.* (citing *Free Enter. Fund*, 561 U.S. at

505–06).  The court rejected the government's argument that the Constitution only required

"the government's 'active oversight, participation, and assent in its private partner's

rulemaking decisions.'"  *Id.*  That proposition—one the court found "nowhere in the case

law—vitiate[d] the principle that private parties must be limited to an advisory or

subordinate role in the regulatory process."  *Id.*  And because an arbitrator settled

disagreements between Amtrak and the FRA, "it would have been entirely possible for

metrics and standards to go into effect that had not been assented to by a single

representative of the government."  *Id.* at 674.

     While not disturbing the D.C. Circuit's private nondelegation analysis, the Supreme

Court vacated *Amtrak I*, holding that Amtrak was a governmental—not private—entity.

*Amtrak II*, 575 U.S. at 55.  Nonetheless, on remand, the D.C. Circuit held that Section 207

of PRIIA violated the Due Process Clause because it gave Amtrak, a self-interested entity

with a statutorily required profit-seeking motive, regulatory power over its competitors.

*Amtrak III*, 821 F.3d at 27–34.  For Due Process purposes, whether Amtrak was deemed a

governmental or private entity mattered not.  *Id.* at 31 ("Wherever Amtrak may fall along

the spectrum between public accountability and private self-interest, the ability—if it

exists—to co-opt the state's coercive power to impose a disadvantageous regulatory regime

on its market competitors would be problematic.") (citing Alexander Volokh, *The New

Private-Regulation Skepticism: Due Process, Non-Delegation, and Antitrust Challenges*, 37 Harv.

J.L. & Pub. Pol'y 931 (2004)).  Its ability to pursue self-interest over its competitors was the

real problem.  *Id.* at 34.  Thus, the D.C. Circuit almost exclusively relied on *Carter Coal* to

hold Section 207 unconstitutional.  *Id.* at 35–36.  And, especially relevant here, the D.C.

Circuit held that *Adkins* and *Currin* were inapplicable because the "FRA's authority to hold

the line against overreaching by Amtrak is undermined by the power of the arbitrator."  *Id.*

at 34 n.4.  The FRA was "powerless to overrule Amtrak" because, "[a]s joint developers,

they occupy positions of equal authority."  *Id.* at 35.  Thus, the FRA could not keep

"Amtrak's naked self-interest in check."  *Id.*

The ultimate remedy?  Severing the arbitration provision.  *Amtrak IV*, 896 F.3d at

545.  "For it empowered Amtrak to impose on its competitors rules formulated with its own

self-interest in mind, *without the controlling intermediation of a neutral federal agency*."  *Id.*

(emphasis added).  The problem was that "Amtrak, through unilateral resort to the

arbitrator, had the power 'to make law' by formulating regulatory metrics and standards

without the agreement or control of the Administration."  *Id.* at 548 (quoting *Amtrak III*, 821

F.3d at 23).  Consistent with the Fifth Circuit's analyses in *Boerschig* and *Rettig*, the D.C.

Circuit found that the power to make law without government review or approval violated

the Due Process Clause under *Carter Coal*.  *See id.* at 541.

Because the arbitration provision allowed Amtrak's standards to take legal effect over

the government's objection, the D.C. Circuit could distinguish the cases upholding the

SEC–NASD model.  *Amtrak I*, 721 F.3d at 671 n.5 ("In none of these cases did a private

party stand on equal footing with a government agency.") (citing, inter alia, *Sorrell*, 679 F.2d

at 1325–26).  Here, by contrast, the Authority can never enact rules without FTC review

and approval.  § 3053(b).  And once the arbitration provision was severed, Amtrak's dual

powers to draft standards and veto the FRA's preferences presented no legal problem. Amtrak no longer had "power 'to make law' . . . without the agreement or control" of the agency. *Amtrak IV*, 896 F.3d at 548 (quoting *Amtrak III*, 821 F.3d at 23). Unlike the FRA, the FTC is not "powerless to overrule" the Authority. *Amtrak III,* 821 F.3d at 35. Indeed, the FTC always has "the final say." *Boerschig*, 872 F.3d at 708.

The Horsemen's reliance on the dissenting judges' nondelegation analysis in *Brackeen v. Haaland* likewise falls short. Dkt. No. 38 at 23. In *Brackeen*, the plaintiffs challenged the Indian Child Welfare Act (ICWA) on nondelegation grounds because it allowed tribes "to establish an order of adoptive and foster preferences that is different from the order set forth" by Congress elsewhere in the statute. *Brackeen*, 994 F.3d at 269 (citing 25 U.S.C. § 1915(c)). Under this authority, the Bureau of Indian Affairs promulgated a rule stating that a tribe's "preferences apply over those initially specified in ICWA." *Id.* at 346 (citing 25 C.F.R. § 23.130). The en banc majority upheld this rule and the statutory provision enabling it, finding that it did not violate the nondelegation doctrine because it "validly integrates tribal sovereigns' decision-making into federal law, regardless of whether it is characterized as a prospective incorporation of tribal law or an express delegation by Congress." *Id.* at 352. The court's decision relied on the tribes' sovereign character, making the majority's reasoning largely irrelevant here.

But the Horsemen urge the Court to apply the nondelegation reasoning of the dissenting judges, which treated the tribes as private entities in part of its analysis. Dkt. No. 38 at 23–24. First, the dissenting judges would have found a nondelegation violation because the statute did not "delegate to tribes authority merely to regulate under Congress's general guidelines." *Brackeen*, 994 F.3d at 420 (Duncan, J., dissenting). Rather, it

"empowere[d] tribes to change the substantive preferences Congress enacted" and "bind courts, agencies, and private persons to follow them." *Id.* at 421. Second, viewing the statute as delegating only regulatory—not legislative—authority, they would still have held it unconstitutional "because it delegates that authority outside the federal government." *Id.* at 422. The Horsemen translate this to mean "when an entity is private, it cannot be given the sole authority to *draft* regulations." Dkt. No. 38 at 23–24 (emphasis added).

But the Horsemen's translation has never been the test, as the SEC–FINRA model demonstrates. Drafting for agency review was not the problem—drafts do not bind. The problem in *Brackeen* (for the dissenters, at least) was that the statute empowered tribes to draft, enact, and bind others to their preferences. Here, by contrast, the Authority cannot change Congress's preferences. In fact, it cannot change anything: the FTC retains the exclusive power to give draft rules the force of law and, in doing so, ensures that the Authority's proposals are consistent with—not contrary to—Congress's will.[28]

### b.    HISA adequately guides the FTC in its review of proposed rules.

The Horsemen also attack the "limited guidance" HISA gives the FTC in its review of proposed rules because the FTC must approve proposed rules that are "consistent with" the Act and with "applicable rules." Dkt. No. 54 at 14; § 3053(c)(2). Though the Horsemen accuse HISA of providing the FTC no standards on which to base its decisions (Dkt. No. 54 at 14), HISA provides criteria governing both the Authority and FTC. *See supra* Section 3.B.i. At a minimum, "consistent with" the Act means that the FTC must independently ensure that proposed rules are consistent with "the safety, welfare, and integrity of covered

---

[28] The Fifth Circuit also identified "no binding precedent to support a rule that regulatory power cannot be delegated outside the federal government." *Brackeen*, 994 F.3d at 352.

horses, covered persons, and covered horseraces." § 3054(a)(2)(A).  More specifically,

consistency review ensures that rulemaking comports with the elements, considerations,

baseline rules, and express prohibitions the Act contains.

The Horsemen's seemingly largest concern comes from a rule that Congress

explicitly mandated: the 48-hour substance prohibition in Section 3055(d).  Here, the

Authority must propose a rule mimicking Congress's express intent.  *Cf. Pittston Co. v. United*

*States*, 368 F.3d 385, 396 (4th Cir. 2004) (finding that private entities serving "functions

specifically defined and mandated by Congress" do not run afoul any private nondelegation

concerns).  And if the Authority attempted to deviate from a Congressional mandate, the

FTC would summarily disapprove the proposed rule as inconsistent with the Act.

Similarly, Congress itself provided lists of the baseline rules for the medication

control program.  § 3055(g).  Consistency review in this context likewise confines the

Authority and the FTC to Congress's express will, with limited exceptions.  Though the

Authority may propose modified rules to the baseline program, the FTC must approve

proposed modification only if it determines they are consistent with the principles the Act

lists, including: (1) "horses should compete only when they are free from" substances "that

affect their performance"; (2) substances that "mask or deaden pain in order to allow injured

or unsound horses to train or race should be prohibited"; and (3) any "therapeutic

medication" given to a covered horse "should be the minimum necessary to address the

diagnosed health concerns."  *See* § 3055(b).  As detailed above in the legislative-standards

section, the Authority's proposed rules must comport with certain principles on the front

end, which the FTC must independently verify on the back end.  *See supra* Section 3.B.i.

Finally, the notice and comment period also buttresses FTC review by allowing all industry stakeholders to highlight potential inconsistencies with HISA.

Despite HISA's unique characteristics, the Horsemen's argument is also undermined by the fact that HISA's consistency review tracks the SEC's review of FINRA rules.  Under the Maloney Act, the SEC "shall approve a proposed rule change of a self-regulatory organization" if "consistent with" the requirements of the Maloney Act and applicable rules.  15 U.S.C. § 78s(b)(2)(C)(i).  Yet the Court recognizes that, because the FTC can only disapprove rules that are inconsistent with the statute, HISA largely gives the Authority the power to "fill up the details" of the Act in places with less specific directives.  *Gundy*, 139 S. Ct. at 2136 (quoting *Wayman v. Southard*, 23 U.S. 1, 20 (1825)).  Filling up the details has long been recognized as the very business of regulating.  *United States v. Grimaud*, 220 U.S. 506, 517 (1911) (recognizing that the "power to fill up the details" of legislation *is* the power to make "administrative rules and regulations").  Furthermore, review for consistency resembles an adjudicative, rather than regulatory, function akin to courts reviewing agency action for whether it is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).  And because Congress withheld the FTC's ability to modify proposed rules, the Authority wields greater power than FINRA and the private entities in *Adkins*. Though distinguishing HISA from the schemes on which it was modeled, these features do not take HISA outside established constitutional limits for the reasons stated above.

### c.     The FTC's inability to formally modify proposed rules does not render HISA unconstitutional under current law.

Because the FTC has the power to approve, disapprove, and recommend modifications to the Authority's proposed standards, its inability to formally modify the Authority's rules is not fatal.  Though the agency in *Adkins* retained the ability to modify the

private parties' proposed prices and standards, the Horsemen acknowledge that the Supreme Court "did not rely on this fact in its reasoning." Dkt. No. 38 at 29. In fact, they clarify that the phrase "approve, disapprove, or modify" has been "taken out of context" by later courts. *Id.* Moreover, the agency in *Currin* could not modify its regulation without industry approval. *See* 306 U.S. at 16. Nor could the FRA modify any standards without Amtrak's agreement, even after the arbitration provision had been severed. *See Amtrak IV*, 896 F.3d at 545.

Though arising in the subdelegation context, the Fifth Circuit's view also supports the conclusion that *Adkins* did not turn on the commission's ability to modify proposed rules. In *Rettig*, HHS retained no ability to modify the private board's standards and certifications. 987 F.3d at 532. Rather, aside from the drastic remedy of repealing the board's involvement entirely, HHS could only "review[] and accept[]" the board's standards. *Id.* at 533. That HHS lacked modification power formed one of the dissent's primary critiques. *See* 993 F.3d at 415 (Ho, J.) (dissenting from denial of rehearing en banc) ("[W]hile the instant scheme arguably allows HHS to 'approve' private standards and actuarial certifications, it emphatically does not leave HHS free to 'disapprove or modify' them.") (quoting *Amtrak I*, 721 F.3d at 671). This Court, of course, is bound by majority opinions.

Consistent with the analyses of *Adkins* and *Rettig*, the decisions upholding the Maloney Act against delegation challenges do not rest their conclusions on the SEC's ability to "modify" NASD rules. *See, e.g.*, *Todd & Co.*, 557 F.2d at 1012. Rather, courts have limited their rulemaking analyses to whether the agency could "approve or disapprove" the private entity's rules even though the SEC retains authority to amend their rules. *Id.*; *see*

*Aslin v. FINRA*, 704 F.3d 475, 476 (7th Cir. 2013) (citing 15 U.S.C. § 78s(c)) (recognizing that the SEC may "abrogate, add to, and delete from all FINRA rules as it deems necessary").  Here, the FTC retains the power to approve or disapprove all rules and, "in the case of disapproval," it "shall make recommendations to the Authority to modify the proposed rule."  § 3053(c)(3)(A).  The defendants argue that there is "no functional difference" between this scheme and true modification power because any rejected proposed rules may be resubmitted if they "'incorporate[] the modifications recommended' by the FTC."  Dkt. No. 60 at 13 (quoting § 3053(c)(3)(B)).  If the Authority fails to "incorporate" the FTC's recommended modification, the FTC could continue to reject the proposed rule.  Though not the equivalent of drafting the rule itself, the power to approve, disapprove, or recommend modification subject to continued rejection ensures that the Authority still "functions subordinately" to the FTC such that the FTC "determines" the binding rules.  *See Adkins*, 310 U.S. at 399.

Again, the Horsemen's grievance is understandable.  Unlike, the SEC–FINRA relationship, the FTC needs the Authority to function as a typical regulator.  *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) ("Absent the unique self-regulatory framework of the securities industry, [FINRA's] responsibilities would be handled by the SEC.").  Only an act of Congress could permanently amend any Authority rule or divest it of its powers.  The FTC may never command the Authority to change its rules or abolish its role in the administrative process.  But Congress has restricted an agency's power before to an arguably greater degree.  The agency in *Currin* could never order the industry to accept its regulatory preferences.  306 U.S. at 16.  Congress limited its regulatory authority to the consent of private parties.  *Id.*

Though the Fifth Circuit has not yet confronted a scheme like HISA, its precedents on the private nondelegation doctrine indicate that Congress has not given away its legislative power under Article I nor violated due process because the Authority does not possess unrestrained and unreviewable power to regulate. *See Rettig*, 987 F.3d at 532; *Boerschig*, 872 F.3d at 708–09. Rather, legislative standards guide the Authority and the FTC, and the FTC controls the promulgation of binding rules. Thus, HISA's rulemaking mechanism does not violate the private nondelegation doctrine.

### B.     The Authority's enforcement powers comport with due process.

Outside of the Authority's rule-drafting power, the Horsemen argue that several of the Authority's non-legislative regulatory functions violate the private nondelegation doctrine. Dkt. No. 38 at 21–32. For example, the Horsemen challenge the Authority's power to investigate and punish rule violations.[29] These functions, however, comport with due process as articulated in *Boerschig*.[30]

The Authority does not have the "unrestrained ability to decide whether another citizen's property rights can be restricted." *Boerschig*, 872 F.3d at 708. The Authority may only investigate rule violations according to "uniform procedures" reviewed and approved

---

[29] The Horsemen also point to the Authority's ability to commence civil actions as an example of the "lack of historical precedent" for the scheme and "the breadth" of its enforcement powers. Dkt. No. 38 at 19 (citing *Buckley v. Valeo*, 424 U.S. 1, 140 (1976)). In the hearing, however, the Horsemen conceded that this ability did not constitute a separate claim but went instead to the Court's irreparable-harm analysis. Tr. at 23. Because the Horsemen do not establish success on the merits of their claims, however, the Court need not engage in an irreparable-harm analysis as it relates to permanent injunctive relief.

[30] Additionally, the Authority Nominating Committee's power to select its board and committee members does not implicate the nondelegation doctrine nor due process, because they are not governmental powers in the first place. *See, e.g.*, *Pittston Co. v. United States*, 368 F.3d 385, 396 (4th Cir. 2004) (noting that a private entity's "internal governance . . . in no way impinges upon others" and "clearly do[es] not violate the nondelegation doctrine").

by the FTC, and they cannot impose any penalty or sanctions without providing due process and an impartial tribunal.  §§ 3054(c), 3057(c)(3).  Thus, even prior to FTC review, due process is baked into the system.  Moreover, any Authority decision with final, legal effect is subject to de novo review by an ALJ, whose decision may then be reviewed de novo by the FTC.  *See* § 3058(b), (c).  This de novo review includes the ability to "reverse, modify, [or] set aside" any sanction of the Authority.  *Id.*  And any determination by an ALJ or the FTC is a "Final Decision" under the APA, enabling judicial review.  § 3058(b)(3)(B); *see* § 3058(c)(2)(B); *see also* Administrative Procedure Act § 10, 5 U.S.C. § 704 (outlining judicial review of administrative agency decisions).

Case law supports this conclusion.  The Maloney Act authorizes private entities to perform certain investigative and disciplinary functions, subject to the SEC's oversight.  *See* 15 U.S.C. § 78*o*-3(h)(3).  This aspect of the Maloney Act has been upheld against constitutional challenges on many occasions.  *See Sorrell*, 679 F.2d at 1325–26; *Todd & Co.*, 557 F.2d at 1014; *R. H. Johnson & Co.*, 198 F.2d at 695.  And these decisions focus on the SEC's ability to review any disciplinary action de novo, which the FTC retains.  *See Sorrell*, 679 F.2d at 1326 & n.2 (citing *R. H. Johnson & Co.*, 198 F.2d at 695).  In addition to HISA's layers of review, the Authority points out that the FTC's review is even more substantial than the SEC's review of FINRA decisions.  *Compare, e.g.*, 15 U.S.C. § 3058(c)(3)(C) (providing for "consideration of additional evidence"), *with* 15 U.S.C. § 78s(e)(1) (providing that the SEC hearing "may consist solely of consideration of the record before the self-regulatory organization and opportunity for the presentation of supporting reasons to affirm, modify, or set aside the sanction").

By contrast, in *Carter Coal*, *Eubank*, and *Roberge*—the cases invalidating private delegations—"the actions of the private party [were] unreviewable." *Boerschig*, 872 F.3d at 709. Any deprivation caused by their actions was "final." *Boerschig*, 872 F.3d at 708 (quoting *Roberge*, 278 U.S. at 121–22). To the extent these enforcement powers implicate Article I or the Due Process Clause, they do not violate the private nondelegation doctrine.

### C.   The Authority is not a self-interested industry competitor.

Relying on *Amtrak III*, the Horsemen also move for summary judgment under the theory that they will be regulated by an economically self-interested competitor in violation of due process. Dkt. 38 at 7. The test they put forth asks whether "a self-interested entity" possesses "regulatory authority over its competitors." *Amtrak III*, 821 F.3d at 32–34. They assert, however, that the "legal analysis is the same whether the economic self-interest constitutes a violation of the Due Process Clause or the private nondelegation doctrine." Dkt. No. 38 at 32 (citing *Amtrak I*, 721 F.3d at 671 n.3). The Authority agrees. Dkt. No. 56 at 36. And, as discussed, the Fifth Circuit treats the private-nondelegation doctrine as a due process issue, suggesting that the claims are coterminous. *See Boerschig*, 872 F.3d at 707–09 (discussing *Carter Coal*). Having already found that HISA falls within the permissible boundaries of private-nondelegation precedent, this claim fares no better for the same reasons.

Assuming that the inquiries are different, however, the Court finds that the Authority is not a self-interested industry competitor creating a due process violation under the Horsemen's alternate theory. HISA explicitly protects against self-interest while preserving industry representation in the Authority. Five of the Authority's nine board members must be "independent members selected from outside the equine industry," meaning that

directors in the controlling coalition cannot be members or representatives of any organization of "owners, breeders, trainers, racetracks, veterinarians, State racing commissions, and jockeys." §§ 3051(8), 3052(b). While four directors must be selected from the industry, "not more than one industry member [may be selected] from any one equine constituency," such as owners or trainers. § 3052(b)(1)(B)(ii). Moreover, the conflicts-of-interest section precludes any person "who has a financial interest in, or provides goods or services to, covered horses," as well as that person's family members, from serving as a member of the "Board or as an independent member of a nominating or standing committee." § 3052(e)(1)–(4). Commercial relationships to those with financial interests in covered horses are likewise barred. § 3052(e)(3). In other words, the Board, while maintaining some industry representation, explicitly prevents any member from competing with any Horsemen or possessing financial interests in the industry.

The Horsemen's CEO alleges in his affidavit that the Horsemen "compete in the horseracing industry with those who selected the Nominating Committee for the Authority and advocated for passage of HISA. Dkt. No. 39-1 at 3. The Authority disputes this "unfounded conclusion." Dkt. No. 56 at 12. And the Horsemen later admit that it is "impossible to know who selected the nominating committee members." Dkt. No. 59 at 21. In any event, the dispute is not material. While the selection of the Nominating Committee is less than clear, it does not repeal the conflict-of-interest provisions found in the statute, nor render their protections meaningless. HISA prevents the type of "structural risk" that may present due process problems. *See N. Carolina State Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 510 (2015). All seven members of the Nominating Committee must be "independent," equally subject to the conflict-of-interest provisions, which bar them from

financial, commercial, and familial relations with the industry.  § 3052(e).  The Horsemen's

insinuation that the Jockey Club and others will puppeteer the independent members of the

Nominating Committee and Board is both insufficiently supported at this point and requires

an assumption of bad faith inappropriate for a facial challenge.  *See Wash. State Grange v.*

*Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008) ("In determining whether a law is

facially invalid, we must be careful not to go beyond the statute's facial requirements and

speculate about 'hypothetical' or 'imaginary' cases.").

      The Horsemen also argue that the standing committees—which provide advice to the

Board—are infected with self-interest, but their argument fails for similar reasons.  Four of

the seven members of both committees must be independent and subject to the conflict-of-

interest provisions.  §§ 3052(c)(1)–(2).  Only one of the remaining three members may own a

covered horse, while the other two industry members must represent other "equine

constituencies." *Id.*  Both standing committees, however, are subject to the Board's

oversight, which, in turn, is subject to FTC oversight.  *See Amtrak IV*, 896 F.3d at 545

(finding that it "raise[s] no constitutional eyebrow as long as the government agency [can]

'hold the line' against the entity's 'overreaching' to advance its own self-interests") (quoting

*Amtrak III*, 821 F.3d at 34 n.4).  Therefore, no single Authority member wields "coercive

power" over others.  *Amtrak III*, 821 F.3d at 31; *see also* § 3052(g) ("For all items where

Board approval is required, the Authority shall have present a majority of *independent*

members.") (emphasis added).

      In addition, the Horsemen also argue that the Authority itself is self-interested

because they will charge fees.  Dkt. No. 54 at 30.  Such is the nature of any "self-regulatory"

organization, which, unlike Amtrak, has no profit-seeking motive as a nonprofit

corporation.  *See* § 3052(a) (stating the Authority is a "private, independent, self-regulatory, nonprofit corporation"); *see also* 15 U.S.C. § 78*o*-3(b)(5) (providing that self-regulatory organizations, like FINRA, require "reasonable dues, fees and other charges").  In fact, Amtrak is "statutorily obligated to 'be operated and managed as a for-profit corporation.'" *Amtrak III*, 821 F.3d at 32 (quoting 49 U.S.C. § 24301(a)(2)).  Like FINRA, the Authority is not.  And its "formula or methodology" for determining fees is subject to FTC review and approval like all other proposed rules.  § 3053(a)(11).  HISA also requires that any fees the Authority collects from covered persons must be done so "equitably" among "covered persons."  § 3052(f)(3)(B).  Additionally, for the Horsemen to succeed on this theory, they must show that the Authority, as an entity, is one of their competitors.  This they have not done.

        To the extent the Horsemen are concerned about self-interest in the disciplinary process, HISA again mitigates any concerns despite stricter due process demands for "adjudicatory" functions than for "rulemaking" functions.  *Amtrak III*, 821 F.3d at 27 n.3 (distinguishing *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248 (1980) (recognizing "rigid requirements" of impartiality for adjudicators); *Tumey v. Ohio*, 273 U.S. 510, 532 (1927) (finding a due process violation when a mayor sat as judge over a criminal trial where he would receive the fines he imposed); *Ward v. Village of Monroeville*, 409 U.S. 57 (1972) (similar); *Gibson v. Berryhill*, 411 U.S. 564, 578 (1973) (finding that an Optometry Board "composed solely of optometrists in private practice for their own account" was "so biased by prejudgment and pecuniary interest that it could not constitutionally conduct [license revocation] hearings" for other optometrists)).  Here, the statute requires that "impartial hearing officers or tribunals" conduct all rule violation adjudications according to

procedures—approved by the FTC—that afford adequate due process before any sanction may be imposed. § 3057(c)(1)–(3). Contrary to the Horsemen's characterization (Dkt. No. 54 at 32), these protections prevent the Authority from having "the unrestrained ability to decide whether another citizen's property rights can be restricted." *Boerschig*, 872 F.3d at 708. And, as detailed above, all disciplinary proceedings are subject to two layers of de novo FTC review. *See* § 3058(b)–(c).

Given the statutory protections, the Authority's nonprofit, self-regulatory nature, and its subordinate role to the FTC in the regulatory process, the Horsemen's alternative due-process theory fails.

**5.     Conclusion**

The Court recognizes that HISA's regulatory model pushes the boundaries of public-private collaboration. The Court also acknowledges the dramatic change that HISA imposes nationwide on the thoroughbred horseracing industry. But that change resulted from a decision of the people through Congress. And despite its novelty, the law as constructed stays within current constitutional limitations as defined by the Supreme Court and the Fifth Circuit. Perhaps the Supreme Court or the Fifth Circuit will cabin their private-nondelegation precedent in light of HISA's reach. But this district court will not "read tea leaves to predict where [the doctrines] might end up.'" *Big Time Vapes*, 963 F.3d at 447 (quoting *Mecham*, 950 F.3d at 265). Indeed, "[d]eclaring unconstitutional an Act of Congress, duly adopted by the Legislative Branch and signed into law by the Executive, is one of the gravest powers courts exercise." *Amtrak IV*, 896 F.3d at 544. And under present articulations of the private-nondelegation doctrine, the plaintiffs' challenge must fail.

– 59 –

The plaintiffs abandoned their Appointments Clause claim (Claim II) and public nondelegation claim (Claim III), so they are dismissed.  The Court denies the plaintiffs' motion for summary judgment (Dkt. No. 37) and grants the defendants' motions to dismiss (Dkt. Nos. 34; 36) the plaintiffs' Article I private-nondelegation claim and due-process claim.  Because the plaintiffs' claims assert facial challenges based on the statute's language, amendment would be futile.  The statute's language is fixed.  Accordingly, the plaintiffs' claims are dismissed with prejudice.

So ordered on March 31, 2022.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE