# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | |
|---|---|
| NATIONAL HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION et al., <br><br> Plaintiffs, <br><br> and <br><br> THE STATE OF TEXAS et al., <br><br> Intervenor-Plaintiffs, <br><br> v. <br><br> JERRY BLACK et al., <br><br> Defendants. | No. 5:21-cv-00071-H <br><br><br> **PLAINTIFFS' SECOND AMENDED COMPLAINT** |

## I.  INTRODUCTION

1.     Thousands of owners and trainers of Thoroughbred racehorses represented by Plaintiffs bring this action to challenge the federal Horseracing Integrity and Safety Act ("HISA"), which grants a private, non-governmental organization governmental power to regulate Plaintiffs and others in the horseracing industry without the pervasive surveillance and oversight of the Federal Trade Commission (FTC). This Court should declare HISA unconstitutional and enjoin Defendants from implementing and enforcing the law.

2.     "Federal lawmakers cannot delegate regulatory authority to a private entity." *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir.

2013) (vacated and remanded on other grounds by *Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225 (2015)). Under the private nondelegation doctrine, granting regulatory authority to a private entity violates the vesting clauses of the Constitution, which places governmental power in the hands of only governmental actors and agencies. The Act has already been declared unconstitutional by the U.S. Court of Appeals for the Fifth Circuit once. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022). Congress subsequently made one modification to the act. Consolidated Appropriations Act, 2023, div. O, tit. VII, § 701 (2022). The amended act is still unconstitutional, because the Authority still is not "subordinate to" and "in aid of" the FTC, or put differently the FTC does not have "pervasive surveillance and authority" over the Authority.

## II. PARTIES

3.      Plaintiff National Horsemen's Benevolent and Protective Association ("National HBPA") is a not-for-profit corporation with its principal place of business in Lexington, Kentucky. Since 1940 it has represented the interests of Thoroughbred racehorse owners and trainers in the United States and Canada. The National HBPA has close to 30,000 members in 30 affiliate organizations throughout the United States and Canada. It is the largest representation group of Thoroughbred owners and trainers in the United States. Membership is open without restriction to all

owners and trainers licensed by state racing authorities.

4.     Plaintiff National HBPA's purpose, as set forth in its by-laws, includes co-operating with governmental authorities charged with regulating horse racing; making recommendations in the best interest of racing and its participants, including medication and safety rules; and representing owners and trainers before state and federal governmental entities, national industry organizations, and trade associations. Its principal goals are providing a representative voice for all Thoroughbred horsemen on matters integral to the advancement of Thoroughbred racing in the United States and Canada and encouraging the highest standards of horsemanship to continuously improve the care, health, and safety of the horse.

5.     Plaintiff Arizona Horsemen's Benevolent and Protective Association ("Arizona HBPA") is a not-for-profit corporation with its principal place of business in Phoenix, Arizona. It is an affiliate of the National HBPA. The Arizona HBPA Thoroughbred owner and trainer members are licensed by the Arizona Racing Commission, the state agency with regulatory authority over all aspects of racing in Arizona, including promulgating and enforcing equine medication and safety rules.

6.     Plaintiff Arizona HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Arizona Racing

Commission, including those governing equine medication and safety.

7.     Plaintiff Arkansas Horsemen's Benevolent and Protective Association ("Arkansas HBPA") is a not-for-profit corporation with its principal place of business in Hot Springs, Arkansas. It is an affiliate of the National HBPA. The Arkansas HBPA Thoroughbred owner and trainer members are licensed by the Arkansas Racing Commission, the state agency with regulatory authority over all aspects of racing in Arkansas, including promulgating and enforcing equine medication and safety rules.

8.     Plaintiff Arkansas HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Arkansas Racing Commission, including those governing equine medication and safety.

9.     Plaintiff Indiana Horsemen's Benevolent and Protective Association ("Indiana HBPA") is a not-for-profit corporation with its principal place of business in Shelbyville, Indiana. It is an affiliate of the National HBPA. The Indiana HBPA Thoroughbred owner and trainer members are licensed by the Indiana Racing Commission, the state agency with regulatory authority over all aspects of racing in Indiana, including promulgating and enforcing equine medication and safety rules.

10.     Plaintiff Indiana HBPA negotiates contracts on behalf of its members

with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Indiana Racing Commission, including those governing equine medication and safety.

11.    Plaintiff Illinois Horsemen's Benevolent and Protective Association ("Illinois HBPA") is a not-for-profit corporation with its principal place of business in Caseyville, Illinois. It is an affiliate of the National HBPA. The Illinois HBPA Thoroughbred owner and trainer members are licensed by the Illinois Racing Commission, the state agency with regulatory authority over all aspects of racing in Illinois, including promulgating and enforcing equine medication and safety rules.

12.    Plaintiff Illinois HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Illinois Racing Commission, including those governing equine medication and safety.

13.    Plaintiff Louisiana Horsemen's Benevolent and Protective Association ("Louisiana HBPA") is a not-for-profit corporation with its principal place of business in New Orleans, Louisiana. It is an affiliate of the National HBPA. The Louisiana HBPA Thoroughbred owner and trainer members are licensed by the Louisiana Racing Commission, the state agency with regulatory authority over all aspects of racing in Louisiana, including promulgating and enforcing equine

medication and safety rules.

14.    Plaintiff Louisiana HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Louisiana Racing Commission, including those governing equine medication and safety.

15.    Plaintiff Mountaineer Park Horsemen's Benevolent and Protective Association ("Mountaineer Park HBPA") is a not-for-profit corporation with its principal place of business in Newell, West Virginia. It is an affiliate of the National HBPA. The Mountaineer Park HBPA Thoroughbred owner and trainer members are licensed by the West Virginia Racing Commission, the state agency with regulatory authority over all aspects of racing in West Virginia, including promulgating and enforcing equine medication and safety rules.

16.    Plaintiff Mountaineer Park HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the West Virginia Racing Commission, including those governing equine medication and safety.

17.    Plaintiff Nebraska Horsemen's Benevolent and Protective Association ("Nebraska HBPA") is a not-for-profit corporation with its principal place of

business in Lincoln, Nebraska. It is an affiliate of the National HBPA. The Nebraska HBPA Thoroughbred owner and trainer members are licensed by the Nebraska Racing Commission, the state agency with regulatory authority over all aspects of racing in Nebraska, including promulgating and enforcing equine medication and safety rules.

18.    Plaintiff Nebraska HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Nebraska Racing Commission, including those governing equine medication and safety.

19.    Plaintiff Oklahoma Horsemen's Benevolent and Protective Association ("Oklahoma HBPA") also does business as the Thoroughbred Racing Association of Oklahoma and is a not-for-profit corporation with its principal place of business in Oklahoma City, Oklahoma. It is an affiliate of the National HBPA. The Oklahoma HBPA Thoroughbred owner and trainer members are licensed by the Oklahoma Racing Commission, the state agency with regulatory authority over all aspects of racing in Oklahoma, including promulgating and enforcing equine medication and safety rules.

20.    Plaintiff Oklahoma HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which

racing occurs, consistent with applicable state laws and regulations of the Oklahoma Racing Commission, including those governing equine medication and safety.

21.      Plaintiff Oregon Horsemen's Benevolent and Protective Association ("Oregon HBPA") is a not-for-profit corporation with its principal place of business in Portland, Oregon. It is an affiliate of the National HBPA. The Oregon HBPA Thoroughbred owner and trainer members are licensed by the Oregon Racing Commission, the state agency with regulatory authority over all aspects of racing in Oregon, including promulgating and enforcing equine medication and safety rules.

22.      Plaintiff Oregon HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Oregon Racing Commission, including those governing equine medication and safety.

23.      Plaintiff Pennsylvania Horsemen's Benevolent and Protective Association ("Pennsylvania HBPA") is a not-for-profit corporation with its principal place of business in Grantville, Pennsylvania. It is an affiliate of the National HBPA. The Pennsylvania HBPA Thoroughbred owner and trainer members are licensed by the Pennsylvania Racing Commission, the state agency with regulatory authority over all aspects of racing in Pennsylvania, including promulgating and enforcing equine medication and safety rules.

24.     Plaintiff Pennsylvania HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Pennsylvania Racing Commission, including those governing equine medication and safety.

25.     Plaintiff Tampa Bay Horsemen's Benevolent and Protective Association ("Tampa Bay HBPA") is a not-for-profit corporation with its principal place of business in Oldsmar, Florida. It is an affiliate of the National HBPA. The Tampa Bay HBPA Thoroughbred owner and trainer members are licensed by the Florida Department of Business and Professional Regulation, the state agency with regulatory authority over all aspects of racing in Florida, including promulgating and enforcing equine medication and safety rules.

26.     Plaintiff Tampa Bay HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Florida Department of Business and Professional Regulation, including those governing equine medication and safety.

27.     Plaintiff Washington Horsemen's Benevolent and Protective Association ("Washington HBPA") is a not-for-profit corporation with its principal

place of business in Auburn, Washington. It is an affiliate of the National HBPA. The Washington HBPA Thoroughbred owner and trainer members are licensed by the Washington Racing Commission, the state agency with regulatory authority over all aspects of racing in Washington, including promulgating and enforcing equine medication and safety rules.

28.     Plaintiff Washington HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Washington Racing Commission, including those governing equine medication and safety.

29.     Defendant Jerry Black is a member of the Nominating Committee for the Horseracing Integrity and Safety Authority, Inc. and a Visiting Professor at the Texas Tech University School of Veterinary Medicine. On information and belief, he resides in Lubbock, Texas, in the Northern District of Texas.

30.     Defendant Horseracing Integrity and Safety Authority, Inc. (the "Authority") is a nonprofit Delaware corporation. HISA gives it the authority to draft rules, assesses fees, and implement programs governing horseracing.

31.     Defendant Federal Trade Commission is the federal agency given limited authority by HISA to oversee the Authority. Its headquarters are in

Washington, D.C.

32.     Defendant Lina Kahn is sued in her official capacity as Chair of the Federal Trade Commission.

33.     Defendant Rebecca Kelly Slaughter is sued in her official capacity as Commissioner of the Federal Trade Commission.

34.     Defendant Alvaro Bedoya is sued in his official capacity as Commissioner of the Federal Trade Commission.

35.     Defendant Christine S. Wilson is sued in her official capacity as Commissioner of the Federal Trade Commission.

### III.     JURISDICTION AND VENUE

36.     This case presents claims arising under the United States Constitution. Therefore, the Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and may grant injunctive relief pursuant to Fed. R. Civ. P. 65. The Court also has jurisdiction pursuant to 28 U.S.C. § 1337 because HISA purports to regulate commerce. The Court has jurisdiction pursuant to 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 to grant a declaratory judgment because an actual controversy exists among the parties. Jurisdiction is proper over Defendants Kahn, Slaughter, Bedoya, and Wilson under *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682 (1949).

37.     Venue is appropriate under 28 U.S.C. § 1391(b)(3) because Defendant

---

Black resides in the Northern District of Texas and is subject to this Court's personal jurisdiction. Venue is also appropriate under 28 U.S.C. § 1391(e) because Defendant Federal Trade Commission is an agency of the United States, and Defendants Kahn, Slaughter, Bedoya, and Wilson are officers of the Federal Trade Commission.

## IV.    FACTUAL ALLEGATIONS

### A. **Plaintiffs**

38.    Plaintiffs Arizona HBPA, Arkansas HBPA, Indiana HBPA, Illinois HBPA, Louisiana HBPA, Mountaineer Park HBPA, Nebraska HBPA, Oklahoma HBPA, Oregon HBPA, Pennsylvania HBPA, Tampa Bay HBPA, and Washington HBPA are all affiliates of Plaintiff National HBPA (collectively, "Plaintiffs" or "Horsemen"). They have as their members thousands of men and women who own, train, and race Thoroughbred horses in the United States.

39.    The HBPA organizations grew out of the time-honored tradition of passing the hat to provide for burial services, medical attention, feeding, and housing for the many needy families in the industry.

40.    For over 125 years, Thoroughbred racing has been regulated by the States. State laws establish a statutory framework, which is then administered and enforced by State Racing Commissions, whose members are appointed by the governor of each state. All owners and trainers must be licensed by their State Racing

Commissions and are subject to rules and regulations promulgated by those Commissions, including rules and regulations regarding equine medication and racetrack safety.

41.     Plaintiffs work to advance and protect the interests of their members by participating in State Racing Commission rule-making and enforcement procedures. They also negotiate, on behalf of their members, horsemen's contracts with racetrack management covering terms and conditions of racing consistent with state law, rules, and regulations.

42.     Plaintiff National HBPA advises and assists its state affiliates in carrying out their responsibilities. On the national level, it participates in model rulemaking by the Association of Racing Commissioners International, a trade association of state regulators, and assists with the work of the Racing Medication & Testing Consortium, an organization of scientists, veterinarians, and racing industry stakeholders, in establishing equine medication and testing standards. In its advocacy, Plaintiff National HBPA makes recommendations in the best interest of racing and its participants, including proposed medication and safety rules, to foster safe and honest horse racing and to provide for the well-being of racehorses and those who care for them.

**B. <u>Legislative History</u>**

43.     On September 8, 2020, the Horseracing Integrity and Safety Authority Inc. ("the Authority), filed a Certificate of Incorporation in Delaware.

44.     The Certificate of Incorporation, at ¶ Seventh, directs that a sole private individual shall appoint temporary Directors to the Authority, who shall then appoint a Nominating Committee, who shall then appoint the Board of Directors of the Authority.

45.     On September 29, 2020, the Horseracing Integrity and Safety Act of 2020, H.R. 1754, passed the U.S. House of Representatives on a voice vote with no debate. It was never discussed either in committee or on the floor of the U.S. Senate. It would have unconstitutionally delegated regulatory authority over the horseracing industry to the newly incorporated Authority.

46.     On October 6, 2020, the Horseracing Integrity and Safety Authority, Inc. selected and publicized the members of the Nominating Committee to select the members of the Board of the Horseracing Integrity and Safety Authority.

47.     Defendants Black, Adams, Coleman, Cox, Dunford, Keating, and Schanzer (collectively, the "Nominating Committee") were appointed to the Nominating Committee; therefore, they had the authority to select the members of the Board of the Horseracing Integrity and Safety Authority.

48.     On December 21, 2020, Congress enacted House Resolution 133, the

2,000-page Consolidated Appropriations Act, 2021, which was signed into law on December 27, 2020, as Public Law No. 116-260. Title XII of Division FF of the Consolidated Appropriations Act, 2021, constitutes the Horseracing Integrity and Safety Act of 2020 ("HISA" or the "Act"). Public Law No. 116-260, §§ 1201-1212, 134 Stat. 1182, 3252-75.

49.    On December 30, 2022, the President signed into law Consolidated Appropriations Act of 2023, which amended the Act to grant the FTC the power to "abrogate, modify, or add to" rules previously promulgated by the FTC. Div. O, tit. VII, § 701 (2022).

## C. **HISA**

50.    HISA unconstitutionally grants to the Authority, a non-governmental private, independent, non-profit corporation, power to develop and enforce a horseracing medication control and racetrack safety program that preempts existing state regulation. The Authority has regulatory control over owners and trainers, among others, who compete in races having a substantial relation to interstate commerce—virtually all Thoroughbred horse racing in the United States. The Authority is charged with developing programs and promulgating rules covering all facets of equine medication and horseracing safety. Further, the Authority is given investigatory powers of the sort traditionally possessed by State Racing

Commissions and the right to enforce alleged rule violations with fines, suspensions, and civil lawsuits brought in its own name.

51.     According to HISA, the Authority is governed by a nine-member Board of Directors appointed by a non-governmental Nominating Committee of seven private citizen members. Those seven individuals are identified and named in their official capacity as Defendants in this action.

52.     The Nominating Committee consists of private citizens who are "independent members selected from business, sports, and academia." Public Law No. 116-260, § 1203(d), 134 Stat. at 3255.

53.     The Nominating Committee is a private entity and not a governmental body.

54.     HISA did not give any governmental entity the authority to appoint, approve, or disapprove, or modify the decision of the Nominating Committee regarding the initial or ongoing members of the Board of the Authority.

55.     The Authority is a "private, independent, self-regulatory, nonprofit corporation." *Id.* at § 1203(a).

56.     HISA delegates legislative authority to regulate the horseracing industry to the Authority, including the power to "develop[ ] and implement[ ] a horseracing anti-doping and medication control program and a racetrack safety

program." *Id*.

57.    HISA delegates legislative authority to the Authority to collect revenue from those it regulates, set a budget, and take out loans. *Id.* at § 1203(f).

58.    The Authority may charge state racing commissions their proportionate share of the fees needed to operate the Authority. *Id*.

59.    If a state racing commission declines to raise funds for the Authority, HISA gives the Authority the power to charge fees directly to horsemen, including the members of Plaintiffs, according to an assessment methodology rule. *Id*.

60.    HISA delegates to the Authority federal regulatory authority over horseracing activities throughout the country. *Id.* at § 1205.

61.    HISA delegates to the Authority "independent and exclusive national authority over . . . all horseracing safety, performance, and anti-doping and medication control matters for covered horses, covered persons, [and] covered horseraces." *Id.* at § 1205(a)(2).

62.    HISA requires that "covered persons" register directly with the Authority, not the FTC. *Id.* at § 1205(d).

63.    HISA defines "covered" horses, persons, and horseraces initially to include only Thoroughbreds—the breed of horses that Plaintiffs' members own, train, and race. *Id.* at § 1202 (2)-(6).

64.    HISA delegates authority to state and private organizations to expand the Authority's regulatory jurisdiction to other breeds: "A State racing commission or a breed governing organization for a breed of horses other than Thoroughbred horses may elect to have such breed be covered by this Act." *Id.* at § 1205(l).

65.    HISA delegates to the Authority federal subpoena and investigatory authority to pursue civil violations within its jurisdiction. *Id.* at § 1205(h).

66.    HISA does not give the FTC authority to approve, disapprove, or otherwise review decisions of the Authority before issuing subpoenas and exercising its investigatory authority.

67.    HISA delegates authority to the Authority to establish its own civil penalties for violations of the rules it promulgates. *Id.* at § 1205(i).

68.    HISA delegates authority to the Authority to bring civil enforcement actions, asserting the power of the federal government to enforce its rules. *Id.* at § 1205(j).

69.    HISA delegates authority to the Authority to draft governmental rules. *Id.* at § 1204.

70.    The rules drafted by the Authority are published in the Federal Register for public comment, as if they had been drafted by a governmental agency. *Id.* at § 1204(b).

71.    HISA does not grant the FTC the power to initiate new rules for the horseracing industry.

72.    HISA requires the FTC to approve rules proposed by the Authority as long as those rules are consistent with the Act. *Id.* at § 1204(c).

73.    Even after the amendment to HISA, the FTC still only exercises consistency review on its initial review of proposed rules. *See, e.g.*, F.T.C. Order, Jan. 9, 2023, at 1-2, and accompanying press release at FTC.gov.

74.    If the FTC wants to abrogate or modify a rule using the powers granted by the amended act, it may only do so after a rule has been approved and promulgated following initial consistency review.

75.    The amended HISA does not give the FTC the power to issue interim final rules.

76.    HISA does not give the FTC the power to independently investigate or enforce any rule violation.

77.    HISA does not give the FTC any power to appoint or remove Authority board members, or a right to attend Authority board meetings.

78.    HISA does not give the FTC the right to limit, suspend, or withdraw the Authority's authority over horseracing regarding any particular rule or program or as to the industry overall.

79.   HISA does not give the FTC the power to recognize an alternative industry self-regulatory organization for horseracing.

80.   HISA does not give the FTC the power to approve or disapprove the Authority's budget, to require an annual audit of the Authority's books, to approve or disapprove of any contracts entered into by the Authority, or to approve or disapprove any increase in the Authority's assessments.

81.   Though HISA required an anti-doping and medication control rule to be in place by July 1, 2022, the Authority unilaterally delayed the proposed rule's effective date to January 1, 2023.

82.   The FTC approved the racetrack safety rule with an effective date of July 1, 2022. The Authority unilaterally decided to push out the effective date for two provisions by one month, and for another provision by six months.[1] The Authority also unilaterally amended the racetrack safety rule by adopting a policy not to enforce a subsection concerning toe-grabs,[2] a prohibition on certain therapy

---

[1] *Announcement Concerning Enforcement of HISA Racetrack Safety Rules and Registration Requirements* (June 28, 2022),
https://static1.squarespace.com/static/604f6ab712afe14e11227976/t/62bb7b4e1f0cc4223684ffc5/1656453966718/Racetrack+Safety+Enforcement+Announcement+6.28+.pdf.
[2] *Announcement Concerning Enforcement of HISA Rule 2276 (HORSESHOES) as It Pertains to Full Outer Rim Shoes and Toe Grabs* (July 29, 2022),
https://static1.squarespace.com/static/604f6ab712afe14e11227976/t/62e3edcb13ecc920a9cffad4/1659104715305/Horseshoe+Rule+Update+7.29.22+.pdf.

---

Plaintiffs' Second Amended Complaint                                                                                    20

devices,[3] and a riding crop safety specification.[4]

83.    In summary, HISA gives tremendous power to a private entity, the Authority, to regulate many facets of the Horsemen's business and relegates the FTC to a subordinate role in the process.

## V. CLAIM I

### HISA violates Article I, Section 1 of the United States Constitution by delegating legislative powers to a nongovernmental organization.

84.    The allegations in all preceding paragraphs are incorporated herein by reference.

85.    In summary, HISA gives tremendous power to a private entity, the Authority, to regulate many facets of the Horsemen's business and relegates the FTC to a minor role in the process.

86.    "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

---

[3] *Announcement Concerning the Prohibition on the Use of Certain Electrical Devices in HISA Rule 2271(f) and on Shockwave Therapy Disclosure and Reporting Requirements in HISA Rule 2272(a)* (Dec. 21, 2022), https://static1.squarespace.com/static/604f6ab712afe14e11227976/t/63a495c5bf8e9731499c70b8/1671730629914/Announcement+Regarding+Rule+2271%28f%29+and+Rule+2272%28a%29.pdf.

[4] *Guidance* (Aug. 15, 2022), https://static1.squarespace.com/static/604f6ab712afe14e11227976/t/6388d815c77cab6d2f6310c9/1669912597611/HISA+Guidance+8.15.22.pdf.

---

87.     "Federal lawmakers cannot delegate regulatory authority to a private entity." *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013).

88.     The doctrine dates back to the founding generation, with Chief Justice Marshall pointing out that "[i]t will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825).

89.     With HISA, Congress has delegated legislative power over the horseracing industry to the Authority, a private, nongovernmental entity.

90.     Congress has subjugated Plaintiffs to this entire regulatory scheme, which is unlawfully written by a private entity.

91.     The limited oversight given to the FTC over the Authority is not sufficient to cure the constitutional violation. To pass constitutional scrutiny, the private entity delegated governmental powers must "'function subordinately' to and 'in aid of' an agency with 'pervasive surveillance and authority' over it." *NHBPA*, 53 F.4th at 890 (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940)).

92.     The Authority is not subordinate to the FTC, and the FTC does not exercise pervasive surveillance and authority over its exercise of legislative powers.

The FTC cannot draft rules in the first instance. It must approve the rules sent to it by the Authority on initial review as long as they are consistent with HISA. It may not exercise independent policy judgment as to the rules on initial review. It may only modify rules and exercise policy judgment after a rule is promulgated through a second, subsequent rulemaking, such that the unreviewed rule is the law of the land for some period of time.

93.   The Authority consistently rewrites the Act and rules through its policies, decisions, and enforcement choices, and the FTC is powerless to hold it accountable to the letter of the law as Congress passed it or the FTC approved it.

94.   The FTC have zero oversight of the Authority's assessment amount, loans, investments, spending, salaries, or other financial decisions. In other words, the Authority exercises congressionally delegated taxing and spending power with zero oversight.

95.   The Horsemen are harmed by the unconstitutional delegations because they are subject to a regulatory process that they are forced to finance with fees imposed on them by the Authority. Also, the Horsemen are harmed because they are subject to new and onerous Authority rules that change and supersede the State Racing Commission rules on which their training and racing businesses have long relied.

96.    By exercising legislative power, the Authority exercises sovereign functions and authorities of the government.

## VI. CLAIM II

**HISA violates Article II, Section 1 of the United States Constitution by delegating executive powers to a nongovernmental organization.**

97.    The allegations above are incorporated herein by reference.

98.    Just as the Constitution grants only Congress the legislative power, so it vests the executive power only in the President.

99.    The President's executive powers include his powers under the "take care" clause, i.e., the power to enforce laws and administer programs, and his powers under the appointments clause, i.e., the power to choose and remove officers.

100.    The Authority investigates rule violations without FTC oversight. The Authority may inspect premises, inspect documents, seize materials, demand interviews, and otherwise investigate rule violations by covered persons. The FTC has no power to clear any of this and may only review the exercises of these powers after-the-fact in appeals filed from concluded sanctions cases.

101.    The Authority exercises enforcement discretion without FTC oversight. If the Authority decides not to investigate a possible violation, or keeps a case open without resolution, or investigates but declines to bring charges, the FTC has zero

review or oversight of those decisions.

102.   The Authority administers programs—runs educational services, hires staff, registers covered programs, enters contracts—without any review by the FTC.

103.   The Authority leadership is an enclosed, self-perpetuating oligarchy. The FTC has zero appointment or removal power over the Board, the CEO, or the senior staff of the Authority.

104.   The FTC has zero power to derecognize or limit the Authority.

105.   By exercising these Article II powers, the Authority is exercising sovereign functions and authorities.

## VII. CLAIM III

**HISA violates the Due Process Clause of the Fifth Amendment because self-interested participants in the horseracing industry are given regulatory power over their competitors in the industry.**

106.   The allegations in all preceding paragraphs are incorporated herein by reference.

107.   When Congress gives an "economically self-interested actor [the power] to regulate its competitors," it violates the Due Process Clause found in the Fifth Amendment. *Ass'n of Am. R.Rs. v. Dep't of Transp.*, 821 F.3d 19, 23 (D.C. Cir. 2016).

108.   The Authority Board has nine total members. Four members of the

---

Authority Board are current industry insiders.

109.   Three supposedly "independent" members of the Authority Board are closely tied to the industry: one is a former board member of Churchill Downs, another is a former president of the New York Racing Association, and a third is a longtime horse farm owner.

110.   On information and belief, the Nominating Committee which initially selected these board members was hand-picked by a small group of owners and trainers within the horseracing industry who supported passage of HISA, over the objections of thousands of owners and trainers represented by Plaintiffs, who will be regulated by HISA.

111.   On information and belief, the businesses of the small group of owners and trainers will thrive as a result of HISA. Meanwhile, HISA will harm thousands of horsemen and drive many of them out of the industry by artificially increasing the costs and fees of participation and by eliminating the use of therapeutic medication prescribed by veterinarians for the health and safety of horses.

112.   By granting these self-interested actors the authority to regulate their competitors, Congress violated the Due Process Clause and harmed Plaintiffs by creating a regulatory body that will increase their fees, diminish the value of many of their horses, and otherwise subject them to onerous regulations.

## VIII.  PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.  Declare that HISA, as amended, is unconstitutional because it violates the private nondelegation doctrine. The Authority is not "subordinate to" the FTC. The FTC does not have or exercise "pervasive surveillance and authority" over the Authority;

b.  Declare that HISA violates the Due Process Clause of the Constitution because it gives economically self-interested actors the power to regulate their competitors;

c.  Enjoin Defendants, preliminarily and permanently, from taking any further action to implement the Horseracing Integrity and Safety Act;

d.  Enjoin the FTC Defendants, preliminarily and permanently, from approving new rules proposed by the Authority;

e.  Enjoin the Horseracing Integrity and Safety Authority, Inc., preliminarily and permanently, from proposing new rules to the FTC, enforcing existing rules, opening new investigations, or levying or collecting additional assessments;

f.  Award Plaintiffs nominal damages of $1 each for suffering a violation of their constitutional rights;

g.  Award Plaintiffs compensatory damages in the amount of all fees charged to their members by Defendant the Horseracing Integrity and Safety Authority, Inc.; and

h.  Award any further relief to which Plaintiffs may be entitled, including attorneys' fees and costs.

Dated: March 6, 2023

Respectfully Submitted,

Fernando M. Bustos
(Texas Bar. No. 24001819)
Matthew N. Zimmerman
(Texas Bar. No. 24100386)
Bustos Law Firm, P.C.
1001 Main Street, Suite 501
Lubbock, Texas 79408
Telephone (806) 780-3976
fbustos@bustoslawfirm.com
mzimmerman@bustoslawfirm.com

and

*/s/ Daniel R. Suhr*
Daniel R. Suhr*, Pro Hac Vice*
Reilly Stephens*, Pro Hac Vice*
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Telephone (312) 637-2280
dsuhr@libertyjusticecenter.org
rstephens@libertyjusticecenter.org

*Attorneys for Plaintiffs*