IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| NATIONAL HORSEMEN'S BENEVOLENT and PROTECTIVE ASSOCIATION et al., *Plaintiff* | § § § § | |
| and | § § | |
| THE STATE OF TEXAS and THE TEXAS RACING COMMISSION, *Proposed Intervenor-Plaintiffs,* | § § § § | CIVIL ACTION NO.  5:21-cv-00071-H |
| v. | § § | |
| JERRY BLACK et al., *Defendants.* | § § § | |

## THE STATE OF TEXAS AND THE TEXAS RACING COMMISSION'S SECOND AMENDED COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF

Intervenor-Plaintiffs the State of Texas and the Texas Racing Commission (collectively "Texas"), by way of this First Amended Complaint in Intervention for Declaratory and Injunctive Relief states and alleges as follows:

## INTRODUCTION

1.      The State of Texas and the Texas Racing Commission file this amended complaint in intervention in the above captioned case. Texas has a justiciable interest in the outcome of the case that is not adequately represented by the current parties in this case. Fed. R. Civ. P. 24(a)(2).

2.      Texas intervened in this action to challenge the recently revised federal Horseracing Integrity and Safety Act ("HISA"), which, among other things, unconstitutionally delegates to a private entity the legislative authority to regulate Plaintiffs and commandeers the legislative and executive branches of state government.[1]

---

[1] The Court granted Texas' Motion to Intervene subject to certain conditions. *See* Dkt. No. 91.

1

3.      "Federal lawmakers cannot delegate regulatory authority to a private entity." *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013) (vacated and remanded on other grounds by *Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225 (2015)). Under the private nondelegation doctrine, regulatory authority may not be delegated to a private corporation without pervasive government oversight and control. The Act has already been declared unconstitutional by the U.S. Court of Appeals for the Fifth Circuit once for failing that test. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022). Congress subsequently made one modification to the Act. Consolidated Appropriations Act, 2023, div. O, tit. VII, § 701 (2022). The amended act is still unconstitutional, because the Authority still is not "subordinate to" and "in aid of" the FTC—or, put differently, the FTC does not have "pervasive surveillance and authority" over the Authority. *NHBPA*, 53 F.4th at 884.

4.      This Court should declare HISA unconstitutional and preliminarily and permanently enjoin Defendants from implementing and enforcing the law.

5.      This Complaint in Intervention incorporates the Second Amended Complaint of Plaintiffs herein in its entirety to the extent the allegations there are relevant to Plaintiffs Texas and adopts such allegations as its own.

## PARTIES

6.      Plaintiff-Intervenor, the State of Texas, is a sovereign state and has the authority and responsibility to protect its sovereignty, the wellbeing of its public fisc, and the health, safety, and welfare of its citizens.

7.      Plaintiff-Intervenor, the Texas Racing Commission ("TRC"), is a state agency of the state of Texas and is enabled under the Texas Racing Act, Tex. Occ. Code Chs. 2021-2035, and the Texas Rules of Racing, 16 Tex. Admin. Code Chs. 301-323,  for regulating pari-mutuel wagering, horse racing integrity and safety in the state of Texas. Its county of residence is Travis County, Texas.

8.      Plaintiff National Horsemen's Benevolent and Protective Association ("National HBPA") is a not-for-profit corporation with its principal place of business in Lexington, Kentucky. Since 1940 it has represented the interests of Thoroughbred racehorse owners and trainers in the United States and Canada. The National HBPA has close to 30,000 members in 30 affiliate organizations throughout the United States and Canada. It is the largest representation group of Thoroughbred owners and trainers in the United States. Membership is open without restriction to all owners and trainers licensed by state racing authorities.

9.      Plaintiff National HBPA's purpose, as set forth in its by-laws, includes co-operating with governmental authorities charged with regulating horse racing; making recommendations in the best interest of racing and its participants, including medication and safety rules; and representing owners and trainers before state and federal governmental entities, national industry organizations, and trade associations. Its principal goals are providing a representative voice for all Thoroughbred horsemen on matters integral to the advancement of Thoroughbred racing in the United States and Canada and encouraging the highest standards of horsemanship to continuously improve the care, health, and safety of the horse.

10.      Plaintiff Arizona Horsemen's Benevolent and Protective Association ("Arizona HBPA") is a not-for-profit corporation with its principal place of business in Phoenix, Arizona. It is an affiliate of the National HBPA. The Arizona HBPA Thoroughbred owner and trainer members are licensed by the Arizona Racing Commission, the state agency with regulatory authority over all aspects of racing in Arizona, including promulgating and enforcing equine medication and safety rules.

11.      Plaintiff Arizona HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Arizona Racing Commission, including those governing equine medication and safety.

12.     Plaintiff Arkansas Horsemen's Benevolent and Protective Association ("Arkansas HBPA") is a not-for-profit corporation with its principal place of business in Hot Springs, Arkansas. It is an affiliate of the National HBPA. The Arkansas HBPA Thoroughbred owner and trainer members are licensed by the Arkansas Racing Commission, the state agency with regulatory authority over all aspects of racing in Arkansas, including promulgating and enforcing equine medication and safety rules.

13.     Plaintiff Arkansas HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Arkansas Racing Commission, including those governing equine medication and safety.

14.     Plaintiff Indiana Horsemen's Benevolent and Protective Association ("Indiana HBPA") is a not-for-profit corporation with its principal place of business in Shelbyville, Indiana. It is an affiliate of the National HBPA. The Indiana HBPA Thoroughbred owner and trainer members are licensed by the Indiana Racing Commission, the state agency with regulatory authority over all aspects of racing in Indiana, including promulgating and enforcing equine medication and safety rules.

15.     Plaintiff Indiana HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Indiana Racing Commission, including those governing equine medication and safety.

16.     Plaintiff Illinois Horsemen's Benevolent and Protective Association ("Illinois HBPA") is a not-for-profit corporation with its principal place of business in Caseyville, Illinois. It is an affiliate of the National HBPA. The Illinois HBPA Thoroughbred owner and trainer members are licensed by the Illinois Racing Commission, the state agency with regulatory authority over all aspects of racing in Illinois, including promulgating and enforcing equine medication and safety rules.

17.     Plaintiff Illinois HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Illinois Racing Commission, including those governing equine medication and safety.

18.     Plaintiff Louisiana Horsemen's Benevolent and Protective Association ("Louisiana HBPA") is a not-for-profit corporation with its principal place of business in New Orleans, Louisiana. It is an affiliate of the National HBPA. The Louisiana HBPA Thoroughbred owner and trainer members are licensed by the Louisiana Racing Commission, the state agency with regulatory authority over all aspects of racing in Louisiana, including promulgating and enforcing equine medication and safety rules.

19.     Plaintiff Louisiana HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Louisiana Racing Commission, including those governing equine medication and safety.

20.     Plaintiff Mountaineer Park Horsemen's Benevolent and Protective Association ("Mountaineer Park HBPA") is a not-for-profit corporation with its principal place of business in Newell, West Virginia. It is an affiliate of the National HBPA. The Mountaineer Park HBPA Thoroughbred owner and trainer members are licensed by the West Virginia Racing Commission, the state agency with regulatory authority over all aspects of racing in West Virginia, including promulgating and enforcing equine medication and safety rules.

21.     Plaintiff Mountaineer Park HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the West Virginia Racing Commission, including those governing equine medication and safety.

22.     Plaintiff Nebraska Horsemen's Benevolent and Protective Association ("Nebraska HBPA") is a not-for-profit corporation with its principal place of business in Lincoln, Nebraska. It is an affiliate of the National HBPA. The Nebraska HBPA Thoroughbred owner and trainer members are licensed by the Nebraska Racing Commission, the state agency with regulatory authority over all aspects of racing in Nebraska, including promulgating and enforcing equine medication and safety rules.

23.     Plaintiff Nebraska HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Nebraska Racing Commission, including those governing equine medication and safety.

24.     Plaintiff Oklahoma Horsemen's Benevolent and Protective Association ("Oklahoma HBPA") also does business as the Thoroughbred Racing Association of Oklahoma and is a not-for-profit corporation with its principal place of business in Oklahoma City, Oklahoma. It is an affiliate of the National HBPA. The Oklahoma HBPA Thoroughbred owner and trainer members are licensed by the Oklahoma Racing Commission, the state agency with regulatory authority over all aspects of racing in Oklahoma, including promulgating and enforcing equine medication and safety rules.

25.     Plaintiff Oklahoma HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Oklahoma Racing Commission, including those governing equine medication and safety.

26.     Plaintiff Oregon Horsemen's Benevolent and Protective Association ("Oregon HBPA") is a not-for-profit corporation with its principal place of business in Portland, Oregon. It is an affiliate of the National HBPA. The Oregon HBPA Thoroughbred owner and trainer members are licensed by the Oregon Racing Commission, the state agency with regulatory authority over all aspects

of racing in Oregon, including promulgating and enforcing equine medication and safety rules.

27.     Plaintiff Oregon HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Oregon Racing Commission, including those governing equine medication and safety.

28.     Plaintiff Pennsylvania Horsemen's Benevolent and Protective Association ("Pennsylvania HBPA") is a not-for-profit corporation with its principal place of business in Grantville, Pennsylvania. It is an affiliate of the National HBPA. The Pennsylvania HBPA Thoroughbred owner and trainer members are licensed by the Pennsylvania Racing Commission, the state agency with regulatory authority over all aspects of racing in Pennsylvania, including promulgating and enforcing equine medication and safety rules.

29.     Plaintiff Pennsylvania HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Pennsylvania Racing Commission, including those governing equine medication and safety.

30.     Plaintiff Tampa Bay Horsemen's Benevolent and Protective Association ("Tampa Bay HBPA") is a not-for-profit corporation with its principal place of business in Oldsmar, Florida. It is an affiliate of the National HBPA. The Tampa Bay HBPA Thoroughbred owner and trainer members are licensed by the Florida Department of Business and Professional Regulation, the state agency with regulatory authority over all aspects of racing in Florida, including promulgating and enforcing equine medication and safety rules.

31.     Plaintiff Tampa Bay HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Florida Department of Business and Professional

Regulation, including those governing equine medication and safety.

32.     Plaintiff Washington Horsemen's Benevolent and Protective Association ("Washington HBPA") is a not-for-profit corporation with its principal place of business in Auburn, Washington. It is an affiliate of the National HBPA. The Washington HBPA Thoroughbred owner and trainer members are licensed by the Washington Racing Commission, the state agency with regulatory authority over all aspects of racing in Washington, including promulgating and enforcing equine medication and safety rules.

33.     Plaintiff Washington HBPA negotiates contracts on behalf of its members with racetrack ownership that include terms and conditions under which racing occurs, consistent with applicable state laws and regulations of the Washington Racing Commission, including those governing equine medication and safety.

34.     Defendant Jerry Black is a member of the Nominating Committee for the Horseracing Integrity and Safety Authority, Inc. and a Visiting Professor at the Texas Tech University School of Veterinary Medicine. On information and belief, he resides in Lubbock, Texas, in the Northern District of Texas.

35.     Defendant Horseracing Integrity and Safety Authority, Inc. (the "Authority") is a nonprofit Delaware corporation. HISA gives it the authority to draft rules to develop and implement a horseracing anti-doping and medication control program and a racetrack safety program.

36.     Defendant Federal Trade Commission is the federal agency given limited authority by HISA to approve or disapprove rules promulgated by the Authority. Its headquarters are in Washington, D.C.

37.     Defendant Lina Kahn is sued in her official capacity as Chair of the Federal Trade Commission.

38.     Defendant Rebecca Kelly Slaughter is sued in her official capacity as Commissioner of

the Federal Trade Commission.

39.     Defendant Alvaro Bedoya is sued in his official capacity as Commissioner of the Federal Trade Commission.

40.     Defendant Christine S. Wilson is sued in her official capacity as Commissioner of the Federal Trade Commission.

## JURISDICTION AND VENUE

41.     This case presents claims arising under the United States Constitution. Therefore, the Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and may grant injunctive relief pursuant to Fed. R. Civ. P. 65. The Court also has jurisdiction pursuant to 28 U.S.C. § 1337 because HISA purports to regulate commerce. The Court has jurisdiction pursuant to 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 to grant a declaratory judgment because an actual controversy exists among the parties. Jurisdiction is proper over Defendants Kahn, Slaughter, Bedoya, and Wilson under *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682 (1949).

42.     Venue is appropriate under 28 U.S.C. § 1391(b)(3) because Defendant Black resides in the Northern District of Texas and is subject to this Court's personal jurisdiction. Venue is also appropriate under 28 U.S.C. § 1391(e) because Defendant Federal Trade Commission is an agency of the United States, and Defendants Kahn, Slaughter, Bedoya, and Wilson are officers of the Federal Trade Commission.

## FACTUAL ALLEGATIONS

### Plaintiffs

43.     Plaintiffs Arizona HBPA, Arkansas HBPA, Indiana HBPA, Illinois HBPA, Kentucky HBPA, Louisiana HBPA, Mountaineer Park HBPA, Nebraska HBPA, Oklahoma HBPA, Oregon HBPA, Pennsylvania HBPA, Tampa Bay HBPA, and Washington HBPA are all affiliates of Plaintiff National HBPA (collectively, "Plaintiffs" or "Horsemen"). They have as their members thousands of

men and women who own, train, and race Thoroughbred horses in the United States.

44.     HBPAs grew out of the time-honored tradition of passing the hat to provide for burial services, medical attention, feeding, and housing for the many needy families in the industry.

45.     For over 125 years, Thoroughbred racing has been regulated by the States. State laws establish a statutory framework, which is then administered and enforced by State Racing Commissions—in Plaintiff-Intervenor Texas' case, the Texas Racing Commission— whose members are appointed by the governor of each state. All owners and trainers must be licensed by their State Racing Commissions and are subject to rules and regulations promulgated by those Commissions, including rules and regulations regarding equine medication and racetrack safety.

46.     Plaintiffs work to advance and protect the interests of their members by participating in State Racing Commission rulemaking and enforcement procedures. They also negotiate on behalf of their members, horsemen's contracts with racetrack management covering terms and conditions of racing consistent with state law, rules, and regulations.

47.     Plaintiff National HBPA advises and assists its state affiliates in carrying out their responsibilities. On the national level, it participates in model rulemaking by the Association of Racing Commissioners International, a trade association of state regulators (of which the Texas Racing Commission is a member), and assists with the work of the Racing Medication & Testing Consortium, an organization of scientists, veterinarians, and racing industry stakeholders, in establishing equine medication and testing standards. In its advocacy, Plaintiff National HBPA makes recommendations in the best interest of racing and its participants, including proposed medication and safety rules, to foster safe and honest horse racing and to provide for the well-being of racehorses and those who care for them.

48.     In 1987, Texas voters passed a referendum that legalized pari-mutuel betting and established the Texas Racing Commission. The purpose of the Texas Racing Act is to provide for the

strict regulation of horse racing and greyhound racing and the control of pari-mutuel wagering in connection with that racing. Tex. Occ. Code § 2021.002. The Texas Racing Commission consists of: (1) seven members appointed by the governor with the advice and consent of the senate; and (2) two ex officio members who have the right to vote. The ex officio members are: (1) the chair of the Public Safety Commission, or a member of the Public Safety Commission designated by the chair; and (2) the commissioner of agriculture or the commissioner's designee. Of the appointed commission members, five members must be representatives of the general public and have general knowledge of business or agribusiness. One additional member must have special knowledge or experience related to horse racing, and one additional member must have special knowledge or experience related to greyhound racing. At least one of the members appointed may be a veterinarian, who also satisfies the requirement that the person have general knowledge of business or agribusiness. Tex. Occ. Code § 2022.001(a)-(d). The Texas Racing Act establishes the statutory framework, which is then administered and enforced by State Racing Commissions, whose members are appointed by the governor of each state. The Texas Racing Commission promulgates the Texas Rules of Racing. 16 Tex. Admin. Code Chs. 301-323. All owners, trainers, veterinarians, other horsemen personnel and racing officials must be licensed by the Texas State Racing Commission and are subject to rules and regulations promulgated by the Commission, including rules and regulations regarding racetrack safety and equine medication including, but not limited to, prohibited substances and therapeutic medications. Tex. Occ. Code Chs. 2025, 2026 and 2034.

**Legislative History**

49.     On September 8, 2020, the Horseracing Integrity and Safety Authority Inc. ("the Authority), filed a Certificate of Incorporation in Delaware.

50.     The Certificate of Incorporation, at ¶ Seventh, directs that a sole private individual shall appoint temporary Directors to the Authority, who shall then appoint a Nominating Committee,

who shall then appoint the Board of Directors of the Authority.

51.     On September 29, 2020, the Horseracing Integrity and Safety Act of 2020, H.R. 1754, passed the U.S. House of Representatives on a voice vote with no debate. It was never discussed either in committee or on the floor of the U.S. Senate. It would have unconstitutionally delegated regulatory authority over the horseracing industry to the newly incorporated Authority.

52.     On October 6, 2020, the Horseracing Integrity and Safety Authority, Inc. selected and publicized the members of the Nominating Committee to select the members of the Board of the Horseracing Integrity and Safety Authority.

53.     Defendant Black, along with Katrina Adams, Leonard Coleman, Nancy Cox, Joseph Dunford, Frank Keating, and Kenneth Schanzer (collectively, the "Nominating Committee") were appointed to the Nominating Committee; therefore, they have the authority to select the members of the Board of the Horseracing Integrity and Safety Authority.

54.     On December 21, 2020, Congress enacted House Resolution 133, the 2,000-page Consolidated Appropriations Act, 2021, which was signed into law on December 27, 2020, as Public Law No. 116-260. Title XII of Division FF of the Consolidated Appropriations Act, 2021, constitutes the Horseracing Integrity and Safety Act of 2020 ("HISA" or the "Act"). Public Law No. 116-260, §§ 1201-1212, 134 Stat. 1182, 3252-53.

55.     On December 30, 2022, the President signed into law Consolidated Appropriations Act of 2023, which amended the act to grant the FTC the power to "abrogate, modify, or add to" rules previously promulgated by the FTC. Div. O, tit. VII, § 701 (2022).

**HISA**

56.     HISA unconstitutionally grants to the Authority, a non-governmental private, independent, self-regulatory, non-profit corporation, power to develop and enforce a horseracing medication control and racetrack safety program that preempts existing state regulation. The

Authority has regulatory control over owners and trainers, among others, who compete in races having a substantial relation to interstate commerce, or virtually all Thoroughbred horse racing in the United States and in the State of Texas. The Authority is charged with developing programs and promulgating rules covering all facets of equine medication and horseracing safety. Further, the Authority is given investigatory powers of the sort possessed by the Texas Racing Commission and the right to enforce alleged rule violations with fines, suspensions, and civil lawsuits brought in its own name.

57.     According to HISA, the Authority is governed by a nine-member Board of Directors appointed by a non-governmental Nominating Committee of seven private citizen members.

58.     The Nominating Committee consists of private citizens who are "independent members selected from business, sports, and academia." § 1203(d), 134 Stat. at 3255.

59.     The Nominating Committee is a private entity and not a governmental body.

60.     HISA did not give any governmental entity the authority to approve, disapprove, or modify the decision of the private individual appointing temporary Directors to the Authority or the decision of the temporary Directors of the Authority appointing the Nominating Committee.

61.     HISA delegates authority to the Nominating Committee to "select the initial members of the Board" of the Authority. § 1203(d), 134 Stat. at 3255.

62.     HISA does not give any governmental entity the authority to approve, disapprove, or modify the selection of the initial Board members of the Authority by the Nominating Committee.

63.     The Authority is a "private, independent, self-regulatory, nonprofit corporation." § 1203(a), 134 Stat. at 3253.

64.     HISA delegates legislative authority to regulate the horseracing industry to the Authority, including the power to "develop[ ] and implement[ ] a horseracing anti-doping and medication control program and a racetrack safety program." § 1203(a), 134 Stat. at 3253.

65. HISA delegates authority to the Authority to collect revenue from those it regulates. §
1203(f), 134 Stat. at 3255-57.

66. HISA directs the Authority to obtain its initial funding through the program's effective
date by securing loans. HISA § 1203(f)(1)(A), 134 Stat. at 3255. Thereafter, no later than 90 days
before the effective date and no later than "November 1 each year thereafter," HISA instructs the
Authority to "determine and provide to each State racing commission the estimated amount required
from the State" for "the State's proportionate share of the horseracing anti-doping and medication
control program and the racetrack safety program for the next calendar year" and "to liquidate the
State's proportionate share of any loan or funding shortfall in the current calendar year and any
previous calendar year." § 1203(f)(1)(C)(i), 134 Stat. at 3255–56.

67. Each state's proportional share is based on the Authority's annual budget for the
following year and "the projected amount of covered racing starts for the year in each State." HISA §
1203(f)(1)(C)(ii)(I), 134 Stat. at 3256.

68. Under HISA, states are forced to adopt one of two options for funding the Authority.
First, a state racing commission may "elect[] to remit fees" and, if they do so, "the election shall remain
in effect and the State racing commission shall be required to remit fees . . . according to a schedule
established in rules developed by the Authority and approved by" the Federal Trade Commission.
HISA § 1203(f)(2), 134 Stat. at 3256–57. The state racing commission must give the Authority at least
one year's notice before it withdraws that election. *Id.* § 1203(f)(2)(C), 134 Stat. at 3256.

69. Second, if a state refuses to pay the fees demanded by the private corporation, the
Authority shall, at least monthly, "calculate the applicable fee per racing start multiplied by the number
of racing starts in the State during the preceding month." HISA § 1203(f)(3)(A), 134 Stat. at 3257. The
Authority will then "allocate equitably the amount calculated . . . among covered persons involved
with covered horseraces pursuant to such rules as the Authority may promulgate," and the Authority

will directly collect fees from the covered persons, who "shall be required to remit such fees to the Authority." *Id.* § 1203(f)(3)(B)–(C), 134 Stat. at 3257. If a state chooses this second route, however, a punishment follows: HISA prohibits that state racing commission from "impos[ing] or collect[ing] from any person a fee or tax relating to anti-doping and medication control or racetrack safety matters for covered horseraces." *Id.* § 1203(f)(3)(D), 134 Stat. at 3257.

70.     That the States are forced to fund this private regulatory corporation empowered by Congress, instead of Congress itself, is made explicit: "Nothing in this Act shall be construed to require . . . the appropriation of any amount to the Authority; or . . . the Federal Government to guarantee the debts of the Authority."  HISA § 1203(f)(5), 134 Stat. at 3257.

71.     HISA delegates to the Authority federal regulatory authority over horseracing activities throughout the country. § 1205, 134 Stat. at 3262.

72.     HISA delegates authority to the Authority to implement a horseracing anti-doping and medication control program and a racetrack safety program. § 1205(a)(1), 134 Stat. at 3262.

73.     HISA delegates authority to the Authority to "exercise independent and exclusive national authority over . . . all horseracing safety, performance, and anti-doping and medication control matters for covered horses, covered persons, [and] covered horseraces." § 1205(a)(2), 134 Stat. at 3262.

74.     HISA states that "[t]he rules of the Authority promulgated in accordance with [HISA] shall preempt any provision of State law or regulation with respect to matters within the jurisdiction of the Authority under [HISA]."  HISA § 1205(b), 134 Stat. at 3259.

75.     HISA further states "[t]o avoid duplication of functions, facilities, and personnel, and to attain closer coordination and greater effectiveness and economy in administration of Federal and State law," in any case involving a violation of both the Authority's rules and state law, HISA requires "State law enforcement authorities" to "cooperate and share information" with the Authority. HISA § 1211(b), 134 Stat. at 3275.

76.     HISA defines "covered" horses, persons, and horseraces initially to include only Thoroughbreds—the breed of horses that Plaintiffs' members own, train, and race. § 1202, 134 Stat. at 3253.

77.     HISA delegates authority to state and private organizations to expand the Authority's regulatory jurisdiction to other breeds: "A State racing commission or a breed governing organization for a breed of horses other than Thoroughbred horses may elect to have such breed be covered by this Act." § 1205(l)(1), 134 Stat. at 3262.

78.     HISA delegates to the Authority federal subpoena and investigatory authority to pursue civil violations within its jurisdiction. § 1205(h), 134 Stat. at 3262.

79.     HISA does not give any governmental entity the authority to approve, disapprove, or modify decisions of the Authority regarding issuing subpoenas and exercising its investigatory authority.

80.     HISA delegates authority to the Authority to establish its own civil penalties for violations of the rules it promulgates. § 1205(i), 134 Stat. at 3262.

81.     HISA delegates authority to the Authority to bring civil enforcement actions, asserting the power of the federal government to enforce its rules. § 1205(j), 134 Stat. at 3262.

82.     HISA delegates authority to the Authority to draft its own governmental rules. § 1204(a), 134 Stat. at 3257-58.

83.     The rules drafted by the Authority are published in the Federal Register for public comment, as if they had been drafted by a governmental agency. §§ 1204(b)(1), (c)(1), and (d)(2), 134 Stat. at 3258.

84.     HISA attempts to justify this unconstitutional delegation of authority to a private entity by providing that the rules promulgated by the Authority must be submitted for oversight to Defendants the Federal Trade Commission and Commissioners Kahn, Slaughter, Bedoya, and Wilson

(collectively, the "FTC"). § 1204, 134 Stat. at 3257-58.

85.     But the FTC role in this process is primarily ministerial. It does not develop or implement federal regulatory authority but, instead, publishes the Authority's regulations for notice and comment rulemaking. § 1204, 134 Stat. at 3257-58.

86.     Under HISA, the FTC may not draft rules to regulate horse racing, nor may it modify rules proposed by the Authority. §1204(c)(1), 134 Stat. at 3258.

87.     The FTC may only "approve or disapprove" rules that have already been drafted by the Authority, subject to a consistency review. §1204(c)(1), 134 Stat. at 3258.

88.     The only instruction given to the Authority for its rulemaking authority is to "develop[ ] and implement[ ] a horseracing anti-doping and medication control program and a racetrack safety program . . . ." § 1203(a), 134 Stat. at 3253.

89.     HISA provides the Authority a list of topics for rulemaking, but the list is non-exhaustive, and the Authority may or may not choose to draft rules on those topics. § 1204(a), 134 Stat. at 3257-58.

90.     The only guidance given to the FTC on whether to approve a rule that has been drafted by the Authority is that it "shall approve a proposed rule . . . if [it] finds that the proposed rule . . . is consistent with—(A) this Act; and (B) applicable rules approved by the [FTC]." § 1204(c), 134 Stat. at 3258.

91.     The amended HISA does not give the FTC the power to issue interim final rules.

92.     HISA does not give the FTC the power to independently investigate or enforce any rule violation.

93.     HISA does not give the FTC any power to appoint or remove Authority board members, or a right to attend Authority board meetings.

94.     HISA does not give the FTC the right to limit, suspend, or withdraw the Authority's

17

authority over horseracing regarding any particular rule or program or as to the industry overall.

95.     HISA does not give the FTC the power to recognize an alternative industry self-regulatory organization for horseracing.

96.     HISA does not give the FTC the power to approve or disapprove the Authority's budget, to require an annual audit of the Authority's books, to approve or disapprove of any contracts entered into by the Authority, or to approve or disapprove any increase in the Authority's assessments.

97.     Though HISA required an anti-doping and medication control rule to be in place by July 1, 2022, the Authority unilaterally delayed the proposed rule's effective date to January 1, 2023.

98.     The FTC approved the racetrack safety rule with an effective date of July 1, 2022. The Authority unilaterally decided to push out the effective date for two provisions by one month, and for another provision by six months.[2] The Authority also unilaterally amended the racetrack safety rule by adopting a policy not to enforce a subsection concerning toe-grabs,[3] a prohibition on certain therapy devices,[4] and a riding crop safety specification.[5]

99.     In summary, HISA gives tremendous power to a private entity, the Authority, to regulate many facets of the Horsemen's business by commandeering State resources while relegating the FTC to a minor role in the process.

---

[2] *Announcement Concerning Enforcement of HISA Racetrack Safety Rules and Registration Requirements* (June 28, 2022), https://static1.squarespace.com/static/604f6ab712afe14e11227976/t/62bb7b4e1f0cc4223684ffc5/1656453966718/Racetrack+Safety+Enforcement+Announcement+6.28+.pdf.

[3] *Announcement Concerning Enforcement of HISA Rule 2276 (HORSESHOES) as It Pertains to Full Outer Rim Shoes and Toe Grabs* (July 29, 2022), https://static1.squarespace.com/static/604f6ab712afe14e11227976/t/62e3edcb13ecc920a9cffad4/1659104715305/Horseshoe+Rule+Update+7.29.22+.pdf.

[4] *Announcement Concerning the Prohibition on the Use of Certain Electrical Devices in HISA Rule 2271(f) and on Shockwave Therapy Disclosure and Reporting Requirements in HISA Rule 2272(a)* (Dec. 21, 2022), https://static1.squarespace.com/static/604f6ab712afe14e11227976/t/63a495c5bf8e9731499c70b8/1671730629914/Announcement+Regarding+Rule+2271%28f%29+and+Rule+2272%28a%29.pdf.

[5] *Guidance* (Aug. 15, 2022), https://static1.squarespace.com/static/604f6ab712afe14e11227976/t/6388d815c77cab6d2f6310c9/1669912597611/HISA+Guidance+8.15.22.pdf.

**HISA's Effects on Texas**

100.     HISA will harm the State of Texas and the Texas Racing Commission ("TRC") in numerous ways.

101.     The TRC is state agency governed by the Texas Racing Act for the strict regulation of horse racing and greyhound racing and the control of pari-mutuel wagering in connection with that racing. Tex. Occ. Code Ann. § 2021.002. The TRC licenses and regulates all aspects of horse racing and greyhound racing in Texas, regardless of whether that racing involves pari-mutuel wagering. Tex. Occ. Code Ann. § 2023.001(a). In adopting rules and in the supervision and conduct of racing, the TRC considers the effect of a proposed commission action on the state's agricultural, horse breeding, horse training, greyhound breeding, and greyhound training industry. Tex. Occ. Code Ann. § 2023.001(b). The TRC is vested with the authority to enact regulations related to pari-mutuel wagering, racetrack and occupational licensing, anti-doping, medication control, racetrack safety, disciplinary action, and enforcement. *See* 16 Tex. Admin. Code §§ 301.1 to 323.203.

102.     The TRC is self-funded by the entities it regulates and is appropriated only General Revenue–dedicated funds. The agency's revenue primarily comes from fees assessed to racetracks, occupational licensee's fees, and simulcast racing taxes. Without these funds, the TRC will not be able to operate, leaving the State of Texas without a horse racing regulatory agency.

103.     For HISA to effectively be implemented, State Racing Commissions must "*voluntarily*" agree to serve as the HISA staff. The voluntary agreements sent to the states in April 2022, took the form of a contract, governed by Kentucky law, which the agency did not have the authority to enter into under Texas law. Texas state agencies are required to follow the Texas Government Code and Comptroller Guidance on all procurement actions. Noncompetitive, sole source contracting actions, such as the HISA agreement, require additional analysis, transparent steps, a cost benefit analysis subject to legislative and state auditor's office scrutiny.

104.     The General Appropriations Act for 2022-2023 provides the fiscal spending limitations that all state agencies are required to follow to expend state appropriations and employ state full-time equivalents. The agency does not have the authority to expend appropriated funds or staff time on any purpose outside of the appropriations language. The Texas Constitution prohibits the giving away of the state's money or property and the use of state money or property for private purposes. State law also requires that state property only be used for state purposes. "Criminal penalties are possible when a public servant intentionally or knowingly misuses government property, services, personnel or any other thing of value belonging to the government."[6] Therefore, the agency was unable to pay the bill sent by HISA in April 2022, because no appropriations authority existed to do so.

105.     HISA requires the Authority to submit proposed rules related to laboratory standards and accreditation requirements for testing of HISA equine specimens. 15 U.S.C. §3053(a)(3). The laboratories are subject to HISA jurisdiction and are unable to cooperate and share with Racing Commissions or other interested parties. 15 U.S.C. §3055(c)(1)(A)(ii), §3057(b) and (e). The Texas A&M Veterinary Medical Diagnostic Laboratory (TVMDL) is properly accredited and conducts all primary testing of race animals on behalf of the TRC. *See* Tex. Occ. Code §2034.002.

106.     HISA requires Texas and the TRC to cooperate and share information with the Authority; forces them to remit taxes and fees to fund the Authority or lose the ability to collect taxes and fees for their own anti-doping, medication-control, and racetrack-safety programs; and preempts some of Texas' laws and regulations.

107.     HISA forces the state through the TRC to assess, collect, and remit to the Authority fees that the Authority determines to be Texas' proportional share of the Authority's annual budget for the next calendar year. HISA § 1203(f)(2), 134 Stat. at 3256–57. The Board of Directors of the

---

[6] https://fmx.cpa.texas.gov/fm/pubs/purchase/restricted/?section=misuse&page=property_misuse

Authority, subject only to public comment, determines the annual budget of the Authority. There is no appeal of or allowable challenge to what the Authority ultimately approves as its budget. If the State of Texas refuses to assess, collect, and remit fees to the Authority, HISA strips from Texas its right to "impose or collect from any person a fee or tax relating to anti-doping and medication control or racetrack safety matters for covered horseraces." *Id.* § 1203(f)(3), 134 Stat. at 3257. So, for example, if Texas were to decide that it desired that its anti-doping regulations be stricter than the Authority's regulations, HISA would bar Texas from raising the funds necessary to enforce its own regulations unless it also agreed to collect the Authority's fees.[7] That ban on state legislation or regulation that imposes taxes and fees applies only to states that refuse to fund the Authority—not to states that give money to the Authority. Furthermore, a portion of the amount of the statutorily designated taxes that the TRC collects are used for these purposes, but it may not be feasible to separately calculate or remove those amounts from the existing taxes.

108.    HISA requires Texas "law enforcement authorities" to "cooperate and share information" with the Authority whenever a person's conduct may violate both a rule of the Authority and Texas law without reciprocal cooperation and sharing of information. HISA § 1211(b), 134 Stat. at 3275. HISA thus forces the State of Texas to spend time and resources to help the Authority carry out a federal regulatory program.

109.    Finally, even though Texas has successfully regulated all breeds of horseracing for decades through the TRC, HISA preempts state laws and regulations on which Texans and the regulated industry have long relied to ensure the safety and integrity of horseracing. *See* HISA § 1205(b), 134 Stat. at 3259. HISA purports to impose this preemption on Texas via the regulations of a private corporation, which has a governing board that is neither appointed nor removable by a

---

[7] *See* 16 Tex. Admin. Code § 319.301 Testing Authorized. *See also* 16 Tex. Admin. Code § 319.361 Testing of Horses (b), a specimen *shall* be collected from each horse that finishes first in a race.

federal officer, and which can impose rules compliant with the Act and federal regulations without any meaningful oversight by politically accountable actors.

## CLAIM I

### HISA violates the Legislative and Executive Vesting Clauses of the United States Constitution because it delegates legislative and executive authority and federal governmental powers to a private nongovernmental entity.

110.    The allegations in all preceding paragraphs are incorporated herein by reference.

111.    "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

112.    The doctrine dates back to the founding generation, with Chief Justice Marshall pointing out that "[i]t will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825).

113.    The basic principle is so well acknowledged that some years later the Court described it as self-evident: "That Congress cannot delegate legislative power . . . is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892).

114.    Even more objectionable is delegating authority to a private entity, which represents "legislative delegation in its most obnoxious form." *Carter v. Carter Coal Co.*, 56 S. Ct. 855, 873 (1936); *see also Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 118-19, 49 S. Ct. 50 (1928); *Eubank v. City of Richmond*, 226 U.S. 137, 140-41, 33 S. Ct. 76 (1912).

115.    Put simply, "Federal lawmakers cannot delegate regulatory authority to a private entity." *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013).

116.    With HISA, Congress has delegated regulatory authority over the horseracing industry to the Authority, a private, nongovernmental entity.

22

117.     This unlawful delegation of authority includes, among other things, the right to draft governmental rules on equine medication and safety, to assess millions of dollars in fees on horse owners and trainers to finance the operations of the Authority, to assess civil penalties, civil sanctions, and rule violations, including levying fines and ordering suspensions of owners and trainers for alleged violations of Authority rules, to issue subpoenas and otherwise investigate purported violations, and to commence civil actions in federal court to enforce Authority rules.

118.     HISA also permits the Authority to "access . . . offices, racetrack facilities, other places of business, books, records, and personal property of covered persons"; to issue and enforce "subpoenas and subpoenas duces tecum"; and to exercise "other investigatory powers of the nature and scope exercised by State racing commissions." HISA § 1205(c)(1)(A), 134 Stat. at 3259. The Authority's decision to exercise its investigative powers against a particular regulated party is subject to *no* governmental oversight *at all*. Congress has empowered a private entity to use the full enforcement power of the government with absolutely no governmental supervision (unless the Authority decides to impose sanctions, at which point the government's review is limited to that decision to impose sanctions). Such a delegation of governmental authority to a private entity is an unconstitutional delegation of legislative power.

119.     HISA additionally empowers the Authority to "determine and provide to each State racing commission the estimated amount required from the State" for "the State's   proportionate share of the horseracing anti-doping and medication control program and the racetrack safety program for the next calendar year" and "to liquidate the State's proportionate share of any loan or funding shortfall in the current calendar year and any previous calendar year." HISA § 1203(f)(1)(C)(i), 134 Stat. at 3255–56. This private delegation of authority not only to collect fees, but also to set the amounts due, impermissibly exceeds what the Constitution permits and the limited arrangements that some courts have approved in the past. *See Pittston*, 368 F.3d at 395 (addressing scheme where private

entity collects premiums but "has no power to determine the premium payments owed by each coal operator" as separately determined by the government); *Frame*, 885 F.2d at 1123–24 (scheme allowing private "collection of assessments" that the government separately determined); *cf. Adkins*, 310 U.S. at 399 (distinguishing a scheme in which the government, "not the [private entity], determines the prices" in the market at issue and thus "lawmaking is not entrusted to the industry").

120.    Congress has subjugated Plaintiffs to this entire regulatory scheme, which is unlawfully run by a private entity.

121.    The delegation of legislative authority to a private entity in HISA constitutes a violation of the private nondelegation doctrine found in Article I, Section I of the Constitution.

122.    The delegation of executive authority to a private entity in HISA constitutes a violation of the private nondelegation doctrine found in Article II, Section I of the Constitution.

123.    The limited oversight given to the FTC over the Authority is not sufficient to cure the constitutional violation. Because the FTC may not draft rules on its own initiative, may only recommend modifications to Authority rules, and has virtually no say in enforcement proceedings, HISA places it in a subservient role to the Authority, and thus, violates the private nondelegation doctrine. To pass constitutional scrutiny, the private entity delegated governmental powers must "'function subordinately' to and 'in aid of' an agency with 'pervasive surveillance and authority' over it." *NHBPA*, 53 F.4th at 890 (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940)).

124.    The Authority is not subordinate to the FTC, and the FTC does not exercise pervasive surveillance and authority over it. The FTC cannot draft rules in the first instance. It must approve the rules sent to it by the Authority on initial review as long as they are consistent with HISA. It may not exercise independent policy judgment as to the rules on initial review. It may only modify rules and exercise policy judgment after a rule is promulgated through a second, subsequent rulemaking,

such that the unreviewed rule is the law of the land for some period of time. The FTC does not have power over the operations, budgets, annual fee assessments, directors, or personnel of the Authority. The FTC does not have power over the investigatory decisions of the Authority. The FTC does not have power to second-guess exercises of enforcement discretion by the Authority. The FTC cannot act when the Authority unilaterally decides to ignore or rewrite sections of the Act or rules through its enforcement discretion. The FTC may not limit, suspend, or revoke the Authority's regulatory privileges. The FTC may not authorize an alternative industry regulatory organization. In short, HISA puts the Authority, not the FTC, in the saddle to make all the decisions, big and small, regulating horseracing nationwide.

125.    In addition, HISA unlawfully delegates to the Nominating Committee the unconstitutional authority to select this federal regulatory body, and there is no FTC oversight whatsoever over the decision.

126.    Texas is harmed by the unconstitutional delegations because it is subject to a regulatory process that it is forced to finance with fees imposed by the Authority. Also, Texas is harmed because it is subject to new and onerous Authority rules on equine medication and safety that change and supersede the Texas Racing Commission rules on which the Plaintiffs' training and racing businesses have long relied.

## CLAIM II

**HISA violates the Due Process Clause of the Fifth Amendment because interested participants in the horseracing industry are given regulatory power over their competitors in the industry.**

127.    The allegations in all preceding paragraphs are incorporated herein by reference.

128.    When Congress gives an "economically self-interested actor [the power] to regulate its competitors," it violates the Due Process Clause found in the Fifth Amendment. *Ass'n of Am. R.Rs. v. Dep't of Transp.*, 821 F.3d 19, 23 (D.C. Cir. 2016).

129.     HISA designates four of the members of the Board of the Authority to be economically self-interested actors, and they are given authority to regulate their competitors. § 1203(b)(1)(B), 134 Stat. at 3253–54.

130.     Three supposedly "independent" members of the Authority Board are closely tied to the industry: one is a former board member of Churchill Downs, another is a former president of the New York Racing Association, and a third is a longtime horse farm owner.

131.     More importantly, under HISA the entire Board of the Authority is selected by a private Nominating Committee. On information and belief, this private Nominating Committee was hand-picked by a small group of owners and trainers within the horseracing industry who supported passage of HISA, over the objections of thousands of owners and trainers represented by Plaintiffs, who will be regulated by HISA.

132.     On information and belief, the businesses of the small group of owners and trainers will thrive as a result of HISA. Meanwhile, HISA will harm thousands of horsemen and drive many of them out of the industry by artificially increasing the costs and fees of participation and by eliminating the use of therapeutic medication prescribed by veterinarians for the health and safety of horses.

133.     By granting these self-interested actors the authority to regulate their competitors, Congress violated the Due Process Clause and harmed Plaintiffs by creating a regulatory body that will increase their fees, diminish the value of many of their horses, and otherwise subject them to onerous regulations.

## CLAIM III

**HISA violates the Tenth Amendment of the United States Constitution by commanding the State of Texas and the Texas Racing Commission to administer this federal regulatory program.**

134.     The allegations in all preceding paragraphs are incorporated herein by reference.

135.     States cannot be commanded by the federal government to administer a federal regulatory program. *Brackeen v. Haaland*, 994 F.3d 249, 298–99 (5th Cir. 2021). The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Congress's legislative powers are limited to those enumerated under the Constitution, and Congress's powers do not include issuing direct orders to the governments of the States or conscripting state governments as its agents. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018); *Brackeen*, 994 F.3d at 298. "The Constitution confers on Congress not plenary legislative power but only certain enumerated powers," as "the Tenth Amendment confirms." *Murphy*, 138 S. Ct. at 1476. Absent from Congress's list of powers "is the power to issue direct orders to the governments of the States," a constitutional limitation known as the "anticommandeering doctrine." *Id.* Congress may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). The "States are not mere political subdivisions of the United States," and our Constitution requires Congress to "exercise its legislative authority directly over individuals rather than over States." *New York v. United States*, 505 U.S. 144, 165, 188 (1992).

136.     Thus, the anti-commandeering doctrine prohibits federal laws commanding the executive or legislative branch of a state government to act or refrain from acting. *Murphy*, 138 S. Ct. at 1477–78 ("the anticommandeering principle prevents Congress from shifting the costs of regulation to the States").

137.     Rule 2133 obligates state stewards to enforce HISA's safety rules. 87 Fed. Reg. at 449.

138.     Rule 2191 instructs state racing commissions to "develop and implement a testing program for drugs and alcohol for Jockeys." 87 Fed. Reg. at 453.

139.     Rule 2180, *et seq.*, delegates to state racing commissions the Authority's statutory

authority to develop and implement a program to educate horsemen on the new rules. 87 Fed. Reg. at 453; 15 U.S.C. § 3056(b)(11).

140.     HISA requires states (via their state racing commissions) to remit state monies to fund the Authority's operations and to pay off the Authority's private loans authorized by the Act. If a state refuses to do so, HISA further commandeers state legislative and executive authorities by prohibiting the state from imposing or collecting certain taxes or fees. In other words, Congress has either (1) unconstitutionally shifted the costs of a federal regulatory program to the states or (2) commanded state legislators and officers not to impose or collect specific taxes or fees.

141.     In other words, although Congress may provide financial inducements to encourage states to cooperate in the administration of federal programs (so long as those inducements are not coercive), and Congress may preempt state law, Congress may not induce states to cooperate or regulate by *threatening* preemption. Forcing state involvement on the threat of boxing out state regulatory agencies from their traditional areas of jurisdiction is far more coercive than minor financial inducements, and therefore violates the anti-commandeering doctrine.

142.     HISA also violates this constitutional principle by requiring "State law enforcement authorities" to "cooperate and share information" with the Authority whenever a person's conduct may violate both state law and the rules of the Authority. HISA § 1211(b), 134 Stat. at 3275. By requiring state law enforcement to cooperate with the Authority, HISA unconstitutionally conscripts the state governments into helping the Authority carry out a federal regulatory program. If Congress wants to regulate, "it must appropriate the funds needed to administer the program," and it must enforce it. *Murphy*, 138 S. Ct. at 1477. Congress has no constitutional authority to command the law-enforcement agencies of the several states to help the Authority administer a federal regulatory program.

143.     HISA violates this constitutional principle by requiring state authorities to implement

various regulations.

144.    HISA violates the Tenth Amendment on anti-commandeering grounds by directing states to legislate in accordance with public policy, like in *New York*, 505 U.S. 144 (1992).

145.    Plaintiffs are harmed by HISA's and the Authority's commandeering of the State of Texas' legislative process and their commandeering of State agents to enact and enforce a federal regulatory program that directly applies to and impacts Plaintiffs.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.    Declare that HISA, as amended, is unconstitutional because it violates the private nondelegation doctrine. The Authority is not "subordinate to" the FTC. The FTC does not have or exercise "pervasive surveillance and authority" over the Authority;

b.    Declare that HISA violates the Due Process Clause of the Constitution because it gives economically self-interested actors the power to regulate their competitors;

c.    Declare that HISA violates the Tenth Amendment of the Constitution by commandeering Texas' legislative and executive branches;

d.    Enjoin Defendants, preliminarily and permanently, from taking any action to implement the Horseracing Integrity and Safety Act;

e.    Enjoin Defendants preliminarily and permanently from appointing new members to the Board of the Horseracing Integrity and Safety Authority;

f.    Enjoin the Horseracing Integrity and Safety Authority, Inc., preliminarily and permanently, from proposing new rules to the FTC, enforcing existing rules, opening new investigations, or levying or collecting additional assessments;

g.    Award Plaintiffs nominal damages of $1 each for suffering a violation of their constitutional rights;

     h.   Award Plaintiffs compensatory damages in the amount of any fees charged to them by Defendant the Horseracing Integrity and Safety Authority, Inc.; and

     i.   Award any further relief to which Plaintiffs may be entitled, including attorneys' fees and costs.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

CHRISTOPHER D. HILTON
Chief for General Litigation Division

*/s/ Taylor Gifford*
TAYLOR GIFFORD
Texas Bar No. 24027262
Office of the Attorney General
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 | FAX: (512) 320-0667
taylor.gifford@oag.texas.gov
ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

     I certify that that on March 16, 2023, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Taylor Gifford*
TAYLOR GIFFORD
Assistant Attorney General