# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# LUBBOCK DIVISION

| | |
|---|---|
| NATIONAL HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION et al., <br>                          Plaintiffs, <br> and <br><br> THE STATE OF TEXAS et al., <br>                         Intervenor-Plaintiffs, <br> v. <br><br> JERRY BLACK et al., <br>                         Defendants. | No. 5:21-cv-00071-H <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF AN EMERGENCY PRELIMINARY INJUNCTION AGAINST THE MEDICATION RULE** |

Daniel R. Suhr
Reilly Stephens
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Telephone (312) 637-2280
dsuhr@libertyjusticecenter.org
rstephens@libertyjusticecenter.org

Fernando M. Bustos
Bustos Law Firm, P.C.
1001 Main Street, Suite 501
Lubbock, Texas 79408
Telephone (806) 780-3976
fbustos@bustoslawfirm.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii
I.   INTRODUCTION ........................................................................................................ 1
II.  ARGUMENT ................................................................................................................ 1
   A.   The Commission remains subordinate to the Authority even after the
        amendment to the Act.......................................................................................... 1
   B.   The Authority is causing irreparable harm to the Horsemen. ............................. 7
   C.   Relief is in the public interest and favored by the balance of harms. ................. 9
III. CONCLUSION ........................................................................................................... 10

**TABLE OF AUTHORITIES**

**Cases**

*Bond v. United States*, 564 U.S. 211 (2011) ............................................................................... 7

*Bristol-Myers Co. v. Fed. Trade Com.*, 424 F.2d 935 (D.C. Cir. 1970) .................................. 1

*Cellco P'ship v. FCC*, 700 F.3d 534 (D.C. Cir. 2012) ............................................................... 4

*Gagnon v. United States*, 193 U.S. 451 (1904) ......................................................................... 4

*Kinderhill Select Bloodstock, Inc. v. U.S.*, 835 F. Supp. 699 (N.D.N.Y. 1993) ...................... 9

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022)("*NHBPA*") ............................................................................................................. 1, 5, 10

*NTCH, Inc. v. FCC*, 950 F.3d 871 (D.C. Cir. 2020) ................................................................. 4

*Paniagua v. City of Galveston*, 995 F.2d 1310, 1315 n.5 (5th Cir. 1993) .............................. 2

*United States v. Transocean Deepwater Drilling, Inc.*, 537 F. App'x 358, 364 (5th Cir. 2013) ................................................................................................................. 9

**Statutes**

15 U.S.C. § 3053 ................................................................................................................ 5, 6, 7

5 U.S.C. § 553 .......................................................................................................................... 6

**Other Authorities**

Edited Press Release, *Equine Injury Database Finds Record Year for Safety*, Bloodhorse, March 20, 2023, https://www.bloodhorse.com/horse-racing/articles/267295/equine-injury-database-finds-record-year-for-safety ...................... 8

## I.   INTRODUCTION

Plaintiffs, National Horsemen's Benevolent and Protective Association and 12 of its state affiliates ("the Horsemen"), submit this Reply in support of their Motion for Emergency Preliminary Injunction (Dkt. 124) ("ADMC Motion"). Defendants Horseracing Integrity and Safety Authority ("the Authority") and Federal Trade Commission ("the Commission") each submitted combined Oppositions to both the ADMC Motion and the Horsemen's broader pending Motion for Preliminary Injunction. *See* Dkt. 116 ("Horsemen PI"); Dkt. 128 ("HISA Opp."); Dkt. 129 ("FTC Opp."). In this Reply, the Horsemen focus on those issues relevant to the ADMC Motion, and reserve without prejudice arguments relevant to the broader motion, for which this Court has set a Reply deadline of April 12.[1]

## II.   ARGUMENT

### A. The Commission remains subordinate to the Authority even after the amendment to the Act.

At bottom, the core question is whether the recent amendments now render the Authority subordinate to the Commission. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 877 (5th Cir. 2022) ("*NHBPA*"). They do not. What the Authority calls the Horsemen's "cramped conception of the FTC's consistency review," HISA Opp. at 13, is in fact simply the reality of consistency review, which is quite cramped. Their quarrel there is not with the Horsemen; it's with the Fifth Circuit. *See NHBPA*, 53 F.4th at 886. And even after

---

[1] The Authority claims that the Horsemen's Motion, filed the same day the ADMC rule was approved, is somehow untimely, in that it comes some two months after the Fifth Circuit remanded the case to this Court. *See* HISA Opp. at 3, 23. But the Horsemen couldn't have challenged the ADMC rule directly prior to March 27. *See Bristol-Myers Co. v. Fed. Trade Com.*, 424 F.2d 935, 940 (D.C. Cir. 1970) (challenge to proposed rule was not ripe). Indeed, the Horsemen did not lollygag: they filed their pending injunction motion along with their Amended Complaint at the beginning of this month, requesting expedited consideration. This Court declined to give that motion expedited consideration, and therefore the Horsemen have now filed a more limited motion specific to the acute harm they are suffering immediately due to the ADMC rule.

1

Congress's intervention, the Commission remains at the mercy of the Authority's preferences. *See* ADMC Motion at 7. This is confirmed even by the ADMC rule itself, in which the Commission reaffirmed its inability to actually control the Authority's rulemaking:

> An amendment made to the Act in December 2022 provides that the Commission may at any time exercise discretionary rulemaking authority to "abrogate, add to, or modify" an Authority rule, if it finds that doing so is "in furtherance of the purposes of the Act." 15 U.S.C. § 3053(e). But this new power extends only to changing existing Authority rules and does not allow the Commission to modify a proposed rule. Accordingly, here, the Commission's powers remain limited to approving or disapproving the proposed rule under § 3053(c). Once a rule is approved and goes into effect, the rule can be modified through a rule modification proceeding by the Authority under § 3053(a); by the Commission itself pursuant to § 3053(e) (in a rulemaking proceeding conducted in accordance with 5 U.S.C. § 553), if the Commission concludes that the Authority's rule does not reflect the policies that the Commission believes would best to protect horseracing integrity or safety; or through a public petition for the amendment of the rule under 16 C.F.R. § 1.31.

Dkt. 126-1 at App.035. By the Commission's own description, its "powers remain limited to approving or disapproving the proposed rule." The only change is that "[o]nce a rule is approved and goes into effect, the rule can be modified through a rule modification proceeding" that the Commission must then undertake. The Authority has the power to make the rules, and Commission has the power to go through a process that may allow them to tweak the rules eventually. The Commission's modification powers do not in fact render it superior to the Authority. The power to modify or amend a regulatory scheme does not equal the power to control a regulatory scheme. *Paniagua v. City of Galveston*, 995 F.2d 1310, 1315 n.5 (5th Cir. 1993) ("the authority to administer a program does not include the power to modify or amend the program"). If a chef hires someone to run his restaurant's kitchen because he's decided to trade the day-to-day of making food to be a celebrity TV chef, he might give his

2

new head chef the power to modify the menu that made him famous—but the chef who is allowed to tweak a recipe is subordinate to the chef who created the recipes in the first place.

It is therefore not the case that "[t]he FTC has left no doubt that it will 'exercise its own policy choices whenever it determines that the Authority's proposals… are not the policies that the [FTC] thinks would be best for horseracing integrity or safety." HISA Opp. at 14. There remains quite a bit of doubt, based on the Commission's own actions and statements. According to the FTC itself, "the Commission's statutory mandate to approve or disapprove a proposed Authority rule is limited to considering only whether the proposed rule 'is consistent with' the Act and the Commission's procedural rule." Dkt. 126-1 at App.037. Even under the 2022 amendment, the Commission still describes its role as rubber-stamping anything under the consistency review the Fifth Circuit rejected. Defendants ask this Court to look past the program as currently operating and *theorize* that *some* FTC *someday* might *attempt* to modify a rule written and enforced by the Authority, while in the meantime the Horsemen and the rest of their industry are to be governed by the rules the Authority pushes through consistency review without any federal power to prevent abuses in the meantime.

Defendants reply that the Horsemen or those like them could simply petition the FTC when they disagree with the Authority's rules. HISA Opp. at 27. In other words, "if the private company makes a rule that will kill your horses and put you out of business, you can file a notice with a government agency and hope they get around it eventually." In a free society, that's simply backwards: if the prohibition against private delegations means anything, it means that the federal government must *set* the policy, because only in the case of government actors are there mechanisms—procedural, legal, and political—to ensure accountability. And while the Authority falls back on the idea that this sort of as applied relief, any rule issues

3

under an unconstitutional scheme itself facially invalid. Whatever label is applied, the ADMC rule governing the industry was written by a private corporation and given only a rubber stamp of insufficient consistency review.

Under the Defendants' interpretation, the Authority could outlaw saddles. Perhaps some animal welfare advocates consider the use of saddles inhumane, while others might think it's more humane than riding bareback, but it doesn't matter either way: if the Authority announces that it views the use of saddles as cruel to both the horses and jockeys, saddles will be outlawed. Defendants' response is that the Horsemen could petition the Commission for rulemaking to modify or amend the anti-saddle rule. But the Horsemen cannot ask that the rule be rescinded— the Commission only has modification and amendment powers, which do not allow the Commission to create new rules or rescind old rules. The power to amend or modify is inherently limited—it is not the power to create; it is not the power to rescind; it isn't even the power to fundamentally change the existing rule. *See Gagnon v. United States*, 193 U.S. 451, 457 (1904) ("This power to amend, too, must not be confounded with the power to create."); *NTCH, Inc. v. FCC*, 950 F.3d 871, 882 (D.C. Cir. 2020) ("[T]he Commission's 'power to modify existing licenses does not enable it to fundamentally change those licenses.'") (quoting *Cellco P'ship v. FCC*, 700 F.3d 534, 543-44 (D.C. Cir. 2012). Any petition the Horsemen made in this regard would be frivolous, since the Commission doesn't have the power to create or rescind rules.

Even if the Commission did decide to take a stand against the excesses of the Authority, it is fundamentally handicapped in policing the Authority. It is required to rubber-stamp the rules, and allowed only to go through notice-and-comment rulemaking to tweak the results. If the Horsemen petition the Commission for this modification, and if the Commission agrees,

the Commission will have to go through an entire administrative process in order to modify the rule—which means the anti-saddle rule, which the Commission would be required to approve in the first instance, will remain in effect for months, or even years, while the Commission's rulemaking is resolved. Any rule the Authority proposes—no matter how impractical, expensive, counterproductive, or stupid—will be the law of the land, and approved under a mere consistency review. The Authority's response is that eventually the Commission might be obliged to undertake an entire rulemaking to fix the mess the Authority made and that the Commission was required to rubber-stamp.

The FTC's consistency review is still a failed flaw to the Act. As the Fifth Circuit stated in its Opinion:

> Saying a rule is or is not "consistent" with that standard says next to nothing. Such high-altitude oversight, the district court itself acknowledged, "largely gives the Authority the power to 'fill up the details' of the Act in places with less specific directives," and "[f]illing up the details has long been recognized as the very business of regulating." Black, 596 F.Supp.3d at ——, 2022 WL 982464, at *22 (citing Gundy, 139 S. Ct. at 2136 (Gorsuch, J., dissenting); United States v. Grimaud, 220 U.S. 506, 517, 31 S.Ct. 480, 55 L.Ed. 563 (1911)).

*NHBPA,* 53 F.4th at 885.

The Commission insists that "any timing gap between consistency review and a new FTC rule is itself a policy choice by the FTC." FTC Opp. at 8. But that is not what the Fifth Circuit found when it examined the limits of consistency review, and the Fifth Circuit's understanding governs in this case. The 2022 amendment makes no substantive change to the consistency review the Fifth Circuit found wanting; it only added the ability to "abrogate, add to, and modify . . ." 15 U.S.C. § 3053(e). The Commission's supposed new power to make policy choices must derive, if at all, from these new authorities, none of which allow the Commission

5

to impose its own policy preferences—which is what the Fifth Circuit held, and Defendants cannot dodge the law of the case by reiterating the arguments the Court of Appeals rejected.

What's more, the Commission's argument depends on its ability to issue interim rules, arguing that "while the Authority's proposed rule is pending FTC review, the FTC could enact an interim final rule that codifies the FTC's policy preference and then reject the Authority's proposed rule as inconsistent with that interim final rule." FTC Opp. at 8. This argument in turn depends on the argument that, in deleting the explicit authority of the Commission to issue interim final rules from the statute, Congress did not remove the authority to issue interim final rules. According to Defendants, by deleting "under conditions specified in section 553(b)(B)" and replacing it with "by rule in accordance with section 553 of title 5," Congress incorporated by reference the interim rulemaking authority in 553(b)(B) it removed.

But this was not the only change to the text. Originally, it read "[t]he Commission may adopt an interim final rule, to take effect immediately, under conditions specified in section 553(b)(B) . . ." The current version reads "[t]he Commission, by rule in accordance with section 553 of title 5, United States Code, may abrogate, add to, and modify the rules of the Authority . . ." 15 U.S.C. § 3053(e). Defendants treat this as an expansion of authority full stop—but Congress deleted the specific provisions about interim rulemaking authority, and the reference to "section 553 of title 5" is grammatically limited: "in accordance" with the § 553, the Commission "may abrogate, add to, and modify the rules." That does not incorporate the entirety of § 553 by reference; it says the Commission may perform specific actions ("may abrogate, add to, and modify the rules") under the limitations § 553 imposes. Adopting a new interim rule is simply not the same thing as the act of "abrogate[ing], add[ing] to, and modify[ing] the rules." If the Commission issues an interim rule, it will be *ultra vires*.

6

And moreover, the statute itself explicitly limits the scope of the Commission's involvement to a list of 11 specific subjects of Authority rulemaking, such as "permitted and prohibited medications," "standards for racing surface quality," and "a program for injury and fatality data analysis." 15 U.S.C. § 3053(a). This necessarily cabins the Commission's rulemaking authority as well. And the Commission is already chaffing at those limits, attempting to pass rules regarding, for instance, the Authority's budget, which the statute provides no actual power to the Commission to oversee.

The Fifth Circuit identified three problems on the legislative delegation: consistency review, the lack of the power to modify rules, and the lack of the power to issue new rules that aren't emergency rules. The Amendment fixed one half of one of those problems. The Commission still operated under consistency review, it can modify enacted rules but not proposed rules, and it cannot initiate new rules (emergency or final). This is not sufficient to survive constitutional scrutiny. As the FTC's own order explains, the ADMC Rule at issue in this emergency motion was approved simply on the basis of the consistency review the Fifth Circuit rejected.

## B. The Authority is causing irreparable harm to the Horsemen.

The Authority rejects the Horsemen's identified irreparable harms as "simply alleg[ing] the Constitution may not be followed with respect to someone." HISA Opp. at 18. But that absolutely is an injury for which citizens are entitled to ask the courts for redress. *Bond v. United States*, 564 U.S. 211, 223 (2011). Defendants' arguments otherwise are simply a rejection of the Fifth Circuit's holding to the contrary.

The Authority falls back on timing concerns, since the Horsemen "have litigated this case for over two years—and have been subject to HISA rules for nine months—without ever

7

requesting preliminary injunctive relief since withdrawing their initial motion in March 2021." But this is simply disingenuous: the Horsemen withdrew their March 2021 injunction motion because the Authority asked for a summary judgment briefing schedule as an alternative, and did not refile in the meantime because they were litigating those motions in this Court and on appeal—and they won. And for most of those past two years, there were no HISA rules to enjoin. It is only in the past few months that the Horsemen found it necessary to ask this Court for relief from injury—indeed, it is only *this week* that the injury addressed by this Motion finally occurred.

Defendants insist that an injunction here would somehow upend the status quo, as if the new rule implemented this week is somehow the status quo since it's technically been the rule for the past few days. They likewise cite the Lazarus Declaration, claiming that it supports the idea that HISA has caused a "'record low rate' of equine fatalities." HISA Opp. at 26, citing Lazarus Dec. ¶ 16 (Dkt. 128-2 at 8). But ¶ 16 of the Lazarus Declaration cites to *the Authority's own press release,*[2] and *even that press release* states that 2022 was "the fourth consecutive year the rate [of equine fatalities] has decreased." To put it simply: the Authority is taking a correlation and claiming it itself as the causation, when in fact the downward trend in fatalities began years before the Authority *even existed*, and therefore must be attributed to factors other than the rules the Authority has imposed since last summer. What's more, this motion is specific to the ADMC rule, which only went into effect this week. The Authority cannot point to the claimed effects of other initiatives to argue that this new rule caused improvements before it was even issued.

---

[2] Edited Press Release, *Equine Injury Database Finds Record Year for Safety*, Bloodhorse, March 20, 2023, https://www.bloodhorse.com/horse-racing/articles/267295/equine-injury-database-finds-record-year-for-safety.

At some points, the Authority wants this to be a transformative national regulatory scheme that will fix major longstanding issues especially around doping. At other points, the Authority characterizes this as no more than minor modifications to long-standing state and racetrack rules. It suggests the only thing that's changing is the Lasix ban, which was directly legislated by Congress. It can't have it both ways. The reality, as the veterinarians' report indicates, is that the rule makes major changes on a whole host of medications, not just Lasix, and that it significantly departs from the current ARCI guidelines and longstanding state rules.

Nor is the Authority correct that the vast majority of the industry approves of HISA: NHBPA is a national organization representing some 30,000 horsemen around the country— one of the largest organizations representing a broad swath of the industry. Each of those members will be required to adhere to the Authority's illegal rules, and as the declarations of Dr. Fenger and Dr. Daniels emphasize, those members will be forced to deny their animals vital medical treatment and medication, without which many horses may die. That is not speculation, and that harm is not repairable at the end of the case via money damages. *Kinderhill Select Bloodstock, Inc. v. U.S.*, 835 F. Supp. 699, 700 (N.D.N.Y. 1993) ("horses are unique, [so] money damages would not be an adequate remedy").

**C.  Relief is in the public interest and favored by the balance of harms.**

Since this is a case about constitutional limits on state power, the balance of harms and public interest collapse into the merits—there is no public interest in violating the law, and no balance to be struck for illegal actions. Defendants are therefore forced to fall back on the proposition that "Halting HISA's implementation nationwide would 'impede the accomplishment' of that paramount statutory purpose." HISA Opp. at 29 (quoting *United States v. Transocean Deepwater Drilling, Inc.*, 537 F. App'x 358, 364 (5th Cir. 2013)). But

9

Congress's statutory purpose is of no moment when it passes an unconstitutional statute. Nor does it matter how many years or how many dollars the Authority has spent to further its goals if those goals require illegal acts to achieve them. The Fifth Circuit held that HISA was illegal—the only question on remand is whether the recent amendments are sufficient to resolve those difficulties on the merits. The Horsemen submit that it is not, and if this Court agrees on the merits, that resolves the remaining questions.

### III.   CONCLUSION

At the end of the day, HISA is simply incompatible with the "cardinal constitutional principle . . . that federal power can be wielded only by the federal government." *NHBPA*, 53 F.4th at 872. The Authority is not a private company providing limited services on a government contract that can be cancelled. It is not an advisory committee providing input. It is an *Authority*, with the form, function, and purpose of a government agency to regulate an industry, but without the checks-and-balances of democratic accountability and transparency. Its design is incompatible with our constitutional design. The 2022 amendment simply continues the preexisting statutory scheme, which sharply limits the authority of the Commission. The Authority and Commission may wish that Congress had amended the statute to provide the Commission the sort of plenary authority that would resolve the constitutional defects identified by the Fifth Circuit, but if wishes were horses, beggars would ride.

For the reasons stated above, and in the Horsemen's initial Memorandum, the ADMC rule should be enjoined.

Respectfully Submitted,                Dated: March 30, 2023

| | |
|---|---|
| Fernando M. Bustos<br>(Texas Bar. No. 24001819)<br>Matthew N. Zimmerman<br>(Texas Bar No. 24100386)<br>Bustos Law Firm, P.C.<br>1001 Main Street, Suite 501<br>Lubbock, Texas 79408<br>Telephone (806) 780-3976<br>fbustos@bustoslawfirm.com | */s/ Daniel R. Suhr*<br>Daniel R. Suhr, *Admitted Pro Hac Vice*<br>Reilly Stephens, *Admitted Pro Hac Vice*<br>Liberty Justice Center<br>440 N. Wells Street, Suite 200<br>Chicago, Illinois 60654<br>Telephone (312) 637-2280<br>dsuhr@libertyjusticecenter.org<br>rstephens@libertyjusticecenter.org<br><br>*Attorneys for Plaintiffs* |