UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

NATIONAL HORSEMEN'S
BENEVOLENT AND PROTECTIVE
ASSOCIATION, et al.,

       Plaintiffs,

THE STATE OF TEXAS and THE
TEXAS RACING COMMISSION,

       Intervenor-Plaintiffs,

v.

JERRY BLACK, et al.,

       Defendants.

No. 5:21-CV-071-H

## MEMORANDUM OPINION AND ORDER

In hopes of standardizing horseracing regulation, the Horseracing Integrity and Safety Act of 2020 (HISA) empowered a private entity to draft nationwide regulations subject to the Federal Trade Commission's review and approval. In response, the plaintiffs claimed that HISA was unconstitutional because it did not give the FTC meaningful oversight—violating the private-nondelegation doctrine. Although this Court recognized that the plaintiffs' concerns were legitimate, it construed binding precedent as permitting Congress's approach in its March 2022 order. The Fifth Circuit disagreed, explaining that precedent could not justify HISA and that it was unconstitutional because the FTC lacked discretion to approve, disapprove, or modify the proposed regulations. Answering the Fifth Circuit's call, Congress amended HISA to empower the FTC to "abrogate, add to, and modify" the entity's regulations. Nevertheless, the plaintiffs continue to allege constitutional violations. But because Congress remedied the offending provisions and brought the law within the Fifth Circuit's stated requirements, the plaintiffs' claims fail.

Specifically, after remand, the original plaintiffs continue to claim that HISA violates the private-nondelegation doctrine under Article I and the Due Process Clause.  Dkt. No. 116.  Texas and the Texas Racing Commission, as intervenor-plaintiffs, raise the same arguments.  Dkt. No. 155 at 22–25.  Additionally, also after remand, another court transferred a related case to this Court.  *Gulf Coast Racing LLC v. Horseracing Integrity & Safety Authority*, No. 2:22-CV-146-Z (N.D. Tex.), Dkt. No. 53.  Those plaintiffs make the same private-nondelegation claim, but only as an alternative to their primary claim that HISA violates Article II's Appointments Clause and Article I's Vesting Clause.  Dkt. No. 136.  In their view, the private entity at issue—the Horseracing Integrity and Safety Authority—is, in reality, a public entity subject to the same requirements applicable to all public officers.  No. 5:23-CV-077, Dkt. No. 36 at 33.  They also allege, albeit briefly, that HISA violates the Tenth Amendment's anti-commandeering principles by requiring Texas to do the federal government's bidding.  *Id.* at 57.

In light of Congress's amendment to HISA and the undisputed evidence following a bench trial, each of these arguments falls short.  First, the plaintiffs' private-nondelegation argument reveals too much and is barred by precedent.  Previously, the plaintiffs argued that "HISA violates the private nondelegation doctrine because the FTC cannot modify the Authority's rules."  Dkt. No. 38 at 26.  Now that Congress expressly authorizes the FTC to modify the Authority's rules, the plaintiffs retreat and admit their true view:  that there is nothing Congress could do to bring the HISA–Authority arrangement within constitutional bounds.  Dkt. No. 182 at 31–33, 37–38.  But this argument ignores the long history of the executive branch leveraging—with court approval—expertise from private industry so long as the industry remains subordinate to a supervisory federal agency.  *E.g.*, *Sunshine Anthracite*

*Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940) (allowing private parties to participate in price setting because the private entities "function[ed] subordinately to the Commission" and because the Commission retained "pervasive surveillance and authority" over the activities of the private parties); *see also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 386–90 (1995) (detailing the "long history of corporations created and participated in by the United States for the achievement of governmental objectives" beginning in the 18th Century). The Court understands the plaintiffs' concerns with these arrangements, especially given how long horseracing has been regulated at the local level. But because Congress brought HISA within the Constitution's limits as defined by the Fifth Circuit, the Court concludes that HISA does not violate the private non-delegation doctrine.

Second, the plaintiffs' facial and as-applied Fifth Amendment Due Process argument fails for the same reasons this Court explained in its first order rejecting it. The Court finds that the Authority is not a self-interested industry competitor creating a constitutional violation. As a facial matter, HISA explicitly protects against self-interest through structural safeguards while preserving industry representation in the Authority. And the as-applied challenge fails because there is no evidence of actual, unconstitutional self-dealing that has harmed industry competitors.

Third, the plaintiffs' appointment and removal arguments fail for a simple reason— the challenged entity at issue (the Authority) is not a public, governmental actor subject to these constitutional limitations. The Fifth Circuit held as much in its panel opinion, so the plaintiffs' assertion otherwise at this point is both contrary to the law of the case and foreclosed by precedent. Moreover, even assuming that the Fifth Circuit left this issue open,

precedent makes clear that the Authority is private because it was not created by the government, and it retains for itself permanent authority to appoint its directors.

Finally, the plaintiffs lack standing to raise their Tenth Amendment argument that HISA unconstitutionally commandeers the states.  Although private plaintiffs are not automatically barred from bringing Tenth Amendment claims, they must still demonstrate injury that is traceable to the defendant's conduct and redressable by the Court.  But the private plaintiffs have no traceable, redressable injury to assert because HISA allows Texas to either elect to collect fees of covered persons or, if not, the Authority will.  HISA allows states to "elect[]" to assess and collect fees on covered persons.  15 U.S.C. § 3052(f)(2)(A).  But if the state does not make such an election, then the Authority steps in to do so.  § 3052(f)(3).  In this way, covered persons like the Gulf Coast plaintiffs will be regulated and subject to assessments even if they were to succeed on the anti-commandeering claim.  Although the private plaintiffs clearly prefer to be regulated by Texas instead of the Authority, the preference alone is insufficient to establish a redressable injury.

For all these reasons, the Court rejects the plaintiffs' arguments and conclude that Congress cured the unconstitutional aspects of HISA's original approach.  Given the parties' desire for an expeditious resolution, the Court's opinion is sufficient to permit appellate review but does not exhaust every possible vein of analysis.[1]

---

[1] As explained *infra* in Parts 1.I through 1.L, the Court is operating on an expedited timeframe. After resolving multiple emergency motions, the Court consolidated these cases on April 11—roughly three weeks ago.  Trial was held last week on April 26.  Although the ADMC rule's effective date was delayed until May 22 (Dkt. No. 180), the plaintiffs request resolution "as soon as possible."  Dkt. No. 181 at 8.

1.    **Findings of Fact**

Following remand from the Fifth Circuit, the plaintiffs filed multiple motions for a preliminary injunction.  Dkt. Nos. 116; 124; 139.  Given the plaintiffs' requests for expedited treatment and temporary emergency relief, the Court consolidated the hearing on the plaintiffs' motions for preliminary injunction with the trial on the merits.  Dkt. No. 135; *See also* Fed. R. Civ. P. 65(a)(2).  The Court finds the following facts.

A.    **Congress enacts HISA with broad bipartisan support.**

American horseracing has existed for centuries, and throughout it "has been regulated by the States, local communities, and private organizations."  *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 873 (5th Cir. 2022).  Although popular even in the colonial era, the growth of American horseracing in the 1850s was met with "a growing interest in the formation of a national governing board to regulate racing."  Joan S. Howland, *Let's Not "Spit the Bit" in Defense of "The Law of the Horse": The Historical and Legal Development of American Thoroughbred Racing*, 14 Marq. Sports. L. Rev. 473, 483 (2004).  But it would take more than 170 years for the first national horseracing legislation to be signed into law.  *Nat'l Horsemen's*, 53 F.4th at 873.

After an increase in doping scandals and racetrack fatalities, Congress passed HISA with broad bipartisan support.  Pub. L. No. 116-260, §§ 1201-12, 134 Stat. 1182, 3252-75 (2020) (codified at 15 U.S.C. §§ 3051–60).  On December 27, 2020, HISA was signed into law.  *Id.*  For the first time in the long history of American horseracing, HISA established a framework for national regulation of certain aspects of the industry.  15 U.S.C. §§ 3051–60.  Specifically, HISA aims to establish nationwide rules over racetrack safety and anti-doping and medication control (ADMC).  *Nat'l Horsemen's*, 53 F.4th at 873.  HISA applies to all

covered horses (thoroughbreds (§ 3051(4)), covered persons (all trainers, owners, breeders, jockeys, racetracks, and veterinarians, among others (§ 3051(6)), and covered horseraces (those horseraces with a substantial effect on interstate commerce (§ 3051(5)).  In other words, "[t]he Act's reach is broad," and HISA creates a truly nationwide, comprehensive regulatory scheme for racetrack safety and ADMC.  *Nat'l Horsemen's*, 53 F.4th at 873.

### B.    A private entity, the Authority, is incorporated in aid of HISA.

The Authority was incorporated as a nonprofit on September 8, 2020.  GPX 6 at 1; No. 5:23-CV-077, Dkt. No. 47 at 5.  HISA "recognize[d]" the Authority, a "private, independent, self-regulatory, nonprofit corporation . . . for purposes of developing and implementing a horseracing anti-doping and medication control program and a racetrack safety program for covered horses, covered persons, and covered horseraces."  15 U.S.C. § 3052(a).  HISA prescribes the makeup of the Authority's board of directors, including the number of total directors (nine), independent directors (five), and industry-member directors (four).  § 3052(b)(1).  The initial directors are chosen by a nominating committee, "comprised of seven independent members . . . set forth in the governing corporate documents of the Authority."  § 3052(d).  HISA also directs the Authority to establish racetrack-safety and ADMC standing committees.  § 3052(c).

### C.    HISA creates a rulemaking procedure that attempts to allow the Authority to aid the FTC in regulating thoroughbred horseracing.

HISA creates a regulatory framework that allows the Authority to operate in aid of the FTC:  The Authority first drafts proposed rules, which are then submitted for FTC approval.  § 3053(a).  Once a rule is received by the FTC, it goes through notice and comment.  § 3053(a)–(b).  HISA also requires FTC approval before a proposed rule can take effect.  § 3053(b)(2).  The FTC is given sixty days to "approve or disapprove the proposed

rule or modification," and the FTC "shall approve" a proposed rule if it is consistent with the statute and applicable rules. § 3053(c).

### D.   With oversight by the FTC, the Authority is tasked with enforcement.

The Authority is empowered to enforce the rules it aids the FTC in creating by investigating violations, imposing civil sanctions, and suing to enforce sanctions or obtain injunctive relief. §§ 3058(a), 3057(d), 3054(h)–(j). The Authority's investigatory powers are subject to "uniform procedures" reviewed and approved by the FTC. § 3054(c). All civil sanctions imposed by the Authority are subject to two layers of FTC oversight. First, all civil sanctions are subject to de novo review by an Administrative Law Judge appointed by the FTC. § 3058(b). And the FTC can review de novo the ALJ's final decision. § 3058(c).

### E.   The Authority is funded by private parties.

At its initial stage, the Authority is funded by loans. *See* § 3052(f)(1). After that initial stage, the majority of the Authority's funding will derive from fees collected from covered persons or state racing commissions. § 3052(f)(1)–(4). Any "proposed increase" in fees for covered persons must be reported to the FTC for review and submitted for notice and comment. § 3052(f)(1)(c)(iv).

### F.   Multiple parties challenge HISA's constitutionality.

This case involves many parties, consisting of the lead-case plaintiffs,[2] the member-

---

[2] The plaintiffs in the lead case are National Horsemen's Benevolent and Protective Association, Arizona Horsemen's Benevolent and Protective Association, Arkansas Horsemen's Benevolent and Protective Association, Indiana Horsemen's Benevolent and Protective Association, Illinois Horsemen's Benevolent and Protective Association, Louisiana Horsemen's Benevolent and Protective Association, Mountaineer Park Horsemen's Benevolent and Protective Association, Nebraska Horsemen's Benevolent and Protective Association, Oklahoma Horsemen's Benevolent and Protective Association, Oregon Horsemen's Benevolent and Protective Association, Pennsylvania Horsemen's Benevolent and Protective Association, Tampa Bay Horsemen's Benevolent and Protective Association, and Washington Horsemen's Benevolent and Protective Association (hereinafter the Horsemen plaintiffs). Dkt. No. 149 at 2–10.

case plaintiffs,[3] the intervenor-plaintiffs,[4] the FTC defendants,[5] and the Authority

defendants.[6]  Both plaintiff groups sued FTC-related defendants and Authority-related

defendants.

### G.    The Fifth Circuit holds HISA unconstitutional.

In March 2021, the National Horsemen's Benevolent and Protective Association and

twelve of its affiliates (the Horsemen plaintiffs) filed suit against the FTC, its commissioners,

the Authority, and the Authority's Nominating Committee members, challenging HISA's

constitutionality on several grounds.  Dkt. No. 1 at 19–26.  In due time, the FTC defendants

and the Authority defendants separately filed motions to dismiss (Dkt. Nos. 34; 36), and the

Horsemen filed a partial motion for summary judgment, seeking declaratory and injunctive

relief on their private-nondelegation and due-process claims (Dkt. No. 37).  After

considering the briefing of the parties and various *amici*, and after oral argument, the Court

concluded, based on what it viewed as binding precedent, that HISA did not result in a

constitutional violation.  *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 596 F. Supp.

3d 691, 725 (N.D. Tex. 2022), *rev'd and remanded*, 53 F.4th 869 (5th Cir. 2022).  Thus, the

Court denied the partial motion for summary judgment (Dkt. No. 37) and noted that the

---

[3] The plaintiffs in the member case are Gulf Coast Racing LLC, LRP Group Ltd., Valle de Los Tesoros Ltd., Global Gaming LSP, LLC, and the Texas Horsemen's Partnership LLP (hereinafter the Gulf Coast plaintiffs).  Dkt. No. 142 at 7–8.

[4] The intervenor-plaintiffs are the State of Texas and the Texas Racing Commission.  Dkt. No. 155.

[5] The Authority defendants are Jerry Black, the Horseracing Integrity and Safety Authority, Lisa Lazarus, Steve Beshear, Adolpho Birch, Leonard Coleman, Ellen McClain, Charles Scheeler, Joseph DeFrancis, Susan Stover, Bill Thomason, D.G. Van Clief, Katrina Adams, Nancy Cox, Joseph Dunford, Frank Keating, and Kenneth Schanzner.  Dkt. Nos. 142; 149.

[6] The FTC defendants are the Federal Trade Commission, Lina Khan, in her official capacity as Chair of the Federal Trade Commission, Rebecca Kelly Slaughter, Alvaro Bedoya, Noah Phillips, and Christine Wilson, all in their official capacities as Commissioners of the Federal Trade Commission.  Dkt. Nos. 142; 149.

plaintiffs had abandoned their remaining claims (*Nat'l Horsemen's Benevolent & Protective Ass'n*, 596 F. Supp. 3d at 728).  The Court dismissed the plaintiffs' complaint (Dkt. No. 23) with prejudice.

On appeal, the Fifth Circuit reversed in a thorough opinion, holding that the FTC-Authority regulatory scheme was unconstitutional because it gave the FTC too little control over a private entity with regulatory authority.  *Nat'l Horsemen's*, 53 F. 4th at 872.  The court explained that "[a] cardinal constitutional principle is that federal power can be wielded only by the federal government."  *Id.*  As a result, "a private entity may wield government power only if it 'functions subordinately' to an agency with 'authority and surveillance' over it."  *Id.* at 881.  To explain the concept "more precisely," the court noted that it is within constitutional bounds for Congress to "formalize the role of private parties in proposing regulations so long as that role is merely 'as an aid' to a government agency that retains the discretion to 'approve[ ], disapprove[ ], or modif[y]' them."  *Id.* (quoting *Ass'n of Am. R.R.s v. Dep't of Transp. [Amtrak I]*, 721 F.3d 666, 671 (D.C. Cir. 2013)).  But "[i]f the private entity does not function subordinately to the supervising agency, the delegation of power is unconstitutional."  *Id.*

Applying these principles, the court held that the Authority was not subordinate to the FTC.  *Id.* at 872–73.  "An agency does not have meaningful oversight if it does not write the rules, cannot change them, and cannot second-guess their substance."  *Id.* at 872.  It was the Authority, not the FTC, that had "the last word over what rules govern our nation's thoroughbred horseracing industry," which rendered HISA unconstitutional.  *Id.*

Three aspects of HISA and the FTC-Authority relationship led the panel to this conclusion.  First, the court noted the Authority's "sweeping rulemaking power" and

observed that "HISA's generous grant of authority to the Authority to craft entire industry 'programs' strongly suggests it is the Authority, not the FTC," that is in control.  *Id.* at 882–83.  Moreover, the court explained that the FTC's ability to adopt interim final rules did not meaningfully alter the scope of the Authority's power because such rulemaking is narrow and reserved for emergencies.  *Id.* at 883.

Second, the court relied on the FTC's limited power to review proposed rules, which prevented the FTC from reviewing the Authority's policy choices.  *Id.* at 884.  The FTC's review of proposed rules for consistency with HISA was "too limited to ensure the Authority 'functions subordinately' to the agency."  *Id.*  "[S]uch arms-length review hardly subjects the Authority's rules to 'independent' oversight."  *Id.* at 885.  Perhaps more importantly, the court explained that, whatever the FTC's consistency review would entail, it excludes review of the Authority's policy choices.  *Id.*  Similarly, the FTC could not force the Authority to modify those choices; it could only make recommendations to the Authority.  *Id.* at 886.  "The Act's division of labor is clear: the Authority writes the rules; the agency may suggest certain changes, but the Authority can take them or leave them."  *Id.*

Finally, the Fifth Circuit noted that HISA's FTC-Authority relationship was materially different from the Maloney Act's SEC–FINRA model, which has consistently withstood non-delegation challenges.  *Id.* at 887.  Although FINRA, like the Authority, "is a private entity empowered to draft and propose regulations" to a federal agency, there was "a key distinction" between the two.  *Id.*  "Unlike HISA, the Maloney Act empowers the SEC to 'abrogate, add to, and delete from' FINRA rules 'as the [SEC] deems necessary or appropriate[.]'"  *Id.* (quoting 15 U.S.C. § 78s(c) and citing *Aslin v. Fin. Indus. Regulatory*

*Auth., Inc.*, 704 F.3d 475, 476 (7th Cir. 2013) (observing that the SEC "may abrogate, add to, and delete from all FINRA rules as it deems necessary")). The SEC's rulemaking power, the court explained, "meaningfully distinguishes the SEC-FINRA relationship from the FTC-Authority relationship." *Id*. The court recognized that while "FINRA plays an important role in formulating securities industry rules, its role is ultimately 'in aid of' the SEC, which has the final word on the substance of the rules." *Id*. The Authority, in contrast, has the final word on formulating and proposing rules because of "the limits built into the FTC's oversight." *Id*. Thus, the Fifth Circuit held that "the FTC's power to *recommend* modifications is not equivalent to the power to *require* modifications." *Id*. at 888.

These reasons—combined with the Fifth Circuit's view that precedent did not require affirmance—led the Court to hold that the Authority was not subordinate to the FTC and, thus, the FTC-Authority structure violated the Constitution's guarantee against private nondelegation. *Id.* at 890.

> **H.** **Congress amends HISA.**

Roughly six weeks after the Fifth Circuit's decision, Congress enacted, and the President signed into law, an amendment to HISA. As amended, § 3053(e) now provides the FTC with authority to "abrogate, add to, and modify the rules of the Authority promulgated in accordance with this chapter as the Commission finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to requirements of this chapter and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of this chapter." 15 U.S.C. § 3053(e). The defendants sought rehearing in the Fifth Circuit in light of the amendment, but the panel

– 11 –

remanded the case to this Court for further proceedings. *Nat'l Horsemen's*, No. 22-10387, Dkt. Nos. 223–24 (5th Cir. Jan. 31, 2023) (denying rehearing and issuing mandate).

## I.   The plaintiffs allege several post-remand emergencies.

Following remand, the plaintiffs in *National Horsemen's* filed a Motion for a Preliminary Injunction (Dkt. No. 116), asking the Court to enjoin the Authority from implementing and enforcing HISA while the parties dispute whether Congress's recent modification to HISA makes the statute constitutional. *Id.* at 6. The plaintiffs proposed that the Court order an expedited briefing schedule on the motion so the Court could issue its order by March 27, 2023—the date an anti-doping rule was scheduled to (and eventually did) go into effect. Dkt. No. 117. After considering the parties' respective positions, the Court declined to order expedited briefing and instead set a regular briefing schedule. Dkt. No. 121.

On March 27, 2023—the very day that the anti-doping rule was approved and went into effect—the plaintiffs filed their Motion for an Emergency Preliminary Injunction Against the Medication Rule. Dkt. No. 124. The emergency motion focused specifically on the anti-doping rule, alleging that it violated the Administrative Procedure Act. *Id.* The Court ordered expedited briefing for the emergency motion only. Dkt. No. 127. In its order, the Court found that the anti-doping rule issued without the notice required under the APA and delayed the Rule's effective date until May 1, 2023. Dkt. No. 134.

Five days later, the plaintiffs in *Gulf Coast*—a case originally pending in the Amarillo Division—moved for a temporary restraining order and preliminary injunction, seeking to enjoin the defendants from enforcing HISA while the Court resolved the pending dispositive motions. No. 2:22-CV-146-Z, Dkt. No. 50. This case was transferred to the Lubbock

– 12 –

Division of this Court because of the substantial overlap of the claims in *Gulf Coast* and *National Horsemen's*, the similarity of the parties, and the likelihood that the evidence involved and objective of the plaintiffs in both cases would be nearly identical. *Gulf Coast*, No. 5:23-CV-077-H, Dkt. No. 53 at 4. After the transfer, the Court denied the motion for temporary restraining order but reserved its ruling on the motion for preliminary injunction. *Gulf Coast*, No. 5:23-CV-077-H, Dkt. No. 59.

### J.    The plaintiffs bring numerous constitutional claims.

The Court found that *Gulf Coast* and *National Horsemen's* involved "a common question of law or fact" and consolidated the two cases pursuant to Federal Rule of Civil Procedure 42(a)(2). Dkt. No. 135 at 1.

### i.    Gulf Cost Racing

The Gulf Coast plaintiffs' operative complaint makes the following constitutional claims: (1) the Authority's leadership-appointment process violates Article II's Appointments Clause, (2) the Authority leadership-removal process violates Article II's Vesting Clause, (3) the Authority's rulemaking constitutes "a naked delegation" of legislative power, (4) the rulemaking authority that is delegated to the Authority violates the nondelegation doctrine because Congress has not supplied an intelligible principle, (5) the delegation of power to the Authority violates the private-nondelegation doctrine, (6) the Authority's power to seek civil penalties from covered persons violates the Seventh Amendment right to a jury trial, (7) the Authority's ability to adjudicate private rights violates Article III, (8) HISA's elect-or-preempt provision violates the Tenth Amendment's guarantee that the federal government cannot command States to enforce federal law, and

(9) HISA Rule 8400, which requires covered persons to consent to inspection as a condition of registration, violates the Fourth Amendment.  Dkt. No. 142.

At the April 18, 2023 pretrial conference, the parties discussed with the Court the possibility that the claims might be narrowed in advance of trial.  Dkt. No. 163 at 16–17. During the conference, the Gulf Coast plaintiffs indicated they were abandoning an argument related to the breed-expansion authority, which they called a subclaim of the private-nondelegation challenge.  *Id.* at 13.  The next day, the Gulf Coast plaintiffs filed an advisory that they would be willing to abandon "Claims 3-4 (public nondelegation), Claim 6 (Seventh Amendment), Claim 7 (Article III), and Claim 9 (Fourth Amendment)," provided the defendants would not hold that abandonment against them in another case or in an enforcement proceeding.  Dkt. No. 161.  The defendants filed a notice advising that they agreed to these conditions (Dkt. Nos. 164; 165), so the Gulf Coast plaintiffs have abandoned their third, fourth, sixth, seventh, and ninth claims.

Thus, the Gulf Coast plaintiffs' remaining claims are:

- An Article I, Section 2, Clause 2 Appointments Clause challenge (Claim 1)

- An Article II, Section 1 removal challenge (Claim 2)

- A private-nondelegation challenge (Claim 5),[7] and

- An anti-commandeering challenge under the Tenth Amendment (Claim 8).

---

[7] The plaintiffs do not identify the constitutional source of this claim.  Dkt. No. 142 at 45–49.  The Fifth Circuit noted that "[c]ourts and commentators differ over the locus of the constitutional violation" (*Nat'l Horsemen's*, 53 F.4th at 881 n.23), but the parties do not dispute that such a violation is cognizable under the Constitution, so the Court does not reach this question.

### ii.    National Horsemen's

The Horsemen plaintiffs' Original Complaint (Dkt. No. 1) and First Amended Complaint (Dkt. No. 23)—which was the operative complaint when the Court previously heard the defendants' motions to dismiss and the plaintiffs' partial motion for summary judgment—included an intelligible-principle claim and an Appointments Clause claim, but those were recognized as abandoned in the Court's memorandum opinion and order (Dkt No. 92 at 60 ("The plaintiffs abandoned their Appointments Clause claim (Claim II) and public nondelegation claim (Claim III), so they are dismissed.")).

The Horsemen plaintiffs' live complaint (Dkt. No. 149) asserts that HISA violates the Constitution in three claims, none of which are abandoned:

- Delegation of legislative powers to a private entity in violation of Article I, Section 1,

- Delegation of executive powers to a private entity in violation of Article II, Section 1, and

- A violation of the Fifth Amendment's Due Process Clause—alleging that self-interested industry participants are given regulatory power over their competitors.

### iii.    The intervenor-plaintiffs

The claims in the intervenor-plaintiffs' operative complaint mirror those in the Horsemen plaintiffs' complaint.  The intervenor-plaintiffs assert that HISA violates the constitution in two claims:

- Delegation of legislative and executive powers to a private entity under Article I, Section I and Article II, Section II, and

- Violation of the Due Process Clause because self-interested industry participants regulate their competitors.

### K.    Multiple motions are currently pending.

Pending before the Court is the Horsemen plaintiffs' Motion for a Preliminary Injunction (Dkt. No. 116).  Also before the Court is the Gulf Coast plaintiffs' Motion for Summary Judgment (Dkt. No. 136) and Motion for a Preliminary Injunction (Dkt. No. 139); the Authority Defendants' Motion to Dismiss (Dkt. No. 137); and the FTC Defendants' Motion for Summary Judgment (Dkt. No. 138).

The Horsemen plaintiffs' Motion for Preliminary Injunction (Dkt. No. 116) asserts that HISA is facially unconstitutional on three bases:  First, the Horsemen argue that "the Authority is not subordinate when exercising legislative powers."  *Id.* at 8.  They argue that the Authority is delegated with rulemaking authority, more so (according to the plaintiffs) than other permissible private delegations.  *Id.* at 8–9.  They also argue that, post-amendment, HISA still requires the FTC to approve rules that are consistent with the statute.  *Id.* at 9–12.  The Horsemen argue that the FTC must be able to approve, disapprove, or modify a rule at the time the Authority proposes it.  *Id.* at 11.  And they argue that the FTC is subordinate to the Authority because the FTC cannot initiate rulemaking.  *Id.* at 12–13.  They say the FTC cannot issue interim final rules.  *Id.* at 13.  And they argue that the Authority has behaved inconsistently with the Act and the Rules by, for instance, extending effective dates of Rules without FTC permission.  *Id.* at 13–14.  They also argue that the Authority exercises taxing-and-spending powers by issuing assessments. *Id.* at 15–16.

Excluding the abandoned claims, the Gulf Coast plaintiffs' Motion for Summary Judgment and Motion for a Preliminary Injunction argue that HISA violates Article II's Appointments Clause because the Authority's directors are "Officers of the United States"

under *Lucia v. SEC*, 138 S. Ct. 2044 (2018).  No. 5:23-CV-077, Dkt. No. 36 at 28.  They also argue that HISA violates Article II's Vesting Clause because the President cannot remove the Authority's directors.  *Id.* at 34.  They then argue that HISA violates the nondelegation doctrine because the Authority exercises legislative power in violation of the nondelegation doctrine (regardless of whether the Authority is a private or public entity).  *Id.* at 37.  The plaintiffs next argue that even if the Authority is a private entity, it violates the nondelegation doctrine.  *Id.* at 45.  Finally, the plaintiffs argue that HISA violates the anti-commandeering doctrine.  No. 5:23-CV-077, Dkt. No. 36 at 57.

In addition to responding to the plaintiffs' arguments, the FTC defendants argue in their Motion to Dismiss (Dkt. No. 137) that the plaintiffs do not have standing to assert an anti-commandeering claim because they cannot enforce the rights of a state and Texas is not joined in that claim.  No. 5:23-CV-077, Dkt. No. 46 at 27–30.  In their motion for summary judgment, the Authority defendants argue that the plaintiffs' fail to prove their claims.  Dkt. No. 137.

### L.     The Court received evidence and heard argument at trial.

On April 26, the Court held a trial on the merits consolidated with the hearings of the plaintiffs' motions for preliminary injunction.  Dkt. No. 178.  The plaintiffs admitted a number of exhibits, as well as witness testimony by declaration.  Dkt. No. 179.  The Horsemen admitted 57 exhibits, including matters of public record (e.g., HPX 14—HISA Racetrack Safety, 87 Fed. Reg. 435 (2022)); Authority guidance (e.g., HPX 26—Guidance of the Horseracing Integrity and Safety Authority (November 29, 2022)); and biographies of Authority board members (e.g., HPX 53-I—Biography of Jerry Black).  The Horsemen also presented three witnesses by declaration, who testified regarding the economic and practical

effects of HISA (HPXs 58; 59; 61).  The Gulf Coast plaintiffs admitted exhibits in the public record, as well as the meeting minutes of the Authority's board of directors (GPXs 41–53) and the Authority's balance sheet (GPX 40).  The Gulf Coast plaintiffs also presented three witnesses by declaration—all agents of the plaintiff entities—who testified regarding the effect of HISA on their businesses or association members.  GPXs 29–32.

The FTC presented no evidence.  The Authority presented seven witnesses, who are agents of the Authority, veterinarians, and horse trainers.  DXs 1–8.  Lisa Lazarus, the CEO of the Authority, testified regarding the benefits of HISA and the Authority on the horseracing industry.  DXs 1–2.  The Authority's CFO, Jim Gates, disputed the economic impact estimated by the Gulf Coast plaintiffs.  DX 3.  Sara Langsam (DX 4), Susan Stover (DX 7), and Mary Scollay (DX 8) are veterinarians who testified regarding the benefits, in their view, of the Authority's anti-doping and medication control (ADMC) program.  And Mark Casse (DX 5) and Graham Motion (DX 6), horse trainers, testified about the positives of uniform regulation.  After the parties closed, the Court heard oral argument and took its ruling under advisement.

## 2.    Standard of Review

When challenging the facial constitutionality of a statute, a plaintiff must show "that no set of circumstances exists under which the [statute] would be valid."  *United States v. McGinnis*, 956 F.3d 747, 752 (5th Cir. 2020) (alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  As a result, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully."  *Salerno*, 481 U.S. at 745.  "Facial challenges to the constitutionality of statutes should be granted sparingly and only as a last resort."  *McGinnis*, 956 F.3d at 752–53 (citations omitted).

In addition to clearing this high bar, a plaintiff must also overcome the constitutional-doubt canon: "[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel. Attorney General v. Delaware & Hudson Co*, 213 U.S. 366, 408 (1909); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 247 (2012) ("A statute should be interpreted in a way that avoids placing its constitutionality in doubt."). The canon is not without limits, but "[i]t is the Court's settled policy, however, to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States*, 490 U.S. 858, 858 (1989). In light of this standard of review and the Court's findings of fact, the Court reaches the following conclusions of law detailed in Parts 3–7.

**3.      The plaintiffs' Article II claims fail because the Authority is a private entity.**

The Gulf Coast plaintiffs allege two violations of Article II of the Constitution. First, they claim that HISA violates Article II's Appointments Clause by creating public officers— the Authority's directors—who were not appointed by the President with the advice and consent of the Senate. No. 5:23-CV-077, Dkt. No. 36 at 21. Second, they claim that HISA violates Article II's Vesting Clause because neither the President nor the FTC on his behalf may remove the Authority's directors, which Gulf Coast believes are executive officials. *Id.* at 34. The Gulf Coast plaintiffs concede that their arguments fail if the Authority is a private entity. No. 5:23-CV-077, Dkt. No. 61 at 9. More broadly, the plaintiffs recognize

that their Article II arguments and private-nondelegation arguments are mutually exclusive. Dkt. No. 182 at 75.

For two reasons, the Court finds that the Authority is a private entity. First, in light of the Fifth Circuit's opinion, it is both the law of the case and foreclosed by binding precedent. Second, even if that were not the case, the Authority is a private entity under *Lebron* and other relevant precedent because it is not government created, and its directors are not government appointed. This matters because private entities are not subject to the constitutional requirements governing appointment and removal of officers, and governmental entities are not subject to private-nondelegation claims. Like the rest of Article II, "the Appointments Clause says nothing" about private entities. *Fin. Oversight & Mgmt. Bd. For P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1658 (2020).

Despite the Gulf Coast plaintiffs' admission that finding the Authority to be private forecloses their arguments, they fail to squarely address the issue. Instead, they merely state that the Authority is different than other self-regulatory organizations (SROs) because it is not a voluntary association. No. 5:23-CV-077, Dkt. No. 61 at 14. But this argument ignores both the Fifth Circuit's opinion in this case and *Lebron*'s application here, which weighs heavily in favor of the defendants' argument that the Authority is private.

### A.   The Fifth Circuit's holding in this case rests necessarily on finding that the Authority is a private entity.

On appeal, the Fifth Circuit held that the Authority was a private entity that was improperly delegated government authority. *Nat'l Horsemen's*, 53 F.4th at 872. The Court explained that "HISA empowers a private entity called [the Authority]" to operate "under [FTC] oversight." *Id.* The Court further explained that "[t]he end result is that Congress has given a private entity the last word over what rules govern our nation's thoroughbred

horseracing industry." *Id.* This was a constitutional issue, the Court concluded, because "Congress defies [the nondelegation doctrine] by vesting government power in a private entity not accountable to the people . . . [C]ourts have distilled the principle that a private entity may wield government power only if it 'functions subordinately' to an agency with 'authority and surveillance' over it." *Id.* at 873, 881. This holding is necessarily predicated on the Authority being a private entity. Moreover, there is the simple fact that the Fifth Circuit called the Authority a private entity throughout its opinion. *Id.* at 872, 873, 881, 887 (the terms "private entity" and "private entities" appear a combined 31 times in the Fifth Circuit opinion).[8]

Of course, "[n]ot all text within a judicial decision serves as precedent." BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 44 (2016) (collecting cases). Only an appellate court's holding—those parts of the decision consisting of the "court's determination of a matter of law pivotal to its decision"—are given the weight of binding precedent (and therefore, likewise become the law of that particular case). *Id.* (quoting Francis Bacon, "The Lord Keeper's Speech in the Exchequer" (1617), in 2 THE WORKS OF FRANCIS BACON 477, 478 (Basil Montagu ed., 1887)). While "commentators and judges don't uniformly define what counts as a holding," all agree that those propositions that are logically necessary to the outcome of the case are counted within the holding. *Id.* at 45; *see*

---

[8] Like the Fifth Circuit, other courts to consider challenges to the FTC-Authority structure have called the Authority a private entity. *Oklahoma v. United States*, 62 F.4th 221 *passim* (6th Cir. 2023) (calling the Authority "a private entity beyond public control" and referring to private entities more than 40 times); *Oklahoma v. United States*, No. 5:21-CV-104-JMH, 2022 WL 1913419, at *11 (E.D. Ky.) ("Plaintiffs make several alternative arguments in case the Court finds the Authority to be a public entity, including that its structure violates the Appointments Clause, its officers are not properly removable under Article II and the separation of powers, and it violates the public nondelegation doctrine. However, as repeatedly stated herein, . . . the Authority is a private entity.").

*also United States v. Johnson*, 256 F.3d 895, 914–15 (9th Cir. 2001) (en banc) (discussing whether a holding is limited to that which is "necessary in some strict logical sense" or the broader "necessarily decided"); *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004) (defining a holding as a statement "necessary to the result or constitut[ing] an explication of the governing rules of law").

Additionally, in the Fifth Circuit, "[t]he law of the case doctrine states that absent manifest error, or an intervening change in the law, an appellate court's decision of a legal issue, whether explicitly or by necessary implication, establishes the law of the case and must be followed in all subsequent proceedings in the same case." *Carnival Leisure Indus., Ltd. v. Aubin*, 53 F.3d 716, 718–19 (5th Cir. 1995). Although the doctrine "does not include determination of all questions which were within the issues of the case and which, therefore, might have been decided," the doctrine "does mean that the duty of a lower court to follow what has been decided at an earlier stage of the case comprehends things decided by necessary implication as well as those decided explicitly." *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 19 (5th Cir. 1974) (cleaned up). Thus, an issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal. *Todd Shipyards Corp. v. Auto Transp.,* 763 F.2d 745, 750 (5th Cir. 1985).

For example, in *Cooper Tire & Rubber Co. v. Farese*, the Fifth Circuit explained that a prior panel "held that the effective date of the separation agreement was ambiguous as a matter of law." 248 F. App'x 555, 560–61 (5th Cir. 2007). In doing so, "the prior panel necessarily had to consider whether the contract's apparent ambiguities could or should be resolved by applying the discretionary canons of construction." *Id.* As a result, the court

explained that the contract's ambiguity became "the law of the case, and the question of whether the effective date of the separation agreement can be determined on summary judgment is now closed." *Id.*

Here, the Fifth Circuit's decision is necessarily predicated on a finding that the Authority is a private entity. The Fifth Circuit held that HISA violates the private-nondelegation doctrine because the statute delegates legislative and executive powers to a private entity. *Nat'l Horsemen's*, 53 F.4th at 873 (applying "the settled constitutional principle that forbids private entities from exercising unchecked government power"). The Fifth Circuit recognized that "HISA empowers a 'private, independent, self-regulatory, nonprofit corporation"—the Authority. *Id.* And the Fifth Circuit expressly disclaimed the idea that it was addressing the public-nondelegation doctrine. *Id.* at 883. The animating concern of the Fifth Circuit's opinion—the "obnoxious" delegation of governmental authority to unaccountable private actors—is meaningless if the entity to whom power is delegated is considered a public body. Thus, the Fifth Circuit has already held—either expressly or, at the very least, by necessary implication—the Authority is a private entity, and the recent Congressional amendment does nothing to disturb that holding. Bound by both precedent and the law of the case, the Court must deny the Gulf Coast plaintiffs' Article II claims.

The plaintiffs insist that the Court is not bound by the Fifth Circuit's private-entity holding. At trial, counsel for the Gulf Coast plaintiffs argued that the Authority's private-entity status was an uncontested assumption of the Fifth Circuit. Dkt. No. 182 at 70–72. When asked, counsel indicated that *Lebron* was his best case on this point, citing the

following language: "[W]e think that *Atchison*'s assumption of Amtrak's nongovernmental status (a point uncontested by the parties in that case . . .) does not bind us here." *Id.* at 68.

But the plaintiffs misread *Lebron*, which held that Amtrak is a public entity for purposes of the First Amendment. *Lebron*, 513 U.S. at 399. In *Lebron*, Amtrak argued that another case, *Atchison*, foreclosed the question of Amtrak's status as a private entity. *Id.* at 393–94. The Supreme Court identified two reasons it was not bound by *Atchison*, and neither was that *Atchison* rested on an uncontested assumption that Amtrak was a private entity. First, in *Atchison*, Amtrak's governmental status was irrelevant because in any event no contractual obligation was imposed. *Nat'l R.R. Passenger Corp. v. Atchison Topeka & S.F. RR. Co.*, 470 U.S. 451, 471 (1985) (stating that "neither the Act nor the Basic Agreements created a contract between railroads and the United States"); *Lebron*, 513 U.S. at 393 (explaining that "[t]he Court said it did not have to consider th[e] question" of whether Amtrak was a governmental entity). Therefore, with no contractual obligation, the *Atchison* court "ha[d] no need to consider whether an allegation of a governmental breach of its own contract warrants application of the more rigorous standard of review that the railroads urge[d] [it] to apply," much less whether Amtrak was a governmental entity in the first place. *Atchison*, 470 U.S. at 470. Second, *Lebron* concluded that even if Amtrak were a governmental entity, there was an independent basis for the court's decision. *See Lebron*, 513 U.S. at 394. (concluding that "even if Amtrak *is* a Government entity," the statute claiming otherwise "suffices to disable that agency from incurring contractual obligations on behalf of the United States"—resolving the challenge). Thus, *Lebron* did not say that *Atchison* did not bind it because Amtrak's governmental status in that case was an

uncontested assumption; rather, *Atchison* simply did not need to resolve that issue—either expressly or by implication.

Moreover, the Fifth Circuit's affirmative grant of relief in this case makes clear that it did not decide the case based on an uncontested assumption. Writing for the court, Judge Duncan emphasized that "Congress defies [the nondelegation doctrine] by vesting government power in a private entity." *Nat'l Horsemen's*, 53 F.4th at 872–73. The Fifth Circuit identified private-entity status as an element—a necessary condition—of a private-nondelegation claim. *See id.* Thus, unlike where *Lebron* distinguished *Atchison*—which denied relief—here the opinion in question granted relief and, therefore, necessarily decided certain issues, including the Authority's status as a private entity. And not only was that decision made in this same case, invoking the law-of-the-case doctrine, it was made by a superior court that precedentially binds the Court.

Finally, while the Supreme Court may be able to consider the reach of its own precedent based on whether a case had "the benefit of full briefing or argument on the issue," *McCutcheon v. Fed. Elec. Comm'n*, 572 U.S. 185, 202–03 (2014), the district court is in a different position. It is accepted that "[a]n inferior court cannot decide adversely to a decision of [a superior court] and send the case up to that court again upon the ground that in the former decision of the court . . . certain points were not sufficiently argued." Basil Jones, *Stare Decisis*, *in* 26 THE AMERICAN AND ENGLISH ENCYCLOPEDIA OF LAW 158, 170 (David S. Garland & Lucius P. McGehee eds., 2d ed. 1904).

Thus, the Court is bound by the Fifth Circuit's holding that the Authority is a private entity, and that holding forecloses the Gulf Coast plaintiffs' appointments and removal

arguments.  But even if the Fifth Circuit had never addressed the issue, the Court independently finds that the Authority is a private entity.

**B.  Even if the Fifth Circuit's opinion only assumed the Authority's status as a private entity, the Court finds that the Authority is not a government actor.**

The Court now addresses the question that it previously assumed without deciding: whether the Authority is a private entity.  *Nat'l Horsemen's Benevolent and Protective Ass'n*, 596 F. Supp. 3d at 699.  Before the Fifth Circuit's remand, the Court assumed the Authority's private-entity status, "respecting the contours of the claims before it" but noting the Authority's "unique genesis."  *Id.* at 699 n.7.  The Court now finds that the Authority is a private entity because it is neither government-created nor government-appointed.

"[A]ctions of private entities can sometimes be regarded as governmental action for constitutional purposes."  *Lebron*, 513 U.S. at 378 (collecting cases); *see also Free Enter. Fund v. Pub. Co. Accounting Bd.*, 561 U.S. 477, 485–86 (2010) (citing to *Lebron* for purposes of determining whether another nonprofit corporation was "'part of the government' for constitutional purposes").  Even the Supreme Court has admitted that the "cases deciding when private action might be deemed that of the state have not been a model of consistency."  *Lebron*, 513 U.S. at 378 (quoting *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 632 (1972) (O'Connor, J., dissenting)).  But one proposition that is clear is that corporations become more than a private entity when created or "selected by Government to accomplish purely governmental purposes."  *Id.* at 395 (quoting *Cherry Cotton Mills v. United States*, 327 U.S. 536, 539 (1946)).

*Lebron* explained that to determine whether the Authority is a private entity for constitutional purposes, the Court need only look to other "corporations created and

participated in by the United States for the achievement of governmental objectives." *Id.* at 386. The first such corporation was the Bank of the United States, created in 1791. *Id.* And the federal government has had close ties with specially created private corporations throughout our nation's history, chartering or buying outright banks, railroad companies, and grain corporations. *Id.* at 387–88; *e.g.*, *Lebron*, 513 U.S. 374 (1995) (Amtrak); *McGinn, Smith & Co., Inc. v. FINRA*, 786 F. Supp. 2d 139, 147 (D.D.C. 2011) (FINRA); *McCulloch v. Maryland*, 4 Wheat. 316 (1819) (second Bank of the United States); *Osborn v. Bank of United States*, 9 Wheat. 738 (1824) (same).

This case law teaches that to be considered a government entity for constitutional purposes, a corporation must be created by the government. *Lebron*, 513 U.S. at 394. In *Lebron*, for example, the Supreme Court determined that Amtrak is a government entity "for the purpose of individual rights guaranteed against the Government by the Constitution." *Id.* The Supreme Court found it significant that "Amtrak was created by a special statute, explicitly for the furtherance of federal governmental goals." *Id.* at 397. The Supreme Court also noted that six of the board's nine directors were named by the President himself and that the government's influence over Amtrak was not temporary. Instead, Amtrak was "established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees." *Id.* at 398.

Courts continue to emphasize the requirement that a corporation is only "part of the government" if it is created by special law. "A corporation is part of the government for constitutional purposes when (1) the government creates the corporation by special law, (2) for the furtherance of governmental objectives, and (3) retains for itself permanent

– 27 –

authority to appoint a majority of the directors of that corporation." *Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017) (cleaned up). And in response to a challenge to Congress's restrictions on removal of Fair Housing Finance Agency officers, the Supreme Court rejected an argument that an agency can be considered a private entity when "its authority stems from a special statute." *Collins v. Yellen*, 141 S. Ct. 1761, 1785 (2021).

Unlike Amtrak and the FHFA, the Authority is a private entity. First, the Authority is a private corporation incorporated under Delaware law. It was not created by the government through special law. No. 5:23-CV-077, Dkt. No. 47 at 5–10. Moreover, the government has no say over the appointment of the Authority's directors—that's the point of the Gulf Coast plaintiffs' appointments argument. *See also* 15 U.S.C. § 3052(c)–(d) (establishing that appointment of the Authority's directors is to be controlled by the corporate bylaws and the initial nominating committee).

Like FINRA, the Authority is a private entity. *Nat'l Horsemen's*, 53 F.4th at 887. Courts have determined that FINRA, like its predecessor NASD, is a private entity. *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 206 (2d Cir. 1999) ("The NASD is a private actor . . . It is a private corporation that receives no federal or state funding. Its creation was not mandated by statute, nor does the government appoint its members or serve on any NASD board or committee."); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 699 n.5 (3d Cir. 1979) ("NASD is not a state agency."); *see also United States v. Solomon*, 509 F.2d 863, 867 (2d Cir. 1975) (holding that the New York Stock Exchange is not an agency). To be sure, FINRA and the Authority were created in anticipation of aiding a federal agency, but that alone is insufficient to render it part of the government. *Nat'l Horsemen's Benevolent & Protective Ass'n*, 596 F. Supp. 3d at 696 ("Had the Authority been created by Congress, it

may have been subject to certain Article II requirements . . . . But because Congress 'recognized' it . . . the Authority avoids some of the strictures of governmental entities, just as other private, self-regulatory organizations that operate nationwide do.").  Ultimately, because the Authority "is a private corporation" that "receives no federal or state funding," whose "creation was not mandated by statute," and whose directors, executives, and employees are not "government appoint[ed]," the Authority is a private entity.  *See Desiderio*, 191 F.3d at 206.

Nor does *Cherry Cotton Mills* change the fact that the Authority is a private entity under relevant precedent.  The plaintiffs neither cite nor rely on *Cherry Cotton Mills*, but because *Lebron* quotes its reference to corporations "selected by Government," the Court notes here why that case is distinguishable.  327 U.S. at 539.  In *Cherry Cotton Mills*, the Supreme Court held that a debt owed to the Reconstruction Finance Corporation was a debt owed to the federal government, which allowed the debt to be set off against a tax refund. *Id*.  But *Cherry Cotton Mills* does not control this case because the RFC was clearly government-created and government-controlled.  The RFC was created by special law.  47 Stat. 5 ("That there be, and is hereby, created a body corporate with the name 'Reconstruction Finance Corporation.'").  Its directors were appointed by the President by and with the advice and consent of the Senate.  *Cherry Cotton Mills*, 327 U.S. at 539.  "[A]ll of its money c[ame] from the Government; its profits if any [went] to the Government; its losses the Government must bear."  *Id.*  Thus, *Cherry Cotton Mills* is inapposite, and its statement that corporations "selected by" government are equivalent to corporations "created by" government is dicta.  *See id.*

At trial, counsel for the Gulf Coast plaintiffs indicated that the *Lebron* standard was inapplicable in cases involving the power to appoint and remove federal officials.  Dkt. No. 182 at 83.  Instead, the plaintiffs argue that *Lucia* sets forth the standard for determining whether the Authority is subject to the Appointments Clause.  *E.g.*, No. 5:23-CV-077, Dkt. No. 51 at 10 (citing *Lucia* for the proposition that "[t]he Authority's Directors . . . are officers subject to the Appointments Clause").  But *Lucia* does not resolve an Appointments Clause question where the challenged entity is private.  The Supreme Court in *Lucia* noted that *Freytag*, a case involving special trial judges of the United States Tax Court, "necessarily decide[d] th[e] case."  138 S. Ct. at 2052.  Thus, both *Lucia* and the case on which it relied resolved Appointments Clause challenges involving individuals who were clearly federal employees.  There was never any possibility that the parties at issue were private employees from outside the government.  And in any event, "[t]he sole question" in *Lucia* was "whether the Commission's ALJs are 'Officers of the United States' or simply employees of the Federal Government."  *Id.* at 2051.  Thus, *Lucia* does not answer the question presented by the parties.

Gulf Coast's argument is further undermined by the fact that other courts apply *Lebron*—not *Lucia*—in cases involving private-nondelegation or Appointments Clause challenges.  For instance, the Fourth Circuit rejected an Appointments Clause challenge to the Metropolitan Washington Airports Authority, an interstate compact, after finding that it was not a public entity under the *Lebron* standard.  *Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152, 159 (4th Cir. 2018) ("MWAA does not satisfy either prong [of the *Lebron* test].  In the first place, MWAA was not created by the federal government . . . . MWAA is not controlled by the federal government . . . [b]ecause the[] [federal] appointees are a distinct

minority of the Board."); *Free Enter. Fund*, 561 U.S. at 485–86 (relying on *Lebron* in stating that the Public Company Accounting Oversight Board is "part of the government" for constitutional purposes in an Appointments Clause challenge) (citing *Lebron*, 513 U.S. at 397).

Finally, while *Lucia* would be applicable if the Court found that the Authority were part of the government, the plaintiffs provide no argument or authority explaining why a private entity should be considered part of the government for purposes of the Appointments Clause.  To the contrary, the current state of jurisprudential affairs indicates that the Authority's directors are not "Officers of the United States" within the Constitution's original public meaning.  "[T]he phrase 'of the United States' limit[s] the Appointments Clause to 'federal' officers."  *Fin. Oversight & Mgmt. Bd. for P.R.*, 140 S. Ct. at 1666 (Thomas, J., concurring in the judgment).  "'Officers of the United States' was probably not a term of art that the Constitution used to signify some special type of official. Based on how the Founders used it and similar terms, the phrase 'of the United States' was merely a synonym for 'federal.'"  *Lucia*, 138 S. Ct. at 2056 (Thomas, J., with whom Gorsuch, J. joins, concurring); *see also* Jennifer Mascott, *Who are "Officers of the United States"?*, 70 STAN. L. REV. 443, 531 (2018) (explaining that the First Congress provided that "individuals involved with [the] operation" of the national bank, such as the "bank directors," "were not appointed in accordance with Article II's requirements"; and that "the probable explanation is that Congress saw the bank as a public-private nongovernmental entity").  True, neither the Fifth Circuit nor the Supreme Court has explained in detail the meaning of "Officers of the United States," but the currently available precedent suggests that the Authority's directors and committee members do not meet that definition.  Thus,

*Lebron*—rather than *Lucia*—supplies the appropriate standard, and the plaintiffs fail to prove their Article II appointments and removal claims.

4.    **As amended, HISA does not create an unconstitutional delegation of governmental power to a private entity.**

    A.    **The Constitution requires a private entity wielding government power to function subordinately to a federal agency's authority and surveillance.**

A pair of 80-year-old cases—*Carter Coal* (1936) and *Adkins* (1940)—lay the foundation for our modern nondelegation doctrine: "a private entity may wield government power only if it functions subordinately to an agency with authority and surveillance over it." *Nat'l Horsemen's*, 53 F.4th at 881 (internal marks omitted).  In *Carter Coal*, the Supreme Court called private nondelegation "legislative delegation in its most obnoxious form" and held that it was "so clearly arbitrary, and so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment, that it is unnecessary to do more than refer to decisions of this court which foreclose the question." *Carter v. Carter Coal*, 298 U.S. 238, 311 (1936).  A few years later, however, the Supreme Court clarified in *Adkins* that an agency can rely on a private entity as long as the private entity "function[s] subordinately to the" agency, which has "authority and surveillance" over the private entity.  *Adkins*, 310 U.S. at 399.

From these twin holdings spring our modern nondelegation jurisprudence, cemented in recent cases like the *Amtrak* line of cases,[9] *Texas v. Rettig*,[10] *National Horsemen's*, and *Oklahoma v. United States*.  In *Texas v. Rettig*, the Fifth Circuit held that an agency may subdelegate an accounting task to a private entity where the agency "reviewed and accepted," "ha[d] the ultimate authority to approve," and "superintended . . . in every respect" the private-entity determination.  987 F.3d at 533.  Before the Supreme Court held that Amtrak was a public entity in *Amtrak II*, the D.C. Circuit concluded that Amtrak was a private entity that was delegated too much power.  *Amtrak I*, 721 F.3d at 672, *rev'd on other grounds by Amtrak II*, 575 U.S. 43.  Amtrak was impermissibly delegated government authority because, unlike the agency in *Adkins*, the Federal Railroad Administration did not have the authority to "unilaterally change regulations proposed to it."  *Amtrak I*, 721 F.3d at 671.

In *National Horsemen's*, the Fifth Circuit surveyed this jurisprudence, noting that the private-nondelegation doctrine is rooted in "the government's promised accountability to the people."  53 F.4th at 880.  The Fifth Circuit also reconciled this general principle with *Carter Coal* and *Adkins*, which together allow a private entity to "wield government power" so long as the private entity "'functions subordinately' to an agency with 'authority and

---

[9] In *Amtrak I*, the D.C. Circuit struck down Section 207 of the Passenger Rail Investment and Improvement Act (PRIIA) because it unlawfully delegated "regulatory power to a private entity." 721 F.3d 666, 668 (D.C. Cir. 2013), *rev'd on other ground by Dep't of Transp. v. Ass'n of Am. R.R.* (*Amtrak II*), 575 U.S. 43 (2015).  While not disturbing the D.C. Circuit's private-nondelegation analysis, the Supreme Court vacated *Amtrak I*, holding that Amtrak was a governmental—not private—entity.  *Amtrak II*, 575 U.S. at 55.  On remand, the D.C. Circuit held that Section 207 of PRIIA violated the Due Process Clause because it gave Amtrak, a self-interested entity with a statutorily required profit-seeking motive, regulatory power over its competitors.  *Amtrak III*, 821 F.3d 19, 27–34 (D.C. Cir. 2016).

[10] 987 F.3d 518, 533 (5th Cir. 2021).

surveillance' over it." *Id.* at 881.  Thus, the court explained it is within constitutional
bounds for Congress to "formalize the role of private parties in proposing regulations so
long as that role is merely 'as an aid' to a government agency that retains the discretion to
'approve[ ], disapprove[ ], or modif[y]' them."  *Id.* at 881 (quoting *Amtrak I*, 721 F.3d at
671).

### B.    As amended, HISA functions subordinately to the FTC and addresses the Fifth Circuit's concerns.

The Court finds that the congressional amendment to § 3053(e) cured the
constitutional issues identified by the Fifth Circuit.  First, the Fifth Circuit identified that
HISA improperly granted the Authority "sweeping rulemaking power," but the FTC's new
power to "abrogate, add to, and modify" the "rules of the Authority" closed the necessary
gap in the relative rulemaking power between the FTC and the Authority.  15 U.S.C.
§ 3052(e).  Second, the Fifth Circuit noted that the FTC's review of Authority rulemaking
was limited to so-called consistency review, which gave the Authority the final word on
policy.  But because the FTC now has the right to make its own policy choices, the
amendment remedied that concern.  Finally, the Fifth Circuit noted that the FTC had less
control over the Authority than the SEC does over FINRA.  The congressional amendment
cured these issues as well.

### i.    Although the Authority retains its generous grant of authority to craft and propose rules, the amended statute significantly broadens the FTC's rulemaking power.

The parties disagree on the correct reading of § 3053(e) as amended.  The amended
statute says that the FTC can "abrogate, add to, and modify" Authority rules.  Does this
mean, as the plaintiffs assert, that the FTC can abrogate, add to, and modify only the *content*
of existing rules?  *See* Dkt. No. 145 at 6 (claiming that "Congress granted only the power to

modify, add to, or abrogate existing rules, not to issue new rules").  The defendants, in contrast, believe the amendment allows the FTC to "modify, add to, or abrogate" the entire body of Authority rules, meaning the FTC can promulgate new rules, as well as modify or abrogate existing rules.  *E.g.*, Dkt. No. 128-1 at 18–19; Dkt. No. 129 at 10.  Based on a plain reading of the statute and the canon of constitutional avoidance—and confirmed by the only other court to interpret this amended subsection—the Court concludes that the FTC has the power to "abrogate, add to, or modify" the body of Authority rules, rather than a single, proposed rule.  In other words, the FTC can create new substantive rules, so it is the FTC that now has "sweeping rulemaking authority."  *See Nat'l Horsemen's*, 53 F.4th at 882.  If in practice, the FTC is derelict in performing its oversight, as-applied challenges may be brought.  But this facial challenge must fail.

A plain reading of the statute confirms that the FTC can "abrogate, add to, or modify" the entire body of the Authority rules.  Congress's amendment included a single, yet significant, change:  Section 3053(e), which previously gave the FTC the ability solely to issue interim final rules, was amended to read:

> The Commission, by rule in accordance with section 553 of Title 5 may abrogate, add to, and modify the rules of the Authority promulgated in accordance with this chapter as the Commission finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to requirements of this chapter and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of this chapter.

15 U.S.C. § 3053(e).  As a result, the FTC now has the power to "add to . . . the rules of the Authority."  *Id.*  When the FTC promulgates a new rule, it "add[s] to" the rules of the Authority.  Thus, a plain, fair reading of this section confirms that the FTC can initiate rulemaking.

Even if the statute's language were not clear, three additional reasons support this plain reading: the surplusage canon, the canon of avoidance, and the Sixth Circuit's persuasive opinion.  First, the surplusage canon confirms that the FTC can initiate rulemaking.  Under the plaintiffs' reading, only existing rules can be "abrogate[d], add[ed] to, [or] modif[ied]."  But if this were the case, why did Congress include both "modify" and "add to" in the statute?  If the FTC adds language to a rule promulgated under HISA, clearly it has modified the rule.  *See* MODIFY, WEBSTER'S THIRD INT'L DICTIONARY UNABRIDGED (2002) (defining Modify as to "make a basic or important change in: alter").  Thus, the plaintiffs' proposed reading of the statute—prohibiting the FTC from initiating rulemaking—would render "add to" a nullity.  And it is a "cardinal principle of statutory construction" that the Court ought to give effect to every word of a statute.  *Williams v. Taylor*, 529 U.S. 362, 404 (2000); *see also Wash. Market Co. v. Hoffman*, 101 U.S. 112, 115–16 (1879) ("As early as in Bacon's Abridgement, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'").

Second, the canon of constitutional avoidance favors the defendants' reading of the statute.  "[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice.  If one of them would raise a multitude of constitutional problems, the other should prevail . . . ."  *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005) (Scalia, J.).  Here, the Court agrees with the defendants' reading of

§ 3053(e), which demonstrates HISA's constitutionality.[11]  The Fifth Circuit previously noted that the Authority was not subordinate to the FTC because it was the Authority who wrote the rules.  *Nat'l Horsemen's*, 53 F.4th at 883.  And the Fifth Circuit explained that the FTC's authority to issue temporary rules "on a break-glass-in-case-of-an-emergency basis" was not enough to subordinate the Authority to the FTC.  *Id.*  That being the case, the Court finds that the proper reading of the statute gives the FTC the authority to initiate rulemaking because Congress does not ordinarily write statutes to be unconstitutional, particularly in cases of an amendment in direct response to a successful constitutional challenge.

Throughout its persuasive opinion, the Sixth Circuit—the only court to interpret the amended HISA's constitutionality—confirms this reading.  The court explained that "[t]he FTC now may create new rules."  *Oklahoma*, 62 F.4th at 230.  It noted expressly that the FTC could decide to act either "by abrogating one of the Horseracing Authority's rules or introducing its own."  *Id*.  Leaving no doubt, it described the "FTC's new discretion to adopt and modify rules" and its "complete authority to initiate new rules."  *Id*. at 232.  And while the plaintiffs may disagree with the Sixth Circuit's reading of the amended statute by pointing to the "nearly identical" language of the Maloney Act (Dkt. No. 116 at 12), the textual differences in the two subsections reveal that "add to" in HISA gives the FTC the power to initiate rulemaking.  The Maloney Act gives the SEC the power to "abrogate, add to, and delete from" proposed rules submitted by FINRA.  15 U.S.C. § 78S(c).  While the

---

[11] For the reasons previously stated, the Court finds implausible the plaintiffs' reading of § 3053(e).  But even if the Court found that the plaintiff's reading were plausible, the canon of avoidance instructs that the Court should adopt the defendants' reading, which is also plausible and does not call into question the statute's constitutionality.

language is similar, Congress's choice to use "modify" rather than "delete from" reveals that the FTC has the power to initiate rules.  The term "modify" encompasses the power to both "add to" and "delete from" the content of rules.  After all, to modify is to change, and regulations are only changed by adding to or deleting from the statutory text.  But HISA's grant of power to both "add to" and "modify" ensures the FTC can initiate rulemaking.

Finally, a recent example confirms the FTC's power to create new rules.  The Court previously delayed the effective date of the ADMC Rule to May 1, 2023.  Dkt. No. 134.  In response to "substantial uncertainty regarding the criteria and procedures under which anti-doping and medication control protocols will be implemented as the thoroughbred horseracing industry nears the Triple Crown events," the FTC issued a new, substantive rule delaying the effective date of the ADMC rule to May 22, 2023.  Dkt. No. 180 at 6–7.  Relying on its § 3053(e) authority, the FTC noted that it has the authority to initiate rulemaking, including in emergency circumstances.  *Id.* at 8 ("Here, the Commission finds, for good cause, that notice and comment is impracticable and unnecessary with respect to the final rule.").  This example is just one additional datapoint of the FTC's rulemaking authority in practice.

In sum, the only fair reading of the statute is that the FTC can create new rules as necessary to accomplish its policy preferences.  This is confirmed by the canons of surplusage and constitutional avoidance, as well as the only court to address the issue.  It is no secret that Congress amended HISA in response to the Fifth Circuit's opinion.  For Congress to amend the law without addressing one of the critical issues identified by the Fifth Circuit would be, to say the least, unusual.

ii.     **The FTC is no longer limited to reviewing the Authority's proposed rules for consistency with HISA; to the contrary, Congress expressly empowered it to review and change policy choices**.

The second constitutional flaw identified by the Fifth Circuit was that, prior to the congressional amendment, the FTC was limited to consistency review and "lack[ed] the power to review the Authority's policy choices." *Nat'l Horsemen's*, 53 F.4th at 884. But the amendment changes this. Through its rulemaking authority explained above, the FTC can now exercise its own policy choices. And while it is true that the FTC is limited to reviewing the Authority's proposed rules for consistency with HISA, this does not change that the Authority is subordinate to the FTC for three reasons. First, the FTC's ability to abrogate, add to, and modify rules nullifies any material concern over consistency review. Second, the FTC's power to promulgate new rules according to its own policy preferences transforms consistency review from a "high-altitude" standard of review into a substantive analysis that includes rejection or modification of the proposals. Finally, the FTC can cure any urgent problems that result from a delay between its consistency review and typical rulemaking by initiating its own expedited rulemaking, as it has already done.

At the outset, the Court notes that the congressional amendment now gives the FTC the power to write rules according to its policy preferences. The amended statute gives the FTC the power to abrogate, add to, and modify the rules of the Authority "as the Commission finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to requirements of this chapter and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of this chapter." 15 U.S.C. § 3053(e). This final phrase—"or otherwise in furtherance of the purposes of this chapter"—gives the FTC the clear authority to promulgate rules according

to its own policy choices.  As Chief Judge Sutton phrased it, "[t]he final catchall indicates that § 3053(e) spans the Horseracing Authority's jurisdiction."  *Oklahoma*, 62 F.4th at 230.  And while the plaintiffs apparently do not dispute this, they claim that the front-end consistency review still poses an issue of constitutional magnitude because "the legislative rules of the Authority govern for at least some period of time."  No. 5:23-CV-077, Dkt. No. 61 at 31.

Again, however, the FTC's front-end consistency review poses no constitutional problem because the FTC can abrogate, add to, and modify rules.  As an initial matter, the plaintiffs identify no authority—on-point, analogous, or otherwise—to support their argument that short-term applicability of a rule approved under consistency review creates a constitutional defect.  Dkt. No. 182 at 42–43 (the Court: "What is your authority, your legal authority for the fact that the delay . . . render[s] [HISA] unconstitutional? . . . I'm genuinely asking, is this just a novel argument or novel scenario that you're responding to and so, Judge, I can't point you to a case? . . . Mr. Suhr: Yeah, I think that's right").  But more critical—and fatal to the plaintiffs' arguments regarding consistency review—is the Fifth Circuit's view of the SEC's consistency review of FINRA rules:  "[W]e find irrelevant Appellee's argument that the SEC engages in the same 'consistency' review as the FTC . . . This again overlooks the separate provision empowering the SEC to 'abrogate, add to, and delete from' FINRA rules 'as the [SEC] deems necessary or appropriate."  *Nat'l Horsemen's*, 53 F.4th at 888 n.35.  Thus, as the Fifth Circuit previously indicated, it is "irrelevant" that the FTC conducts an initial review for consistency with the statute and rules, given that the FTC can later abrogate, add to, and modify Authority rules.  *See id.*

– 40 –

Moreover, the FTC's power to initiate rulemaking according to its policy preferences gives consistency review teeth.  As the FTC continues to promulgate new rules or modify existing rules according to its policy preferences, its consistency review will transform from "high-altitude oversight" to substantive analysis to ensure the proposed rule is consistent with the FTC's view of the proper national horseracing policy.  And if the plaintiffs are concerned that the timing gap subjects the industry to regulation by a private entity in the meanwhile, the FTC's ability to initiate rulemaking on an expedited basis, as well as its ability to promulgate rules concerning the effective date of rules approved under consistency review, resolves the issue.  The plaintiffs are under the impression that "for the FTC to do a rulemaking takes months to years."  Dkt. No. 182 at 43.  But as explained above, the FTC has already exercised its emergency rulemaking powers to, for instance, change the effective date of a rule.  *See* Dkt. No. 180.  Thus, the Court finds that front-end consistency review poses no constitutional problem, particularly because the Fifth Circuit has already identified the ability to modify rules as the key distinction.

### iii.  Heeding this Court's call, Congress amended HISA to expressly mirror the SEC-FINRA relationship.

In holding HISA unconstitutional, the Fifth Circuit looked to the SEC–FINRA model and noted that "the FTC has less supervisory power than the SEC."  *Nat'l Horsemen's*, 53 F.4th at 887.  But as amended, this is no longer the case.  Congress noted the "key distinction" identified by the Fifth Circuit—that the SEC can "abrogate, add to, and delete from" FINRA rules.  *Id.*  And by giving the FTC a similar, if not greater, rulemaking authority, Congress eliminated the only difference that "meaningfully distinguishe[d] the SEC–FINRA relationship from the FTC-Authority relationship."  *Id.*  In this way, Congress considered the reasoning of the Fifth Circuit opinion and adjusted accordingly.  Dkt. No.

182 at 110.  No longer is the FTC limited to "recommend[ing] modifications"; now the FTC, like the SEC, "has the final word on the substance of the rules." *Nat'l Horsemen's*, 53 F.4th at 887–88.  And the Authority is now on equal footing to FINRA in its role "in aid of" the federal agency that retains ultimate rulemaking authority.  *Id.*

### iv.  Combined, these changes allow HISA to survive a facial challenge.

Congress answered the call—identifying the three constitutional concerns that led the Fifth Circuit to hold HISA unconstitutional and rectifying each with the amendment to § 3053(e).  The FTC can now initiate rulemaking according to its own policy preferences.  And while it still conducts an initial consistency review of the Authority's proposed rules, the FTC can abrogate, add to, or modify those rules by following the typical agency rulemaking procedure—or step in to resolve emergency situations by exercising its good-cause emergency rulemaking authority.  And post-amendment, the FTC has at least as much supervisory control over the Authority as the SEC does FINRA.  All told, "a productive dialogue occurred in this instance," as the Fifth Circuit ably did the work to identify the constitutional flaws in HISA while Congress quickly worked to correct them. *Oklahoma*, 62 F.4th at 225.

### C.  The only court to address the issue post-amendment agrees.

Parallel challenges to HISA have been brought throughout the country.  *See, e.g.*, *Louisiana v. Horseracing Integrity & Safety Authority, Inc.*, 2020 WL 17074823 (5th Cir. Nov. 18, 2022).  One such challenge was brought in the Eastern District of Kentucky and appealed to the Sixth Circuit.  *Oklahoma*, 62 F.4th 221.  But before the court could resolve the case, Congress amended HISA.  As noted above, Chief Judge Sutton wrote for the panel and explained in detail how the congressional amendment cured the defects identified by

the Fifth Circuit.  *Id.* at 236.  Notably, the Sixth Circuit held the amended HISA

constitutional not because it disagreed with the Fifth Circuit's private-nondelegation

jurisprudence but because it agreed.  *Id.* at 230.[12]  Like the Court does today, the Sixth

Circuit analyzed the Fifth Circuit's opinion and noted the one-to-one match between the

issues identified in that opinion and the solutions passed by Congress.  *Id.* at 229–32.

### D.   Plaintiffs' remaining assertions of unconstitutionality fall short.

In addition to the arguments rejected above, the plaintiffs wage an assortment of

other post-amendment challenges.  First, in three sentences, the plaintiffs rely on the fact

that the FTC can no longer issue interim final rules.  Dkt. No. 116 at 13.  The plaintiffs

understand "[t]he FTC [to] have less power today . . . because it can no longer promulgate

an interim final rule."  *Id.*  But as the defendants point out (Dkt. No. 128-1 at 22–23), the

FTC can now issue rules without delay under the APA's good-cause standard.  *Compare* 15

U.S.C. § 3053(e) (conferring to the FTC rulemaking authority "in accordance with section

553 of Title 5"), *with* 5 U.S.C. § 553(b)(B) (allowing an agency to forego notice requirements

where "the agency for good cause finds . . . that notice and public procedure thereon are

impracticable, unnecessary, or contrary to the public interest"); *see also United States v.

Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) (stating that notice and comment "may be

bypassed if 'good cause' exists").  Thus, the plaintiffs do not need to "hop[e] no emergencies

happen in horseracing" because the FTC will be able to respond with the same emergency

toolkit afforded to all federal agencies.  Dkt. No. 116 at 13.

---

[12] In a separate concurrence, Judge Cole explained that he agreed with the amended Act's
   constitutionality but also would have held HISA constitutional before the amendment.  *Id.* at 236
   (Cole, J., concurring).

Next the plaintiffs argue that the FTC cannot police the Authority if it does not follow the rules.  Dkt. No. 116 at 13.  But as previously discussed, "[t][he FTC now may create new rules."  *Oklahoma*, 62 F.4th at 230.  The FTC's new power to surveille and supervise includes the ultimate authority to control "the Horseracing Authority's implementation of th[e] rules."  *Id.*  Section 3053(e) gives HISA "the tools to step in" (*id.* at 231) should the Authority choose to "adopt[] policies which in practice amend the Act and the rules" (Dkt. No. 116 at 13).  The plaintiffs cite a number of examples in support of their argument that the Authority has allegedly rewritten HISA and the rules, but these challenges are better asserted through as-applied challenges, which the plaintiffs have omitted from this lawsuit.  *See* Dkt. No. 149 (bringing only facial challenges).

The plaintiffs next claim that the FTC has no control over fees, spending, or the Authority's budget.  Dkt. No. 116 at 15–16.  But this is not true.  On fees—the Authority "shall" report to the FTC any "proposed increase" in fees.  15 U.S.C. § 3052(f)(1)(C)(iv)(I).  The proposed increase must then undergo a notice-and-comment period.  § 3052(f)(1)(C)(iv)(II).  And FTC rules govern how fees are determined and allocated.  §§ 3052(f)(2)(B), (3)(B)–(C), 3053(a)(11).  On budget and spending—the FTC has interpreted HISA to require the Authority to propose its annual budget for FTC approval.  Procedures for Oversight of the Horseracing Integrity and Safety Authority's Annual Budget, 88 Fed. Reg. 18034 (March 27, 2023).  Finally, the FTC retains the power to issue rules "as necessary or appropriate" to govern the Authority's assessment and allocation of fees.  15 U.S.C. § 3053(e).

Additionally, the Gulf Coast plaintiffs' reliance on *A.L.A. Schechter Poultry Corp. v. United States* is misplaced.  295 U.S. 495, 537 (1935).  They insist that this 1935 Supreme

Court case, on its own, controls the outcome of the private-nondelegation analysis. No. 5:23-CV-077, Dkt. No. 58 at 9–10. The plaintiffs believe their reliance on *Schechter Poultry* to be a case-winning argument, noting that neither the Fifth nor Sixth Circuit has addressed the case and claiming that the "[d]efendants ignore *Schechter Poultry* because they have no answer for it." *Id.* While *Schechter Poultry* does hold that certain delegations to private industry groups are unconstitutional (295 U.S. at 551), it does not control this case for one simple reason—the fact here are nowhere near as extreme as in *Schechter Poultry*. The Third Circuit recognized that *Schechter Poultry* is "aberrational" and is one of just two instances of the Supreme Court departing from its "generous recognition of congressional power to delegate rulemaking authority." *United States v. Frank*, 864 F.2d 992, 1010 (3d Cir. 1988); *see also Milk Indus. Found. v. Glickman*, 949 F. Supp. 882, 889 (D.D.C. 1996) (stating that *Schechter Poultry* must be understood in its "unique historical context" and describing the relevant statute as "the most sweeping congressional delegation of all time"). The statute in question in *Schechter Poultry*, the National Industrial Recovery Act, gave the President "blanket authority . . . to prescribe and approve mandatory 'codes of fair competition' for various industries without additional congressional approval." *South Dakota v. Dep't of Interior*, 423 F.3d 790, 795 (8th Cir. 2005). *Schechter Poultry* is inapposite because it involves the most extreme example of delegation in this nation's history, and it precedes *Carter Coal* and *Adkins*, which serve as the foundation of our modern nondelegation jurisprudence. *See Nat'l Horsemen's*, 83 F.4th at 880 (explaining that *Carter Coal* and *Adkins* are "key to applying the [nondelegation] doctrine).

Finally, at trial, the plaintiffs argued that because an agency must exercise "pervasive surveillance and control" over regulation, HISA must fail. Dkt. No. 182 at 21–22 ("[T]his

case comes down to four words: pervasive surveillance and control.").  But as explained above and by the Fifth and Sixth Circuits, binding precedent makes clear that the FTC's new power to "abrogate, add to, and modify the rules of the Authority" amounts to pervasive surveillance and control.  Perhaps the plaintiffs disagree with that precedent, but the Court is bound by its role as an inferior court to faithfully apply it.  Nevertheless, at trial, plaintiffs took the position that no version of a HISA-empowered Authority could ever pass constitutional muster because, in their view, the SEC-FINRA model is likewise unconstitutional.  Dkt. No. 182 at 31–33, 37–38.  When the Court asked what else Congress could have done to bring HISA in bounds, plaintiffs explained that only a newly created federal agency could properly do this work.  *Id.* at 37–38.  The plaintiffs believe "the entire model [allowing private entities to have any role] is flawed, because, as the Fifth Circuit said, people outside government can't wield government power."  *Id.* at 39.  But that is not what the Fifth Circuit said.  To the contrary, the panel explained that "a private entity may wield government power" as long as it "'functions subordinately' to an agency with 'authority and surveillance' over it."  *Nat'l Horsemen's*, 53 F. 4th at 871.  Thus, regardless of the equities of the plaintiffs' argument, precedent teaches that pervasive surveillance and control is satisfied by HISA as amended, and this Court is bound by precedent.

**5.    The plaintiffs' executive-delegation argument has already been resolved.**

The plaintiffs also bring a claim under Article II, claiming that the executive power has been improperly delegated.  The plaintiffs claim that the Authority is not subordinate because: (1) the FTC does not have meaningful oversight of investigations, (2) the FTC cannot review the Authority's prosecutorial discretion, (3) the FTC cannot prevent the Authority from seeking a temporary restraining order or preliminary injunction, (4) the FTC

does not have oversight of the Authority's programs, (5) the FTC does not have oversight of the Authority's leadership, and (6) the FTC lacks the power to derecognize the Authority. In response, the defendants note that several of the complained-of activities are nongovernmental—such as hiring and contracting. Dkt. No. 128-1 at 24–25. And the defendants point out that any Authority enforcement decision will be reviewed by an ALJ and the FTC, a process which "is even more substantial than the SEC's review of FINRA decisions." *Id.* at 25 (quoting *Nat'l Horsemen's Benevolent & Protective Ass'n*, 596 F. Supp. 3d at 726).

The Court declines to readdress its prior finding that the Authority's exercise of enforcement and investigatory powers does not disturb the Constitution.[13] When it first heard this case (pre-amendment and pre-remand), the Court found that the Authority's "non-legislative regulatory functions" did not violate the private-nondelegation doctrine because "[t]hese functions . . . comport with due process as articulated" by binding precedent. *Nat'l Horsemen's Benevolent & Protective Ass'n*, 596 F. Supp. 3d at 725 (citing *Boerschig v. Trans-Pecos Pipeline, L.L.C.*, 872 F.3d 701, 708 (5th Cir. 2017)). And while there has since been an opinion by the Fifth Circuit, a congressional amendment, and a remand, none of these intervening events have disturbed the Court's prior finding or analysis. Specifically, the Fifth Circuit declined to address the Court's finding that the Authority's non-legislative functions did not offend the private-nondelegation doctrine. *Nat'l*

---

[13] Like the plaintiffs' other arguments concerning "non-legislative regulatory functions," the Court finds the due-process argument was resolved by the Court's prior order (*Nat'l Horsemen's Benevolent & Protective Ass'n*, 596 F. Supp. 3d 691). The Court previously found that "the Horsemen's alternative due-process theory fails." *Id.* at 728. And again, the Fifth Circuit's opinion and the intervening congressional amendment change nothing about the Court's prior findings on the due-process argument. Thus, the Court will not revisit the issue here.

*Horsemen's*, 53 F.4th at 890 n.37 ("[W]e do not address . . . the Authority's investigative and enforcement measures—without the rulemaking authority, the investigative and enforcement powers are nugatory . . . .").  Thus, the Court's prior finding is the law of the case, which has not been disturbed by either the Fifth Circuit opinion or the congressional amendment.

**6.    The plaintiffs lack standing to bring the anti-commandeering claim.**

The Gulf Coast plaintiffs argue that "HISA unconstitutionally commandeers the states" in violation of the Tenth Amendment.  No. 5:23-CV-077, Dkt. No. 36 at 57.  The Authority defendants challenge the plaintiffs' standing to bring an anti-commandeering claim on behalf of the states and claim that any Tenth Amendment violation would not harm these private-party plaintiffs.  No. 5:23-CV-077, Dkt. No. 46 at 29–30.  The FTC defendants argue that the anti-commandeering claim fails because HISA takes a conditional-preemption approach, which has repeatedly been upheld as constitutional.  No. 5:23-CV-077, Dkt. No. 49 at 39–42.  First evaluating its jurisdiction to hear the claim, as it must, the Court finds the private-entity Gulf Coast plaintiffs do not have standing to bring a Tenth Amendment challenge to HISA.

"[T]he Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States."  *New York v. United States*, 505 U.S. 144, 166 (1992).  Thus, Congress cannot require the States to implement federal programs.  *Printz v. United States*, 521 U.S. 898, 925 (1997).  "Nor may the federal government issue 'orders directly to the States' to carry out this or that federal program."  *Oklahoma*, 62 F.4th at 234 (quoting *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018)).  But these limitations do not prevent

Congress from "encourag[ing] a State to regulate or hold[ing] out incentives in hopes of influencing a State's policy choices." *Id.* (internal marks and citation omitted).

To establish the irreducible constitutional minimum of Article III standing, a plaintiff must show "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 399 (5th Cir. 2020). True, it is no longer the case that "a private citizen, acting on his own behalf and not in an official capacity or on behalf of the state citizenry, lacks standing to raise a Tenth Amendment claim." *United States v. Torres*, 573 F. Supp. 2d 925, 950 (W.D. Tex. 2008), *abrogated by Bond*, 564 U.S. at 223 (holding that a plaintiff does not lack standing to assert a Tenth Amendment claim purely because he is not a state). But nothing in *Bond* contradicts the settled notion that "[a]n individual who challenges federal action on [Tenth Amendment] grounds is, of course, subject to the Article III requirements." *Bond*, 564 U.S. at 225.

To the contrary, *Bond* reinforces this requirement. There, the indicted defendant challenged the constitutionality of a chemical-weapons statute criminalizing her conduct on Tenth Amendment grounds. *Id.* at 214. The Court of Appeals held that the defendant could not challenge the law under the Tenth Amendment because no state was a party to the criminal proceeding. *Id.* The Supreme Court disagreed, holding private individuals can seek redress for their own injuries under the Tenth Amendment. *Id.* at 226. Notably, however, the *Bond* court emphasized throughout its opinion that the litigant still must assert a claim based on his own injury. *Id.* at 225 ("Individuals have 'no standing to complain simply that their Government is violating the law.'") (quoting *Allen v. Wright*, 468 U.S. 737,

– 49 –

755 (1984)); *id.* (stating that the litigant relying on the Tenth Amendment must still suffer

from injury in fact, traceable to the defendant's conduct, and redressable by a favorable

decision).

Here, the plaintiffs cannot show Article III standing to assert their Tenth

Amendment claim.  The plaintiffs' professed injury—"[t]hey are harmed by the

commandeering scheme because Plaintiffs prefer Texas's [ADMC] and racetrack-safety

rules"—is no injury at all.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 (1992) (providing

that a plaintiff cannot seek relief "that no more directly and tangibly benefits him than it

does the public at large).  A party cannot establish constitutional injury by suggesting that he

may be subject to rules that he does not prefer.  *Compare TransUnion LLC v. Ramirez*, 141 S.

Ct. 2190, 2204 (2021) (explaining that the concrete harm necessary to establish an injury in

fact is that with a "close relationship" to a harm traditionally recognized as providing a

basis for a lawsuit in American courts), *with Lujan*, 504 U.S. at 573 ("We have consistently

held that a plaintiff raising only a generally available grievance about government . . . does

not state an Article III case or controversy.").

Additionally, even if this were a valid injury, it is not redressable by a court order.

HISA allows states to "elect[]" to assess and collect fees on covered persons.  15 U.S.C.

§ 3052(f)(2)(A).  But if the state does not make such an election, then the Authority steps in.

15 U.S.C. § 3052(f)(3).  In this way, covered persons like the Gulf Coast plaintiffs will be

regulated and subject to assessments even if they were to succeed on the anti-

commandeering claim.  Because the plaintiffs' Tenth Amendment argument is independent

of their other claims, the Court examines it as such.  And assuming that HISA survives the

plaintiffs' other challenges, the plaintiffs will be subject to fees and assessments through

either HISA or Texas law, so any alleged Tenth Amendment injury is not redressable by this Court.  Because it cannot "provide [the] plaintiff[s] "with any effectual relief," the Court finds that the private-party plaintiffs lack standing to bring the anti-commandeering claim. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021).

The plaintiffs respond to the defendant's standing argument in a footnote.  No. 5:23-CV-077, Dkt. No. 61 at 51 n.12 (citing No. 5:23-CV-077, Dkt. No. 24 at 17).  They first argue that the defendants are changing their position because the defendants previously represented (in opposition to Texas's motion to intervene) that Texas's interests are adequately represented.  The defendants correctly point out that a party's representation has no bearing on the constitutional standing analysis.  *Id.*  But more importantly, Judge Kacsmaryk found (prior to the transfer) that the "State Intervenors cannot show their interests are inadequately represented" because Texas's claims, legal arguments, and prayers for relief have largely mirrored that of the plaintiffs.  No. 5:23-CV-077, Dkt. No. 32 at 9.  Moreover, the Court previously gave Texas a choice: intervene late in this litigation, but be limited to the current claims, or file a separate suit and raise as many arguments as you like.  Dkt. No. 84 at 3 ("[T]he Court notifies the parties that it is inclined to grant permissive intervention, subject to the following condition[:] the proposed intervenors . . . may not pursue their anti-commandeering claim.").  Texas chose the former, yet it later moved to intervene in the Gulf Coast litigation (before it was transferred here).  No. 5:23-CV-077, Dkt. No. 18.  Judge Kacsmaryk properly denied that motion.  No. 5:23-CV-077, Dkt. No. 31.  The intervenor-plaintiffs joined this lawsuit with eyes wide open, and the Court does not find that any misrepresentation occurred.

7.  **The plaintiffs' due-process challenges fail.**

The plaintiffs claim that the Authority allows economically self-interested industry participants to regulate their competitors in violation of the Due Process Clause.  Dkt. No. 176 at 16–21.  First, to the extent the plaintiffs assert a facial due process claim, the Court denies that claim for the reasons articulated in its prior order.  Prior to the remand, the plaintiffs moved for summary judgment on their claim that the Authority is a self-interested entity possessing regulatory authority over its competitors.  *Nat'l Horsemen's Benevolent & Protective Ass'n*, 596 F. Supp. 3d at 725; *see also Amtrak III*, 821 F.3d at 31.  The Court denied that claim because of HISA's statutory protections against conflicts of interest, the Authority's nonprofit, self-regulatory nature, and, in the Court's view, the Authority's subordinate role to the FTC.  Dkt. No. 38 at 7, 32.  The Fifth Circuit's opinion did not address the Court's due-process analysis.  *Nat'l Horsemen's*, 53 F.4th at 830 n.37 ("[W]e do not address the district court's conclusion rejecting the Appellants' due process claims on the ground that the Authority is not a self-interested industry participant.").  And there has been no intervening change in law.  Thus, the Court's prior finding of no facial due-process violation stands as the law of the case and, in any event, fails for the reasons stated in the Court's prior order.  *Nat'l Horsemen's Benevolent & Protective Ass'n*, 596 F. Supp. 3d at 725.

The Court also rejects the plaintiffs' as-applied due-process challenge.  Dkt. No. 176 at 17.  The plaintiffs claim that, from a boots-on-the-ground perspective, the Authority is made up of self-interested competitors.  *Id.*  At trial, the plaintiffs identified members of the Board, nominating committee, and the two policy-making committees whom they believe do not meet the requirement that certain directors or committee members be "'independent,' i.e., 'from outside the equine industry.'"  *Id.* (quoting 15 U.S.C § 3052(d)).

– 52 –

In support, the plaintiffs submitted a number of exhibits that are effectively biographical information of the board and committee members.  HPX 40–54 (HPX 53 consists of 28 biographies).

Other than five pages in the plaintiffs' trial brief, the parties did not brief the due-process claim.  *See* Dkt. No. 176 at 16–21.  The standard the plaintiffs set out, derived from *Amtrak III*, is that the Due Process Clause of the Fifth Amendment is violated when an "economically self-interested actor . . . regulate[s] its competitors."  *Id*. at 21 (quoting *Amtrak III*, 821 F.3d at 23).  But the plaintiffs fail to show either element.  At the outset, the Authority does not "regulate[] its competitor."  *See id.*  As the Court previously explained, the Authority's power to submit proposed rules is cabined by the FTC's unilateral right to "abrogate, add to, and modify" the rules of the Authority.  *Supra* Part. 4.B.i.

Nor is the first requirement—that the Authority or its directors be "economically self-interested"—met here.  "[T]he statute . . . [and] bylaws are replete with conflict-of-interest provisions."  Dkt. No. 182 at 131; *see* 15 U.S.C. § 3052(e). The plaintiffs admit that directors and committee members, and their family members, cannot have a financial interest in covered horses, but they argue that Authority officials can be self-interested if their involvement in the industry is related to racetracks or some other portion of the industry not related to covered horses.  Dkt. No. 176 at 20.  The plaintiffs apparently overlook section 3052(e)(2), which prohibits Authority officials from serving as "official[s] or officer[s]" of— or "in a governance or policymaking capacity" for—an "equine industry representative."  15 U.S.C. § 3052(e)(2).  HISA defines an equine industry representative as "an organization regularly and significantly engaged in the equine industry, including organizations that

– 53 –

represent the interests of . . . racetracks." 15 U.S.C. § 3051(8).[14]  Thus, HISA adequately

protects against self-interested directors and committee members.  And the plaintiffs do not

cite any director or committee member who is economically self-interested; they only point

out directors and committee members who they believe do not qualify as "independent

members" under the statute.  Dkt. No. 176 at 17–20.  How this alleged defect qualifies as

economic self-interest is unclear, and the plaintiffs do not explain.  But even if this were

economic self-interest, HISA gives the FTC the authority to step in and define what it

means to be an independent member.  *See supra* Part 4.B.i; 15 U.S.C. § 3053(e) (explaining

that the FTC can initiate rulemaking as necessary "to ensure the fair administration of the

Authority").

There are two final issues with the plaintiffs' argument.  First, even with the

introduction of evidence and the passage of time, this as-applied challenge is essentially no

different than the facial challenge the Court has already decided.  The directors and

nominating committee members are the same as when the plaintiffs originally brought their

claim.  Dkt. No. 182. at 130; Dkt. No. 39-1 at 13–15.  None of the biographical evidence

submitted changes the Court's conclusion—the Authority is not a self-interested industry

participant.  And second, the plaintiffs have not identified a rule, policy, or enforcement

decision that resulted in a worse outcome for one of the plaintiffs.  *See* Dkt. No. 182 at 131.

Basic notions of justiciability require that the plaintiffs do more than "complain simply that

their Government is violating the law."  *Bond*, 564 U.S. at 225.  In short, HISA affords

sufficient protection through its conflicts-of-interest provisions, and the plaintiffs have not

---

[14] The section also covers those who "represent the interests of, and whose membership consists of, owners, breeders, trainers, racetracks, veterinarians, State racing commissions, and jockeys."  *Id.*

met their burden to show unconstitutional self-dealing by directors, committee members, or others associated with the Authority.

**8.      Conclusion**

Given the Court's findings of fact and conclusions of law, the plaintiffs fail to establish that HISA, as amended following the Fifth Circuit's opinion, continues to violate the Constitution.  The Court finds that Horsemen plaintiffs have failed to prove Counts 1–3, and the intervenor plaintiffs have failed to prove Counts 1–2.  Similarly, the Gulf Coast plaintiffs fail to prove Counts 1, 2, 5, and 8.  The Gulf Coast plaintiffs voluntarily withdrew Counts 3, 4, 6, 7, and 9.  The Court denies all other requested relief.  The Court will enter a final judgment by separate order.

So ordered on May 4, 2023.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE